## In the

# United States Court of Appeals

### For the Seventh Circuit

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSE TRINIDAD GARCIA, JR., and
ALFONSO PINEDA-HERNANDEZ, a/k/a Flaco,

*Defendants-Appellants,*

_____

On appeal from the United States District Court for the
Southern District of Indiana, Case No. 1:15–cr–200
The Honorable Chief Judge Magnus-Stinson

_____

**OPENING BRIEF AND REQUIRED SHORT APPENDIX
OF APPELLANT ALFONSO PINEDA-HERNANDEZ**

_____

Kyle R. Hosmer
Andrew J. Ball
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
Telephone: 303.607.3656
Email: kyle.hosmer@faegrebd.com
        andrew.ball@faegrebd.com

Brian J. Paul
FAEGRE BAKER DANIELS LLP
300 North Meridian Street
Suite 2700
Indianapolis, Indiana 46204
Telephone: 317.237.0300
Email: brian.paul@faegrebd.com

*Counsel for Defendant-Appellant*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>18-2261</u>

Short Caption: <u>United States v. Alfonso Pineda-Hernandez</u>

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a nongovernmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement stating the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statement be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐**PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P 26.1 by completing item #3):

    <u>Alfonso Pineda-Hernandez</u>

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    <u>Faegre Baker Daniels LLP; Doneaka Rucker-Brooks, Esq.; Harold Samuel Ansell, Esq.; Edward F. Schrager, Esq; Andrew J. Borland, Esq.; Timothy J. Burns, Esq.</u>

(3) If the party or amicus is a corporation:

    i) Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii) list any publicly held company that owns 10% or more of the party's or amicus' stock:

        <u>N/A</u>

========================================================================

Attorney's Signature: s/ Kyle R. Hosmer             Date: 5/1/2019

Attorney's Printed Name: Kyle R. Hosmer

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).

**Yes ☐ No ☒**

Address: 3200 Wells Fargo Center, 1700 Lincoln Street, Denver, CO 80203

Phone Number: 303-607-3656

Fax Number: 303-607-3600

E-Mail Address: kyle.hosmer@faegrebd.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iv

INTRODUCTION.............................................................................1

JURISDICTIONAL STATEMENT..........................................................4

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ...........................4

STATEMENT OF THE CASE ..............................................................5

    I.    THE GRAND JURY INDICTS TWELVE INDIVIDUALS ............................5

    II.    THE GOVERNMENT PROSECUTES "CODE RED" .................................5

    III.    AN INACCURATE TRANSLATION OF KEY GOVERNMENT TESTIMONY VIOLATES PINEDA-HERNANDEZ'S RIGHT TO DUE PROCESS ...............7

        A.    Niko and Barragan-Lopez testify against Pineda-Hernandez....7

        B.    Ramos mistranslates Barragan-Lopez's testimony.................9

        C.    The court grapples with Ramos's significant mistranslation... 12

            1.    *The Government presents the court a false dichotomy*.. 12

            2.    *Pineda-Hernandez does not waive any rights*.............13

            3.    *The jury hears a prejudicial second day of testimony from a key Government witness*.......................................14

    IV.    THE DISTRICT COURT SENTENCES PINEDA-HERNANDEZ AS A LEADER AND ORGANIZER OF A CRIMINAL ENTERPRISE ................................17

        A.    The Probation Office applies a leadership enhancement, which considerably lengthens the Guidelines range........................17

        B.    The district court sentences Pineda-Hernandez as a leader.....19

        C.    Pineda-Hernandez files this appeal.....................................20

SUMMARY OF ARGUMENT .............................................................21

STANDARDS OF REVIEW.................................................................23

ARGUMENT ...............................................................................23

    I.    FAULTY TRANSLATION OF BARRAGAN-LOPEZ'S TESTIMONY VIOLATED PINEDA-HERNANDEZ'S DUE PROCESS RIGHTS.................................23

        A.    Grave doubts about whether the translation of Barragan-Lopez's testimony was accurate plagued trial ...................................23

B.     This case is distinct from others the Court has considered .....25

C.     Grave mistranslation of witness testimony goes to the foundation of the district court's fact-finding mission, warranting a new trial .......................................................................................27

D.     The Government cannot show that the mistranslation of key witness testimony was harmless beyond a reasonable doubt ..29

E.     The district court exacerbated the violation of Pineda-Hernandez's due process rights by not taking advantage of federal resources..............................................................31

F.     The district court abused its discretion by recalling Barragan-Lopez for a second day of testimony ..................................33

G.     Pineda-Hernandez did not waive any right to challenge Barragan-Lopez's testimony..............................................35

II.    THE DISTRICT COURT CLEARLY ERRED BY APPLYING A LEADERSHIP ENHANCEMENT AT SENTENCING ...................................................38

A.     Pineda-Hernandez's alleged involvement in the Code Red conspiracy does not support a leadership enhancement .........38

B.     The leadership enhancement prejudiced Pineda-Hernandez...42

CONCLUSION ..............................................................................................44

ORAL ARGUMENT STATEMENT .......................................................................45

CERTIFICATE OF COMPLIANCE ......................................................................46

CERTIFICATE OF SERVICE...............................................................................47

SHORT APPENDIX ......................................................................................48

# TABLE OF AUTHORITIES

**PAGE(S)**

**FEDERAL CASES**

*Brady v. United States*,
  397 U.S. 742 (1970) ........................................................... 35, 37

*Freeman v. Pierce*,
  878 F.3d 580 (7th Cir. 2017) ............................................... 35

*Gall v. United States*,
  552 U.S. 38 (2007) ............................................................... 43

*Johnson v. Zerbst*,
  304 U.S. 458 (1938) ........................................................... 31, 38

*Malinski v. New York*,
  324 U.S. 401 (1945) ............................................................. 1

*Mendoza v. United States*,
  755 F.3d 821 (7th Cir. 2014) .......................................... 24, 29–31

*Molina-Martinez v. United States*,
  578 U.S. __, 136 S. Ct. 1338 (2016) ................................. 42, 43

*Neder v. United States*,
  527 U.S. 1 (1999) ............................................................... 27, 28

*Peugh v. United States*,
  569 U.S. 530 (2013) ............................................................. 43

*Schneckloth v. Bustamonte*,
  412 U.S. 218 (1973) ............................................................. 36

*Shaughnessy v. United States ex rel. Mezei*,
  345 U.S. 206 (1953) ............................................................. 1

*United States ex rel. Negron v. New York*,
  434 F.2d 386 (2nd Cir. 1970) ......................................... 24, 29, 31

*United States v. Anderson*,
  580 F.3d 639 (7th Cir. 2009) ............................................... 23

*United States v. Brown,*
944 F.2d 1377 (7th Cir. 1991) .................................................. 39

*United States v. Cirrincione,*
780 F.2d 620 (7th Cir. 1985) ........................................... *passim*

*United States v. Colon,*
919 F.3d 510 (7th Cir. 2019) ........................................... *passim*

*United States v. Gonzalez,*
319 F.3d 291 (7th Cir. 2003) ........................................... *passim*

*United States v. Kielar,*
791 F.3d 733 (7th Cir. 2015) .................................................. 23

*United States v. Leiva,*
821 F.3d 808 (7th Cir. 2016) .................................... 23, 25, 26

*United States v. McMillian,*
786 F.3d 630 (7th Cir. 2015) .................................................. 23

*United States v. Mustread,*
42 F.3d 1097 (7th Cir. 1994) .................................... 39, 41, 42

*United States v. Sandoval,*
347 F.3d 627 (7th Cir. 2003) ............................................ 24, 28

*Weaver v. Massachusetts,*
582 U.S. __, 137 S. Ct. 1899 (2017) ............................... 27–29

## FEDERAL STATUTES

18 U.S.C. § 1956 ....................................................... 4, 5, 18

18 U.S.C. § 3231 ................................................................... 4

21 U.S.C. § 841 ..................................................................... 4

21 U.S.C. § 841 ..................................................................... 5

28 U.S.C. § 1291 ................................................................... 4

28 U.S.C. § 1827 ............................................................ 31, 32

**RULES**

Federal Rule of Appellate Procedure 34(a)......................................................45

Local Rule 34(a)............................................................................................45

**OTHER AUTHORITIES**

U.S. Sentencing Comm'n, *Guidelines Manual* (Nov. 2016).........18–20, 38, 43–44

The "history of American freedom is, in no small measure, the history of procedure." *Malinski v. New York*, 324 U.S. 401, 414 (1945) (Frankfurter, J., concurring). The "safeguards of 'due process of law' and 'the equal protection of the laws' summarize the history of freedom of English-speaking peoples dating back to Magna Carta and reflected in the constitutional development of our people." *Id.* Thus, "[p]rocedural fairness and regularity are of the indispensable essence of liberty." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 224 (1953) (Jackson, J., dissenting).

This is a case about procedure. Procedure that the Constitution guarantees, but which was deprived from Alfonso Pineda-Hernandez. At the height of a five-day jury trial, the Government called a key witness: Miguel Barragan-Lopez. Barragan-Lopez's testimony was vital to the prosecution. It was supposed to show that Pineda-Hernandez distributed signature product: red methamphetamine. And it was supposed to provide a first-hand look into the criminal enterprise Pineda-Hernandez allegedly orchestrated. In short, it was a critical thread that was meant to tie together the Government's theory of the "Code Red" conspiracy.

Barragan-Lopez and Pineda-Hernandez speak little English. For that reason, the district court appointed two federally certified translators to service trial for Pineda-Hernandez. And the Government hired a non-federally certified translator

to service Barragan-Lopez's testimony. The translation of Barragan-Lopez's testimony, however, was gravely inaccurate. In fact, it was so troublesome that the two court-appointed, federally certified translators felt duty bound by their ethical code to report the issue to the district court.

Once on notice, the district court presented Pineda-Hernandez with a Morton's fork: live with the gravely inaccurate translation or incur the considerable prejudice of recalling Barragan-Lopez for a second day of testimony. The choice turned out to be illusory. The district court both recalled Barragan-Lopez for a second day of testimony and also failed to strike or otherwise instruct the jury to ignore his first day of testimony. Worse still, having taken a practice run, Barragan-Lopez's second testimony differed from the first in significant ways.

Most notably, Barragan-Lopez's second day of testimony closely tracked the Government's theory and theme of the case. Namely: that Pineda-Hernandez ran a drug-distribution ring that blanketed Indianapolis with a distinct brand of red methamphetamine; that Pineda-Hernandez was the key source of the red meth; and that, because Pineda-Hernandez ran the Code Red conspiracy, he exerted dominion and control (including through threats of violence) over his subordinates.

It wasn't only the jury (which convicted Pineda-Hernandez) that was influenced by Barragan-Lopez's testimony. The district court was influenced by it, too. That is, the district court applied a leadership enhancement when sentencing

Pineda-Hernandez to twenty-five years' imprisonment. That sentence is more than double what most other defendants received. Indeed, the individual the district court identified as the Code Red ringleader received only nine years' imprisonment.

This case is exceptional. The testimony of a key Government witness, Barragan-Lopez, was gravely inaccurate. It thus threw the integrity of the trial into doubt. In that sense, the inaccurate translation of Barragan-Lopez's testimony violated Pineda-Hernandez's due process rights. The district court's recall of Barragan-Lopez for a second day of testimony could not cure this violation: it was structural error for which Pineda-Hernandez is entitled to a new trial.

Further, even assuming a lower standard applies, the Government can't show that the mistranslation was harmless beyond a reasonable doubt. Barragan-Lopez supplied facts fundamental to the prosecution of Pineda-Hernandez. His mistranslated testimony tainted trial. And his recalled testimony was a prejudicial mulligan. Worse still, the district court necessarily considered that testimony to wrongly sentence Pineda-Hernandez as a leader of the Code Red drug-distribution ring.

For these reasons, described more fully below, the Court should vacate the district court's judgment and remand for a new trial. In the alternative, the Court should vacate the sentence the district court imposed and remand for resentencing without the improper leadership enhancement.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. § 3231. On May 25, 2018, it entered a judgment finding Pineda-Hernandez guilty of conspiracy to distribute 500 grams or more of methamphetamine mixture, 21 U.S.C. §§ 841(a)(1), 846, and conspiracy to launder monetary instruments, 18 U.S.C. § 1956(a)(1)(B)(i), (h). No. 1:15–cr–200, Dkt. No. 601 (S.D. Ind. May 25, 2018) (the "District Court"). Pineda-Hernandez timely filed a notice of appeal on June 5, 2018. *Id.*, Dkt. No. 605. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether the inaccurate translation of a key Government witness, about which two court-appointed translators expressed grave doubts, violated Pineda-Hernandez's due process rights.

2.      Whether the district court abused its discretion by recalling a key Government witness for a second day of testimony, especially where it did not strike that witness's first, gravely mistranslated day of testimony.

3.      Whether the district court abused its discretion by failing to employ resources and procedures available to it under the Court Interpreters Act, 28 U.S.C. § 1827.

4.      Whether the district court clearly erred by applying a leadership enhancement when sentencing Pineda-Hernandez.

## I. THE GRAND JURY INDICTS TWELVE INDIVIDUALS.

On November 10, 2015, the grand jury for the Southern District of Indiana returned an indictment against twelve individuals for an alleged drug distribution conspiracy. Trial Court, Dkt. No. 1. The grand jury named Pineda-Hernandez among the defendants. *Id.* The indictment charged these individuals with one count of conspiracy to distribute controlled substances, one count of conspiracy to launder monetary instruments, and one count of distribution of methamphetamine. *Id.* at 1, 8, 10. *See* 18 U.S.C. § 1956(a)(1)(B)(i), (h); 21 U.S.C. §§ 841(a)(1), 846. Indictment, 1, 8. The indictment also included a forfeiture count. Trial Court, Dkt. No. 1 at 11.

## II. THE GOVERNMENT PROSECUTES "CODE RED"

The Government had developed its theory and theme of the case early. Its investigation into the twelve defendants charged in the indictment began after police conducted a traffic stop on Jose Araujo-Orduno in May 2015. A3. Police searched Araujo-Orduno's car, discovering more than eighty grams of methamphetamine. *Id.* The meth was distinctive: it had been dyed red. *Id.* The hue was so unique—an officer testified that he hadn't come across anything similar in more than 100 cases— that it even inspired the Government to dub its investigation "Code Red". A2–3.

Code Red proceeded in unexceptional fashion. A confidential informant identified Nicolas Cazares-Garcia ("Niko") as the source of the red meth. A8. Officers coordinated multiple controlled buys from Niko in July and August 2015. A18–24. Through those purchases, the police successfully obtained large amounts of red methamphetamine directly from Niko. *See id.* Then, on September 9, 2015, Niko and Jose Trinidad Garcia, Jr. sold heroin to a controlled informant. A29–30.

While pursuing these leads against Niko, the Government also used Araujo-Orduno as a confidential source. *See* A2. Araujo-Orduno was an alleged dealer of the red meth. A4. He claimed to owe his source $10,000. *Id.* And he claimed that source was Pineda-Hernandez. *Id.* To that end, the Government orchestrated three controlled payments by Araujo-Orduno to Pineda-Hernandez. A5. First, on May 28, 2015, Araujo-Orduno took funds to a local restaurant. A6. But he didn't pay the funds to Pineda-Hernandez; he gave them to Aurelio Estrada-Alvarado instead. A5. Araujo-Orduno again took funds to a local restaurant on June 3, 2015. A9. But, again, Araujo-Orduno paid the funds to Estrada-Alvarado rather than Pineda-Hernandez. *Id.*

The third controlled payment happened June 16, 2015. A10. Araujo-Orduno met Pineda-Hernandez in a store parking lot. A13. Araujo-Orduno invited Pineda-Hernandez into his car and paid off a portion of his outstanding debt. A14. Araujo-Orduno and Pineda-Hernandez then discussed obtaining and pricing

additional meth for Araujo-Orduno to sell.  A16.  Yet despite that discussion, the Government didn't recover any methamphetamine—and certainly not any red meth—after the June 16 controlled payment.  *See id.*

So, while Araujo-Orduno identified Pineda-Hernandez, the facts demonstrate that Niko was the primary source of the red meth.  In addition, Code Red uncovered that Niko continued his drug sales even while Pineda-Hernandez was on vacation in Florida.  A23–24.  Then, at one point, Niko directly received a large shipment of meth without any apparent help from or involvement by Pineda-Hernandez.  A25. And on September 9, 2015 Niko and Jose Trinidad Garcia, Jr. sold heroin to a controlled informant.  A29–30.  Pineda-Hernandez wasn't present.  *See id.*

Finally, the Government observed an altercation between Niko and Miguel Barragan-Lopez, an alleged dealer involved in Niko's conspiracy.  A26–28.  In late summer 2015 Niko went to Barragan-Lopez's house to collect a drug debt.  *Id.* Fernando Paniagua and Pineda-Hernandez were with Niko.  *Id.*  Once at his house Niko and Paniagua got out of the car to confront Barragan-Lopez.  *Id.*  Pineda-Hernandez did not.  A27–28.

## III. AN INACCURATE TRANSLATION OF KEY GOVERNMENT TESTIMONY VIOLATES PINEDA-HERNANDEZ'S DUE PROCESS RIGHTS

### A. Niko and Barragan-Lopez testify against Pineda-Hernandez.

At the close of its Code Red investigation, the Government persuaded eleven of the indicted defendants to plead guilty.  Niko was among them.  He received a

sentence of nine years' imprisonment. PSR, at 2. Barragan-Lopez was among the settling defendants, too. He received a sentence of ten years' imprisonment. *Id.* Jose Trinidad Garcia, Jr. pled out and received a sentence of twenty years' imprisonment; Estrada-Alvarado pled out and received eight years' imprisonment. *Id.* Araujo-Orduno received a sentence of a little less than eleven years after pleading guilty. *Id.* The other six defendants who pled guilty received sentences ranging from ten years' imprisonment to two years' probation. *Id.*

Pineda-Hernandez, of course, did not plead guilty. His trial began October 30, 2017. A1. Consistent with their plea agreements, the Government called two critical witnesses to testify against Pineda-Hernandez: Niko and Barragan-Lopez. A32, A55. Niko and Barragan-Lopez were both heavily involved in the alleged Code Red drug-distribution ring. Both, however, speak little English and relied on live, in-court translation to testify. *See, e.g.*, A30–32.

The Government hired an interpreter—Sam Ramos, who was not federally certified—to provide translation services for Niko and Barragan-Lopez. SA6, 13. Here's how it worked. At trial, Ramos was required to listen to a counsel's question, translate that question into Spanish for the Spanish-speaking witness, listen to the witness's Spanish response, then translate that response back into English for the benefit of the jury, the court, Pineda-Hernandez, and the record. *See* A32–33. The district court did not elect to make a contemporaneous audio recording of trial. As

a result, no record of Ramos's English-to-Spanish translation of counsels' questions exists. Nor does a record of the witness's original Spanish responses exist.

Because of the additional Spanish-speaking participants in the case—Pineda-Hernandez, most notably—the district court enlisted two interpreters to service the five-day trial. *See* SA21. In contrast to Ramos—whom the Government selected—these additional interpreters were court-appointed and were federally certified (the "court-appointed interpreters"). SA22, 29.

The court-appointed interpreters served several roles, including facilitating Pineda-Hernandez's participation in trial. The court-appointed interpreters translated the proceedings from English to Spanish for Pineda-Hernandez and helped Pineda-Hernandez communicate with his English-speaking trial counsel. All told, while Niko and Barragan-Lopez were on the stand, three translators were in court.

## B. Ramos mistranslates Barragan-Lopez's testimony.

Barragan-Lopez was a key Government witness. Barragan-Lopez's testimony not only provided a supposed first-hand look at the structure of the criminal enterprise, *e.g.*, A34–37, but also identified Pineda-Hernandez as a central figure. A34. Barragan-Lopez also described tension between individuals allegedly involved in the meth distribution ring, including a description of an alleged confrontation between himself, Niko, and Paniagua (which Pineda-Hernandez observed from the backseat of Paniagua's car). A48–50.

Barragan-Lopez took the stand on the third morning of trial, at the height of the proceeding. A32. From the beginning, the court had issues with its chosen system of translation. A31. Those issues continued throughout Barragan-Lopez's testimony. *See, e.g.*, A39. In one instance defense counsel raised specific concerns that Ramos was not effectively translating Barragan-Lopez's testimony. A39–40. ("Well, Sam is not translating the questions."). Yet, despite those red flags, Barragan-Lopez's testimony went forward. A41.

After several hours of testimony, the district court dismissed Barragan-Lopez and returned him to custody. SA9. It then recessed trial for a lunch break. *Id.* During that recess the two court-appointed interpreters expressed to counsel grave doubts about the accuracy of the translation of Barragan-Lopez's testimony. SA10. The court-appointed interpreters then raised their concerns with the court. *E.g.*, SA12. The court-appointed interpreters explained that Ramos was translating in "chunk[s]" rather than translating an entire statement or sentence all at once. SA16. This translation method often fails to accurately capture the source-language meaning, the court-appointed interpreters explained. *Id.*

The court-appointed interpreters then pointed to multiple, specific instances of Ramos's mistranslations—including those that were critical errors. SA18. As but one example, the court-appointed interpreter described how Ramos's mistranslation distorted important context in Government questioning:

> Interpreter: I have two examples of two mistranslations.
>
> The Court: Okay.
>
> Interpreter: It was something about a question, and I think this part of the question was being asked by the U.S. Government. Something, whatever drugs that you received from [Pineda-Hernandez] *through* [Niko], kind of showing through whom. It was interpreted into Spanish to the witness that you received from [Pineda-Hernandez] *or* [Niko]. *It is just one example of numerous things that happened like that.*

SA18. (emphasis added).

Beyond specific examples of mistranslation, the court-appointed interpreters stated that Ramos's translation of Barragan-Lopez's testimony was riddled with errors. SA12. As the testimony proceeded, the many errors and omissions "started to accumulate." *Id.* According to the court-appointed interpreters, Ramos consistently omitted "two to three words" from the end of many questions. SA21.

Ramos's mistranslation of Barragan-Lopez's testimony got so bad that the court-appointed interpreters felt duty-bound by their ethical code to bring the issue to the court. SA28. That's not all: the translation errors stunned even the prosecuting attorneys. One stated that he hadn't seen a situation so bizarre in his more-than-thirty-year career. SA28, SA34. The district court, for its part, recognized that the court-appointed interpreters' observations had serious due process implications for Pineda-Hernandez. *See, e.g.*, SA12, 21.

So, in a supposed effort to "honor" Pineda-Hernandez's due process rights, the district court suggested that it would recall Barragan-Lopez to have him testify a second time with a new interpreter. SA22. And yet, despite the serious concerns raised by the two court-appointed interpreters, the court didn't strike Barragan-Lopez's contaminated testimony. *Id*.

## C. The court grapples with Ramos's significant mistranslation.

### 1. *The Government presents the court a false dichotomy.*

The district court began the next day of trial—day four of five—with a discussion of the translation errors. *See* SA34. The Government offered that the court had only two options to resolve the issue. SA39. Either it could recall Barragan-Lopez—risking duplicative and cumulative testimony from a key Government witness. *Id*. Or Pineda-Hernandez could "waive" his right to complain on appeal and stand on Barragan-Lopez's original testimony—even though the two court-appointed interpreters raised grave doubts about its accuracy. *Id*.

Pineda-Hernandez thus faced a Morton's fork. Both options presented by the Government required him to bear the risk of harm caused by significant mistranslations by a *Government-selected translator for a key Government witness. See id.*; SA6. The district court didn't have to accept this false dichotomy. It could have declared a mistrial. Or it could have reviewed the testimony outside the jury's presence. SA21. Instead, it proceeded with the Government's suggestion.

### 2. *Pineda-Hernandez does not waive any rights.*

Having decided to recall Barragan-Lopez for a second day of testimony, the district court engaged with defense counsel to discuss the impact on Pineda-Hernandez's core due process rights. SA41–45. The court asked whether Pineda-Hernandez understood that, by permitting Barragan-Lopez to testify twice, he could not argue on appeal that doing so was reversible error. SA42. On multiple occasions, however, Pineda-Hernandez expressed an unwillingness to waive his right to complain on appeal. *See, e.g.*, SA41.

For instance, defense counsel stated: "I believe [Pineda-Hernandez] fully understood it when I spoke to him, and as Your Honor is well aware, he has been pretty firm in not agreeing to [waive] anything." *Id.* The court acknowledged that point: "[u]nderstood, not waiving any rights." *Id.* Despite that statement, the district court then went into a lengthy discussion of the process and implication of a waiver of Pineda-Hernandez's right to complain on appeal about Barragan-Lopez's duplicative testimony. SA41–45.

But Pineda-Hernandez's response to that discussion illustrated confusion. SA44. Pineda-Hernandez stated (with a real-time translation error from the court-appointed interpreter) that he "would like to hear the testimony of . . . this witness" and that he "*would not like to waive any right to any appeal.*" *Id.* (emphasis added). The court, perhaps noticing the inconsistency in Pineda-Hernandez's

response, sought to clarify that if Barragan-Lopez testified a second time, Pineda-Hernandez was "waiving a right to complain on appeal that he testified two times." *Id.*

Pineda-Hernandez responded, again through an interpreter:

> Your Honor, let me say it again. What I am saying, it was not my problem. It was not an issue for my attorney. I think this was an issue that came up that no one was planning for it to happen, and let me say this again, *I do not want to waive my right.*

*Id.* (emphasis added). Throughout its discussion with him, the court never requested that Pineda-Hernandez waive any right to complain about the use of an inaccurate method of witness translation. *See* SA41–45.

### 3. *The jury hears a prejudicial second day of testimony from a key Government witness.*

After Pineda-Hernandez confirmed that he wasn't waiving any appeal rights, the court brought in the jury. SA48–49. Before Barragan-Lopez took the stand, the court explained that "an issue was raised as to the accuracy of the translation" of his initial testimony. SA49. The court further explained that the parties had "agreed" to have Barragan-Lopez testify a second time, with the aid of a different interpreter. *Id.* The court then called Barragan-Lopez to the stand for the second time in twenty-four hours. *Id.*

During his second bite at the testimony apple, the Government asked Barragan-Lopez similar—though not identical—questions. *See, e.g.*, A51.

However, Barragan-Lopez's testimony was different than it was during his practice run. *See* A52; A54. For example, during his first day of testimony Barragan-Lopez testified as follows:

> Prosecutor: In this business arrangement regarding the distribution of methamphetamine, what did [Pineda-Hernandez] do?
>
> Barragan-Lopez: He received it.
>
> Prosecutor: Okay. Received it from where.
>
> Barragan-Lopez: From Mexico.

*See* A12. On day two, however, Barragan-Lopez was much more strident in describing Pineda-Hernandez's role in the alleged Code Red conspiracy:

> Prosecutor: Directing your attention to around May of 2015, did you enter into an arrangement with [Pineda-Hernandez], [Niko], and [Junior] involving the distribution of methamphetamine?
>
> Barragan-Lopez: Yes.
>
> Prosecutor: And in that arrangement, what did [Pineda-Hernandez] do?
>
> Barragan-Lopez: *He was in charge.*

A52 (emphases added).

As another example, on his first day of testimony the prosecutor asked Barragan-Lopez about the methamphetamine allegedly distributed at Pineda-Hernandez's direction.

| | |
|---|---|
| Prosecutor: | As you sit here today, do you recall the color of the methamphetamine that you received from [Pineda-Hernandez]? |
| Barragan-Lopez: | Yes. |
| Prosecutor: | What color was it? |
| Barragan-Lopez: | *Pinky transparent*. |
| . . . | |
| Prosecutor: | Now, you have indicated that some of the methamphetamine you received was, I believe, *pinkish or red*; is that what you testified to? |
| Barragan-Lopez: | Yes. |

A42 (emphases added). On day two, the Government again asked Barragan-Lopez about the color of the meth he allegedly distributed at Pineda-Hernandez's direction. This time, though, Barragan-Lopez's answer tracked the Government's theory and theme of the Code Red prosecution:

| | |
|---|---|
| Prosecutor: | Okay. Now, as you sit here today, do you recall the color of the methamphetamine that you received to distribute to your customers? |
| Barragan-Lopez: | Yes. |
| Prosecutor: | What color was it? |
| Barragan-Lopez: | It was pinkish, between pinkish and red—and red, and the other one was translucent. |

A54.

16

Barragan-Lopez's make-up testimony concluded on day four of a five-day trial. At the end of day four, the district court indicated that it might not tender any jury instruction regarding Barragan-Lopez's second testimony. SA50–51. The parties agreed. *Id.* But the court had changed its mind by day five. SA53. After some discussion with the Government, the court concluded that it would instruct the jury not to give any extra weight to Barragan-Lopez's testimony simply because he was permitted to testify twice. *Id.* Specifically, the court instructed:

> Barragan-Lopez testified twice because an issue was raised as to the accuracy of the translation of his first testimony. You should not give any extra weight to Barragan-Lopez because he testified twice. Barragan-Lopez's testimony should be evaluated in accordance with these instructions.

SA54. The court did not strike Barragan-Lopez's first day of testimony. After deliberation, the jury convicted Pineda-Hernandez as charged and he was remanded to the custody of the U.S. Marshal Service to await sentencing. A77.

## IV. THE DISTRICT COURT SENTENCES PINEDA-HERNANDEZ AS A LEADER AND ORGANIZER OF THE CRIMINAL ENTERPRISE

### A. The Probation Office applies a leadership enhancement, which considerably lengthens the Guidelines range.

The U.S. Probation Office filed its Presentence Investigative Report on April 27, 2018. PSR, at 1. Under §§ 2D1.1(c)(3) and 3D1.2(c) of the 2016 Sentencing Guidelines, the Probation Office assessed Pineda-Hernandez a base offense level of 34 on Count I (conspiracy to distribute 500 grams or more of methamphetamine

mixture). PSR, at 6. It then added two levels under § 2D1.1(b)(5) because the offense involved the importation of methamphetamine from Mexico, and added another two levels under § 2D1.1(b)(12) because Pineda-Hernandez allegedly maintained a premises for the purpose of manufacturing or distributing a controlled substance. *Id.* On Count II, the Probation Office assessed Pineda-Hernandez a base offense level of 38 under § 2S1.1(a)(1) of the 2016 Sentencing Guidelines. PSR, at 7. It then added two levels because Pineda-Hernandez was convicted under 18 U.S.C. § 1956. *Id.*; U.S. Sentencing Comm'n, *Guidelines Manual* § 2S1.1(b)(2)(B) (Nov. 2016).

The Probation Office added a leadership enhancement to its calculations of Pineda-Hernandez's offense level for Count I and Count II. On Count I, it added four levels under § 3B1.1(a) because Pineda-Hernandez was an alleged organizer or leader of a criminal activity that involved five or more participants. PSR, at 6. And on Count II, it added two levels under § 3B1.1(c) because Pineda-Hernandez was an organizer, leader, manager, or supervisor in a criminal activity. *Id.* at 7. The Probation Office arrived at an offense level of 42 for each count, and thus a total offense level of 42. *Id.* After concluding that Pineda-Hernandez had a criminal history score of one, the Probation Office determined his criminal history category to be category I. *Id.* at 9.

The leadership enhancements dramatically increased Pineda-Hernandez's Guidelines range. Without it, given his criminal history category, the Guidelines range on Count I would have been 235–293 months' imprisonment. *Guidelines Manual*, Ch. 5, Pt. A. And the Guidelines range on Count II would have been 292–365 months' imprisonment. *Id.* With the enhancements, the Guidelines range for Counts I and II shot up to 360 months to life imprisonment. *Id.*; *see* PSR, at 14.

## B. The district court sentences Pineda-Hernandez as a leader.

The district court sentenced Pineda-Hernandez on May 23, 2018. A78. At the hearing, the court considered the PSR, Pineda-Hernandez's objections to it, and the parties' sentencing memoranda. A85–97. The court accepted the findings of fact in the PSR and weighed Pineda-Hernandez's conduct against each enhancement. A82, A83–85. Defense counsel objected to the leadership enhancement, arguing that Pineda-Hernandez did not hear the Code Red conspiracy. A84. After hearing from the Government, the court found that the four-point leadership enhancement to Count I was warranted. *Id.*

However, the court *did* note some skepticism. SA57–58. While it concluded that Pineda-Hernandez "was a leader," it noted that he was "not the only leader." *Id.* The court stated that "[Niko] certainly held a leadership role, and in some ways the evidence might have supported, *had a larger role or at least imported more and different types of drugs into our community*." *Id.* The Court also remarked that Niko

was "a larger drug dealer . . . or involved in more and different types of drugs" than Pineda-Hernandez. *Id.*

Yet the court accepted the Probation Office's recommendations. It sentenced Pineda-Hernandez to 300 months' imprisonment on Count I and 240 months' imprisonment on Count II. SA58. As described above, Pineda-Hernandez's twenty-five-year sentence is more than double the nine-year sentence that Niko—a bigger fish, in the court's eyes—received. It is also considerably longer than the sentences given to most of Pineda-Hernandez's alleged coconspirators. PSR, at 2.

### C.    Pineda-Hernandez files this appeal.

The district court entered judgment against Pineda-Hernandez on May 25, 2018. Trial Court, Dkt. No. 601. Pineda-Hernandez timely noticed this appeal on June 5, 2018. Trial Court, Dkt. No. 605. On August 13, 2018, this Court *sua sponte* suspended the briefing schedule in this appeal pending resolution of defense counsel's motion to withdraw. Dkt. Nos. 10, 11. The Court granted defense counsel's motion and appointed the undersigned counsel to represent Pineda-Hernandez on January 10, 2019. Dkt. No. 15.

I.     This Court's binding precedent holds that a defendant in a criminal proceeding is denied due process when the accuracy and scope of a translation at a hearing or trial is subject to grave doubt. Here, two court-appointed, federally certified translators expressed grave doubts about whether the translation of key Government testimony was accurate.

The errors in the mistranslation of Barragon-Lopez's testimony were pervasive, affecting nearly every question asked and answer given. As a result, the fundamental fairness of Pineda-Hernandez's trial framework is in doubt. The Court should vacate the judgment against him and remand for a new trial.

II.     The Court Interpreters Act enables the district court to take advantage of federal resources and processes when trial participants do not speak English (or do not speak it well). The Government's prosecution of the Code Red conspiracy involved hours of Spanish-speaking testimony and considerable Spanish-language evidence.

More to the point, Pineda-Hernandez and two key Government witnesses speak very little English. Yet the Court did not make contemporaneous audio recordings of trial. And it authorized the Government to hire a non-federally certified translator for a key witness. The district court thus abused its discretion, exacerbating the violations of Pineda-Hernandez's due process rights.

III.     The district court abused its discretion by recalling Barragan-Lopez for a second day of testimony (within the span of twenty-four hours). Barragan-Lopez was a key Government witness.  His testimony supplied facts fundamental to the prosecution of Pineda-Hernandez.  And his testimony tied together the Government's theory and theme of the case.

What's more, giving him a training run on the third day of trial allowed him to change his testimony on the fourth.  Worse still, the district court necessarily considered that testimony when sentencing Pineda-Hernandez.  The decision to recall Barragan-Lopez after the grave mistranslation of his initial testimony came to light thus prejudiced Pineda-Hernandez.

IV.     The district court clearly erred by applying a leadership enhancement at sentencing, which considerably lengthened Pineda-Hernandez's Guidelines range. This Court's precedent holds that acting as a middleman in a drug conspiracy does not support a leadership enhancement at sentencing.

Pineda-Hernandez's alleged role in the Code Red conspiracy did not rise above middleman status.  Yet the district court sentenced him as a leader.  That was clear error.  And because it caused the district court to sentence Pineda-Hernandez under an incorrect Guidelines range, it was also prejudicial.

The Court reviews legal issues de novo and evidentiary decisions for an abuse of discretion. *See, e.g.*, *United States v. McMillian*, 786 F.3d 630, 635 (7th Cir. 2015) and *United States v. Kielar*, 791 F.3d 733, 744 (7th Cir. 2015). The Court reviews sentencing enhancements applied below for clear error. *United States v. Anderson*, 580 F.3d 639, 649 (7th Cir. 2009).

## ARGUMENT

**I. FAULTY TRANSLATION OF BARRAGAN-LOPEZ'S TESTIMONY VIOLATED PINEDA-HERNANDEZ'S DUE PROCESS RIGHTS**

### A. Grave doubts about whether the translation of Barragan-Lopez's testimony was accurate plagued trial.

More than thirty years ago this Court held that "a defendant in a criminal proceeding is denied due process when . . . the accuracy and scope of a translation at a hearing or trial is subject to grave doubt[.]" *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985). This Court appears to have defined "grave doubt" only by defining what it is not. Mere "hiccups" during a translation do not give rise to grave doubt. *United States v. Leiva*, 821 F.3d 808, 820 (7th Cir. 2016). Nor do minor difficulties with live, foreign-language translation. *Id.* And a translation need not be verbatim to be constitutionally sound so long as it "reasonably conveys the intent or the idea of the thought spoken." *United States v. Gonzalez*, 319 F.3d 291, 296 (7th Cir. 2003) (internal quotation omitted).

This case is exceptional. It presents the Court with clear, credible allegations that in-court testimony was gravely inaccurate.[1] Here, the two federally certified translators that the district court appointed to service Pineda-Hernandez felt that the mistranslations of Barragan-Lopez's testimony were "so great that they didn't want to continue" proceedings without bringing the issue to the court's attention. SA11. In other words, the interpreters "noticed great differences in meaning" so "felt the need to interfere" with trial. *Id.* "[T]here were a lot of omissions . . . towards the end of every, of every question, of every answer back into English or questions into Spanish." SA16. In fact, the court-appointed translators felt duty bound by "the first canon of [their] code of ethics"—accuracy—to report the errors by the Government's hired interpreter. SA11.

A trial that is corrupted with an inaccurate witness translation lacks the basic, fundamental fairness due process requirements. *United States ex rel. Negron v. New York*, 434 F.2d 386, 389 (2nd Cir. 1970). That is especially so here, where the inaccurate testimony was by a key Government witness and concerned fundamental facts underpinning the Government's case against Pineda-Hernandez. For example, the court-appointed translators identified a line of questioning by the Government

---

[1]    The Court's prior decisions typically disposed of translation issues by finding that the inaccuracy arguments were not credible. *See, e.g.*, *Mendoza v. United States*, 755 F.3d 821, 827–29 (7th Cir. 2014) (discussing credibility determinations); *United States v. Sandoval*, 347 F.3d 627, 632 (7th Cir. 2003) ("[T]here is no evidence to suggest that the interpreter used was incompetent.").

about how the Code Red conspiracy *procured drugs for sale*—the very thrust of the case—as one example of a gravely inaccurate translation. SA18. Further, Barragan-Lopez's testimony about the color of the methamphetamine he received from Pineda-Hernandez changed when his interpreters did. *Compare* A42 *with* SA11. This was no small detail. The color of the methamphetamine was a critical thread that tied together the Government's case. *See* A66–67, 69, 70, 72, 76 (citing in closing argument the presence of red methamphetamine as a critical fact).

**B.  This case is distinct from others the Court has considered.**

This case is thus distinct from the Court's prior translation caselaw. In *Leiva*, for example, the Court considered a translator who struggled to keep up with the defendant's Cuban dialect and therefore made frequent, real-time corrections. The Court concluded that these minor "hiccups" did not violate the defendant's due process rights. 821 F.3d at 814–15, 820.

In *Gonzalez*, for another example, the Court considered the mistranslation of "descompuesto." 319 F.3d at 295. The Government relied on that mistranslation to question the defendant's credibility. *Id.* The Court rejected the defendant's challenge on appeal, relying on the district court's decision to allow cross-examination about "decompuesto" and citing the fact that the translation error was identified more or less contemporaneously. *Id.*

Here, in contrast, the mistranslation of Barragan-Lopez's testimony was pervasive. So much so, indeed, that the court-appointed, federally certified translators also working the trial felt duty bound to disrupt trial to raise the issue. SA12. The errors were substantive—as opposed to colloquial difference like those at issue in *Gonzalez*. *See id.* And they affected "every single question" posed to Barragan-Lopez. *See* SA21. What's more, the translation errors in Barragan-Lopez's testimony weren't corrected in real time, as they were in *Leiva* and *Gonzalez*. 821 F.3d at 816; 319 F.3d at 295.

This grave doubt that the federally certified interpreters raised points to serious errors that directly threaten the fact-finding ability of the district court. *See* SA12. Indeed, the court-appointed translators couldn't identify all of the numerous errors in the translation of Barragan-Lopez's testimony when pressed by the court and defense counsel. SA17.

So defense counsel couldn't return to a topic or line of questioning to clarify (or impeach) Barragan-Lopez's testimony as defense counsel did in *Gonzalez*. 319 F.3d at 296. Instead, defense counsel was constrained by the illusory choice the district court forced on Pineda-Hernandez: either run the risk that his fate be decided by mistranslated testimony or accede to the recall of Barragan-Lopez for a prejudicial second day of testimony (in the span of twenty-four hours). *See* SA41–45.

In *Cirrincione*, this Court established a clear, commonsense rule: a defendant in a criminal proceeding is denied due process when "the accuracy and scope of a translation at a hearing or trial is subject to grave doubt." 780 F.2d at 634. If that holding is to mean anything, it should apply here. Simply, two federally certified, court-appointed translators identified specific errors in the translation of Barragan-Lopez's testimony.

These instances were symptoms of a pervasive disease. The testimony of a key Government witness—which concerned fundamental facts that formed a basis for the Government's theory and theme of the case against Pineda-Hernandez—was gravely inaccurate. Pineda-Hernandez was denied due process.

### C. Grave mistranslation of witness testimony goes to the foundation of the district court's fact-finding mission, warranting a new trial.

While a constitutional error doesn't necessarily require automatic reversal, the Supreme Court has recognized that "some errors should not be deemed harmless beyond a reasonable doubt." *Weaver v. Massachusetts*, 582 U.S. __, 137 S. Ct. 1899, 1907 (2017). The purpose of this "structural error" doctrine "is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Id.* Put another way, structural errors "deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair." *Neder v. United States*, 527 U.S. 1, 8 (1999)

(internal quotation omitted). "Errors of this type are so intrinsically harmful as to require automatic reversal." *Id.*

The "defining feature of a structural error is that it affects the framework within which the trial proceeds, rather than being simply an error in the trial process itself." *Weaver*, 137 S. Ct. at 1907 (internal quotation omitted). For the reasons described above, the grave mistranslation of Barragan-Lopez's testimony here rose to the level of structural error. In short, the pervasive mistranslation of key Government testimony tainted proceedings. The Government was handed a second bite at the apple. The mistranslation thus affected the trial framework and rendered Pineda-Hernandez's trial fundamentally unfair. *See, e.g.*, *Neder*, 527 U.S. at 9.

This court has rarely, if ever, considered a case where the accuracy of in-court translation is credibly called into doubt. *Cf. Sandoval*, 347 F.3d at 632 (noting that there was "no evidence to suggest that the interpreter used was incompetent") and *Johnson*, 248 F.3d at 662 ("There is also no question that the interpreter was qualified and adequately translated the proceedings."). This Court prior decisions have concerned issues like the process a district court employed, *Johnson*, 248 F.3d at 662–63 and *Gonzalez*, 319 F.3d at 296, an interpreter's qualification, *Sandoval*,

347 F.3d at 632, or whether an interpreter was warranted at all, *Cirrincione*, 780 F.2d at 634.[2]

In *Negron*, the Second Circuit concluded that "regardless of the probabilities" of guilt, the prosecution of a Spanish-speaking defendant who was not provided a translator at trial "lacked the basic and fundamental fairness" that the constitution guarantees. 434 F.2d at 389. This Court should reach the same conclusion here. Because grave doubts about the accuracy of translated key testimony for the Government exist, Pineda-Hernandez's trial lacked the basic fairness that the due process clause guarantees. The Court should vacate the judgment against him and remand for a new trial.

## D. The Government cannot show that the mistranslation of key witness testimony was harmless beyond a reasonable doubt.

Even if the mistranslation of Barragan-Lopez's testimony does not amount to structural error, the Government cannot show that the error was harmless beyond a reasonable doubt. *See, e.g.*, *Weaver*, 137 S. Ct. at 1907. Barragan-Lopez was a key Government witness. *See* SA40. He testified to Pineda-Hernandez's allegedly integral role in the Code Red conspiracy and corroborated the government's theory

---

[2] The Court applied a harmlessness review in *Mendoza*. But *Mendoza* raised an issue different than Pineda-Hernandez raises here. Specifically, in *Mendoza* the defendant argued in the context of a § 2255 motion that he was unconstitutionally deprived a translator. Here, in contrast, Pineda-Hernandez argues that the mistranslation of a key Government witness violated his due process rights.

that Pineda-Hernandez was intimately tied with the red meth.  A34, 42.  But grave doubts about the accuracy of those pieces of testimony exist.  *See id.*

For example, Barragan-Lopez's initial, mistranslated testimony about Pineda-Hernandez's role in the conspiracy was inconsistent with his subsequent testimony when recalled.  Also inconsistent was Barragan-Lopez's testimony about the color of the methamphetamine allegedly distributed by Pineda-Hernandez. *Compare* A34 *with* A52.  The latter error concerned a critical theme that bound together the prosecution of the Code Red conspiracy, to which the Government referred repeatedly in closing argument.  *See, e.g.*, A67.  Add to these circumstances the fact that the court-appointed interpreters reported errors in nearly every question to Barragan-Lopez and the magnitude of the harm to Pineda-Hernandez becomes clear.  SA21.

This case thus stands in stark contrast to *Mendoza*.  There, the Court determined that a decision declining to provide contemporaneous and continuous translation services for one adverse witness was harmless beyond a reasonable doubt.  755 F.3d at 829–30.  The Court rejected the defendant's argument that real-time access to counsel (through a translator) would have been better equipped him to confront the witness.  *Id.*  The defendant had access to a translator throughout the proceeding.  *Id.*  The defendant hadn't raised any possible lines of impeachment for

the witness (who had been long scheduled to testify). *Id.* at 629. And the witness "was not . . . important . . . for the prosecution" in any event. *Id.*

The circumstances here are far more serious. The mistranslated testimony of Barragan-Lopez concerned critical support for the theory and theme of the Government's case against Pineda-Hernandez. The Government, therefore, can't show that the mistranslation was harmless beyond a reasonable doubt. The Court should vacate the judgment against Pineda-Hernandez and remand for retrial.

### E. The district court exacerbated the violation of Pineda-Hernandez's due process rights by not taking advantage of federal resources.

"Particularly inappropriate in this nation where many languages are spoken is a callousness to the crippling language handicap of a newcomer to its shores, whose life and freedom the state by its criminal processes chooses to put in jeopardy." *Negron*, 43 F.2d at 390. Perhaps in recognition of this fundamental notion of fairness, Congress enacted the Court Interpreters Act ("CIA") in 1978. 28 U.S.C. § 1827. Among other things, the CIA ensures that the "quality of translation" during trial "does not fall below a constitutionally permissible threshold." *Johnson*, 248 F.3d at 661.

To this end, the CIA establishes a process by which federal courts determine when and how to employ in-court translation. *Id.* In short, a federal court must use "the services of the most available certified interpreter" if it determines that a witness "speaks only or primarily a language other than" English. *Id.* § 1827(d)(1)(A). In

addition, the CIA also authorizes a court to order the use of sound recording at trial. That decision is informed by, among other things, the qualifications of the interpreter and the length and complexity of the proceedings. *Id.* § 1827(d)(2).

The district court here, however, did not take advantage of the tools available to it under the CIA to aid the translation of Barragan-Lopez's testimony (or for any other purpose). *See* SA13. The CIA expresses a clear preference for federally certified translators. *See* 28 U.S.C. § 1827(b)(1). The district court appointed two federally certified interpreters to translate for Pineda-Hernandez. But the translator that the Government hired to service its key witness, Barragan-Lopez, was *not* federally certified. *See* SA13; 28 U.S.C. § 1827(b)(1).

Beyond that, the trial court again failed to employ the CIA when it declined to implement live audio recording of trial. *See* 28 U.S.C. § 1827(d)(2). The CIA indicates audio recording is particularly appropriate when, among other things, the qualifications or prior experience of an interpreter are questionable, or the proceedings are lengthy or highly complex. *Id.* § 1827(d)(2). Pineda-Hernandez's trial spanned five days. A65. It involved hours of Spanish-speaking testimony and considerable Spanish-language evidence. *See, e.g.*, A55. The complexity of the proceeding is self-evident—among other things, it required *three* interpreters to assist at trial.

If any case cried out for live audio recording under the CIA, it was Pineda-Hernandez's. Contemporaneous audio recording, too, would have provided a simple solution to the grave doubts about the accuracy of Barragan-Lopez's testimony. Rather than recall Barragan-Lopez, the court could have reviewed the live audio tape with a new interpreter (or the court-appointed interpreters) outside the presence of the jury. The new interpreter could have advised the court about the extent and severity of the mistranslations. In this respect, the district court could have avoided the highly prejudicial result here, where the jury was twice presented key Government testimony.

Instead, the district court adopted the Government's suggestion to offer two paths: accept the mistranslated testimony or accept a second day of prejudicial testimony from a key witness. Both options forced Pineda-Hernandez to bear the risk caused by a Government-hired translator. By neglecting to take advantage of resources available under the CIA, the district court abused its discretion. That abuse of discretion exacerbated the harm to Pineda-Hernandez's due process rights

## F. The district court abused its discretion by recalling Barragan-Lopez for a second day of testimony.

After Barragan-Lopez testified he was released back to custody. SA18. Contemporaneously, the court-appointed translators were raising with the district court the pervasive errors in the translated Barragan-Lopez testimony. SA10–18. After questioning the translators about specific examples of error, the district court

33

made the unilateral decision to recall Barragan-Lopez. *See* SA18 ("Well, then I think it is important that we recall him. I am just making that decision."). That decision was an abuse of discretion that imposed considerable prejudice on Pineda-Hernandez.

Barragan-Lopez was a key Government witness. Recalling him turned his first day of testimony into a practice run. Having had the opportunity to hear the Government's questions and ponder his answers, his testimony on the second day differed from the first in important ways. For example, in his first attempt Barragan-Lopez testified that Pineda-Hernandez merely received methamphetamine from Mexico. SA12. But on his second attempt Barragan-Lopez claimed that Pineda-Hernandez was "in charge" of the Code Red conspiracy. SA12.

Similarly, Barragan-Lopez's description of the methamphetamine that the Code Red ring allegedly distributed at Pineda-Hernandez's direction changed. *Compare* A42 *with* A52. These distinctions are important because they bring Barragan-Lopez's testimony in line with the Government's theory and theme of the case against Pineda-Hernandez. And, compounding the error of recalling Barragan-Lopez, the district court didn't strike his first day of testimony. SA23.

Nor did the district court instruct the jury to ignore the mistranslated first day of testimony. *See* SA22. Instead, all the district court said was that the jury should not "give any extra weight" to what Barragan-Lopez testified simply because he did

so twice. SA54. Then, the district court sentenced Pineda-Hernandez as a leader of the Code Red conspiracy after finding that the evidence supported such an enhancement. SA60. The evidence the district court considered necessarily included Barragan-Lopez's changed testimony about Pineda-Hernandez's role and the color of the Code Red meth.

The district court thus abused its discretion by recalling Barragan-Lopez for a second day of testimony, especially where it declined to strike his first day of testimony or otherwise instruct the jury to ignore it.

### G. Pineda-Hernandez did not waive any right to challenge Barragan-Lopez's testimony.

A defendant can waive a constitutional right. *See, e.g.*, *Freeman v. Pierce*, 878 F.3d 580, 586 (7th Cir. 2017) (discussing waiver of Sixth Amendment right to counsel) and *Cirrincione*, 780 F.2d at 624. But to be effective, the waiver must be "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). "The determination of whether there has been an intelligent waiver" of a constitutional right depends on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Id.*

Put another way, to be valid a waiver must be both voluntary and knowing, with an awareness of the relevant circumstances and consequences. *Cirrincione*, 780 F.2d at 624 (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). In a

criminal case, the Court must indulge every presumption against a waiver of fundamental constitutional rights; it cannot presume acquiescence in such a waiver. *Id.* This standard is particularly strict where the constitutional right at issue preserves the fairness of trial. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 241 (1973).

Below, the district court addressed the topic of waiver three times. SA31–32, 41; 42–44. On the morning of day four, the court explained that if Pineda-Hernandez consented to a second day of testimony by Barragan-Lopez, he necessarily waived his right to appeal. *See, e.g.*, SA41. The court further implied that if Pineda-Hernandez did *not* consent to a second day of testimony, he necessarily waived any right to contest the mistranslation of Barragan-Lopez's first day of testimony. SA43. The court thus presented Pineda-Hernandez with two choices: either accept the mistranslation of Barragan-Lopez's first day of testimony or accept a prejudicial second day of testimony. Whatever he chose, then, the court shifted to Pineda-Hernandez the risk caused by the mistranslation.

Further, in the district court's formulation, Pineda-Hernandez could not both retain his right to appeal and have Barragan-Lopez retestify. *Id.* Each time it was presented to him, however, Pineda-Hernandez failed to grasp that choice. *See id.* More to the point, when the court addressed the topic of waiver, Pineda-Hernandez explicitly stated that he did not waive his right to appeal. SA41

("[Pineda-Hernandez] has been pretty firm in not agreeing to anything."); SA42–43 ("And I would not like to waive any right to any appeal. And so I would like for that witness to testify today."); SA44 ("I do not waive my right . . . I would like for Barragan-Lopez to testify again.").

Pineda-Hernandez's purported acquiescence to Barragan-Lopez's second day of testimony stood in direct conflict with his desire to maintain his rights. On its face, Pineda-Hernandez's confusion thus illustrates that he did not grasp the consequences of his supposed waiver. *See Cirrincione*, 780 F.2d at 624 (quoting *Brady*, 397 U.S. at 748). Consider further that the most tangible consequence of a waiver, as described by the district court, was Pineda-Hernandez's loss of right to appeal. But that is the right that Pineda-Hernandez most stridently sought to maintain. Indeed, Pineda-Hernandez repeatedly expressed that he did "not want to waive [his] right" to appeal. SA44.

For these reasons, Pineda-Hernandez didn't waive his right to appeal the errors related to Barragan-Lopez's testimony. And even if this Court concludes that Pineda-Hernandez did in fact effect a valid waiver, that waiver only concerned Barragan-Lopez's repeat testimony. That is, the district court framed its discussion as whether Pineda-Hernandez would waive his "right to complain on appeal that Barragan-Lopez testified two times." *Id.* The court never asked Pineda-Hernandez whether he waived a claim of error related to the actual underlying translation errors

themselves. *See* SA31–32, 41, 42–43. Absent such inquiry—and drawing every reasonable presumption against waiver—it can't be said that Pineda-Hernandez knowingly waived his right to challenge the translation errors themselves. *Zerbst*, 304 U.S. at 464. That is especially so given Pineda-Hernandez's background, education, and experience.

Because he didn't know that he was purportedly waiving his right to appeal the inaccurate translation of Barragan-Lopez's first day of testimony, and because he didn't understand the consequences of Barragan-Lopez's second day of testimony, Pineda-Hernandez didn't waive any rights and is not precluded from taking this appeal.

## II. THE DISTRICT COURT CLEARLY ERRED BY APPLYING A LEADERSHIP ENHANCEMENT AT SENTENCING

### A. Pineda-Hernandez's alleged involvement in the Code Red conspiracy does not support a leadership enhancement.

The Sentencing Guidelines provide various upward and downward adjustments based on specific offense conduct. Relevant here, § 3B1.1(a) provides a four-point upward adjustment if the defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." And § 3B1.1(c) provides a two-point upward adjustment if the court concludes that the defendant "was an organizer, leader, manager, or supervisor in any criminal activity" other than that covered by section 3B1.1(a) or section 3B1.1(b). The

Probation Office applied both enhancements to Pineda-Hernandez in the PSR. The district court found at sentencing that they were warranted. As a result, the court sentenced Pineda-Hernandez 300 months' imprisonment on Count I and 240 months' imprisonment on Count II (to be served concurrently). Dkt. No. 636 at 24.

The district court plainly erred by applying the leadership enhancements to Pineda-Hernandez. The core concern of section 3B1.1 is relative responsibility; defendants who play an aggravating role in an offense receive harsher sentences. *United States v. Brown*, 944 F.2d 1377, 1381 (7th Cir. 1991). But "[b]eing a distributor, even a large distributor . . . is not enough to support a § 3B1.1 offense level increase." *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir. 1994).

Middleman status alone does not establish the predicate for an enhancement under section 3B1.1. *Brown*, 944 F.2d at 1382. Instead, the critical inquiry is whether the defendant "organized, led, managed, or supervised the criminal activity." *United States v. Colon*, 919 F.3d 510, 517 (7th Cir. 2019). A defendant who operates in a common group of coconspirators but does not exercise real control and is essentially an equal partner in the crime is not an "organizer" or "leader" under section 3B1.1. *Mustread*, 42 F.3d at 1104–05.

Here, Pineda-Hernandez didn't exert dominion or control over members of the Code Red conspiracy. Rather, he allegedly engaged in conduct on par with other defendants. At most, he was a middleman. So, while some trial testimony indicated

that Pineda-Hernandez discussed product distribution with other individuals, and that Fernando Paniagua sometimes drove for him, no evidence showed that Paniagua or anyone else was required to comply with Pineda-Hernandez or was otherwise under his control. *See, e.g.*, A14, 60.

Indeed, a closer look at Niko and Barragan-Lopez illustrates the loose coalition the alleged Code Red conspiracy really was. In contrast to the Government's theory, Pineda-Hernandez was not a hardened boss who controlled a drug operation. A73; *see Colon*, 919 F.3d at 519. To the contrary, Niko and Barragan-Lopez operated significantly on their own. *See, e.g.*, A60. Niko, for example, was hardly a subordinate of Pineda-Hernandez. Niko kept his own drug ledger. A61. He sold drugs without any input from Pineda-Hernandez. A63. He operated independently when Pineda-Hernandez was out of state. A60. And he even sold drugs *to Barragan-Lopez* independent of Pineda-Hernandez. *Id.* Niko also testified about an instance where someone owed *both* he and Pineda-Hernandez money, indicating neither was superior. A64.

For his part, Barragan-Lopez had no issue standing his ground and ending whatever relationship he had with Pineda-Hernandez. A43–44. Indeed, Barragan-Lopez was independent enough to forcefully argue that he didn't want to coordinate with Pineda-Hernandez. He was instead interested in working only with Niko. *Id.* True, at times Pineda-Hernandez negotiated with Barragan-Lopez about the terms

of a drug deal. But that behavior is inherent to operating as a middleman; it doesn't satisfy the terms of section 3B1.1. *See Colon*, 919 F.3d at 518–19 (observing that leadership enhancement wasn't appropriate for defendant who frequently negotiated the terms, locations, and methods of drug transactions).

Even the district court acknowledged this dynamic. *See* A84. The court described how "[Niko] certainly held the leadership role" and possibly even "had a larger role or at least imported more and different types of drugs into [the] community if [it was] not mistaken about what the evidence was." The court was not mistaken. Niko, Barragan-Lopez, and Pineda-Hernandez were "essentially equal partners in crime," making the sentencing enhancement under § 3B1.1 clearly erroneous. *See Mustread*, 42 F.3d at 1105.

This Court's decisions in *Mustread* and *Colon* are instructive. *Mustread* concerned a defendant convicted for his role in a drug distribution ring. 42 F.3d at 1100–01. The court acknowledged that Mustread coordinated with one coconspirator to transport drugs and got another to purchase a pager for use in the distribution ring. *Id.* at 1105.

Still, the court concluded that Mustread didn't control his coconspirators. *Id.* The court found that those individuals were instead akin to independent suppliers and coconspirators; they were not at Mustread's "beck and call." *Id.* Mustread and the coconspirators were "essentially equal partners in crime." *Id.* For these reasons,

the court held that a leadership enhancement was clearly erroneous and that Mustread was entitled to a new sentence. *Id.*

The court reached a similar conclusion in *Colon*. There, Colon had been a "central figure" in a drug ring that brought "huge quantities" of drugs to the Indianapolis area. 919 F.3d at 517. On appeal, the court conceded that Colon had received and sold "large quantities" of drugs and even "negotiated the terms of their sale by directing others." *Id.* And yet the court concluded that a leadership enhancement was still inappropriate because Colon was merely a middleman or conduit in the drug operation. *Id.* While Colon did use a driver to facilitate drug deals, the court concluded that that was more emblematic of "a supplier accommodating the needs of his customer than an organizer controlling a drug operation." *Id.* at 519.[3]

Pineda-Hernandez is situated similarly to the defendants in *Mustread* and *Colon*. As in those cases, the Court should find here that the district court plainly erred by sentencing Pineda-Hernandez as a leader or organizer under § 3B1.1.

**B.     The leadership enhancement prejudiced Pineda-Hernandez.**

Sentencing a defendant under an incorrect Guidelines range prejudices him or her because, as the Supreme Court has "made clear[,]" the "Guidelines are to be the

---

[3] The Court ultimately concluded that the erroneous leadership enhancement was harmless in *Colon* because the sheer volume of the drug distribution ring motivated the district court's sentencing decision. 919 F.3d at 519–20.

sentencing court's 'starting point . . . and initial benchmark.'" *Molina-Martinez v. United States*, 578 U.S. __, 136 S. Ct. 1338, 1345 (2016) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). Federal courts *must* begin their sentencing analyses with the Guidelines. *Id.* The Guidelines are thus "'the framework for sentencing' and 'anchor . . . the district court's discretion.'" *Id.* (quoting *Peugh v. United States*, 569 U.S. 530, 540 (2013)). For that reason, "a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." *Id.* at 1346.

Here, because of the erroneous leadership enhancement, the district court sentenced Pineda-Hernandez under a Guidelines range of 360 months to life imprisonment. Without the enhancements, the district court would have applied Guidelines ranges of 235–293 months' imprisonment and 292–365 months' imprisonment for Counts I and II, respectively. *Guidelines Manual*, Ch. 5, Pt. A. The Supreme Court has held that such an error constitutes prejudice and warrants reversal. *Molina-Martinez*, 136 S. Ct. at 1338. The Court should reach that conclusion here.

Further, Pineda-Hernandez received a sentence nearly three times the length of Niko's—who the district court thought was a more culpable defendant—and more than two times the length of Barragan-Lopez's. To that point, the relatively equal culpability of many of Pineda-Hernandez's coconspirators is belied by their

respective sentences. *See* PSR at 2. The district court noted as much. Sent. SA57–58. At sentencing, it emphasized the "*unwarranted . . .* disparities" between Pineda-Hernandez and his coconspirators. *Id.* (emphasis added). Pineda-Hernandez's uniquely lengthy sentence was owed, at least in part, to the court's determination that he was subject to an enhancement under § 3B1.1.

Those disparities, far from abstract, are a perfect illustration of the harm done by the trial court's erroneous conclusion under § 3B1.1. While the district court expressed some hesitance prior to imposing a lengthy, twenty-five-year sentence, it ultimately sentenced Pineda-Hernandez harshly. *See* SA57–59. And unlike the sentencing court in *Colon*, which relied almost entirely on statutory sentencing factors, the court here cited directly to its erroneous conclusion that Pineda-Hernandez was a "leader" of the Code Red conspiracy under the Sentencing Guidelines. SA57.

The trial court clearly erred when it sentenced Pineda-Hernandez as a leader or organizer of the Code Red conspiracy. Pineda-Hernandez was harmed by that error. The Court should therefore vacate the sentence imposed and remand for resentencing without the leadership enhancement.

## CONCLUSION

For the reasons described above, the Court should vacate the judgment of the district court and remand for a new trial. In the alternative, the Court should vacate

the sentence that the district court imposed and remand for resentencing without the improper leadership enhancement.

## Oral Argument Statement

Pineda-Hernandez respectfully requests that the Court hear oral argument. *See* Fed. R. App. P. 34(a) and Local Rule 34(a). The legal and factual issues here are complex; argument would aid the decisional process.

Dated: May 1, 2019

Respectfully submitted,

*/s/ Kyle R. Hosmer*

Brian J. Paul
Faegre Baker Daniels LLP
300 North Meridian Street
Suite 2700
Indianapolis, Indiana 46204
Telephone: 317.237.0300
Email: brian.paul@faegrebd.com

—and—

Kyle R. Hosmer
Andrew J. Ball
Faegre Baker Daniels LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
Telephone: 303.607.3656
Email: kyle.hosmer@faegrebd.com
            andrew.ball@faegrebd.com

*Counsel for Defendant-Appellant*

<u>**CERTIFICATE OF COMPLIANCE**</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because:

- This brief contains 9,657 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type style requirements of Fed. R. App. P. 32 (a)(5), (6) because:

- This brief has been prepared in a proportionally spaced 14-point Times New Roman font using Microsoft Word.

/s/ *Kyle R. Hosmer*
Kyle R. Hosmer
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
Telephone: 303.607.3656
Email: kyle.hosmer@faegrebd.com

*Counsel for Defendant-Appellant*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 1, 2019, I electronically filed the foregoing ***Opening Brief and Required Short Appendix of Appellant Alfonso Pineda-Hernandez*** with the Clerk of this Court using the CM/ECF System, which will send a notification of electronic filing to all counsel of record who are registered CM/ECF users.

*/s/ Kyle R. Hosmer*

Kyle R. Hosmer
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
Telephone: 303.607.3656
Email: kyle.hosmer@faegrebd.com

*Counsel for Defendant-Appellant*

# SHORT APPENDIX

# CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), counsel certifies that all material required by Circuit Rule 30(a) and (b) are included in the appendix.

Dated:  May 1, 2019

s/ Kyle R. Hosmer
Kyle R. Hosmer
FAEGRE BAKER DANIELS LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, Colorado 80203
Telephone: 303.607.3656
Email: kyle.hosmer@faegrebd.com

*Counsel for Defendant-Appellant*

# SHORT APPENDIX
# TABLE OF CONTENTS

Page(s)

Judgment of Trial Court (May 23, 2018)........................................................... SA1

Final Pretrial Conference Hearing Transcript (October 12, 2017)
        (excerpt p. 19)................................................................... SA6

Jury Trial Transcript – Day 3 (Vol. 3) (November 1, 2017)
        (excerpt pp. 376-77) ......................................................... SA7

Jury Trial Transcript – Day 3 (Vol. 3) (November 1, 2017)
        (excerpt pp. 448-72) ......................................................... SA9

Jury Trial Transcript – Day 3 (Vol. 3) (November 1, 2017)
        (excerpt pp. 505-08) ....................................................... SA34

Jury Trial Transcript – Day 4 (Vol. 4) (November 2, 2017)
        (excerpt pp. 511-22) ....................................................... SA38

Jury Trial Transcript – Day 4 (Vol. 4) (November 2, 2017)
        (excerpt pp. 679-81) ....................................................... SA50

Jury Trial Transcript – Day 5 (Vol. 5) (November 3, 2017)
        (excerpt p. 688).............................................................. SA53

Jury Trial Transcript – Day 5 (Vol. 5) (November 3, 2017)
        (excerpt p. 777).............................................................. SA54

Sentencing Hearing Transcript (May 23, 2018) (excerpt pp. 21-26) ............... SA55

AO 245B(Rev. 02/16) Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
### Southern District of Indiana

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br><br>ALFONSO PINEDA-HERNANDEZ<br>A/K/A "FLACO" | **JUDGMENT IN A CRIMINAL CASE**<br><br>Case Number: 1:15CR00200-001<br>USM Number: 13351-028<br><br>Doneaka   Rucker-Brooks<br>——————————————————<br>Defendant's Attorney |

**THE DEFENDANT:**

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)_ which was accepted by the court.

☒ was found guilty on count(s) 1 and 2 after a plea of not guilty

The defendant is adjudicated guilty of these offense(s):

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21§§ 841(a)(1) and 846 | Conspiracy to Distribute 500 Grams or More of Methamphetamine Mixture | 11/10/2015 | 1 |
| 18§1956(a)(1)(B)(i) and (h) | Conspiracy to Launder Monetary Instruments | 11/10/2015 | 2 |

The defendant is sentenced as provided in pages 2 through 5 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) dismissed on the motion of the United States.

**IT IS ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances.

5/23/2018
——————————————————
Date of Imposition of Sentence:


Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**A CERTIFIED TRUE COPY**
Laura A. Briggs, Clerk
U.S. District Court
Southern District of Indiana

By ——————————————
Deputy Clerk

Date: 5/25/2018

SA1

AO245B(Rev 02/16) Judgment in a Criminal Case                                    Judgment Page 2 of 5

DEFENDANT: Alfonso Pineda-Hernandez, a/k/a "Flaco"
CASE NUMBER: 1:15CR00200-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of **300 months. Ct 1: 300 months, Ct. 2: 240 months to be served concurrent.**

☒The Court makes the following recommendations to the Bureau of Prisons:  Designation to Manchester, Kentucky, and if that is unavailable then Terre Haute, Indiana.  Participation in substance abuse treatment and electrical and mechanical vocational programming.

☒The defendant is remanded to the custody of the United States Marshal.

☐The defendant shall surrender to the United States Marshal for this district:

    ☐ at

    ☐ as notified by the United States Marshal.

☐The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant was delivered on _____ to _____
at _____, with a certified copy of this judgment.

_____
           UNITED STATES MARSHAL

BY: _____
           DEPUTY UNITED STATES MARSHAL

SA2

AO245B(Rev 02/16) Judgment in a Criminal Case                                                                    Judgment Page 3 of 5

DEFENDANT: Alfonso Pineda-Hernandez, a/k/a "Flaco"
CASE NUMBER: 1:15CR00200-001

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of **5 years.   Ct. 1: 5 years, Ct. 2: 3 years, concurrent.**

## MANDATORY CONDITIONS

1. You must not commit another federal, state, or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance.  You must submit to one drug test within 15 days of release from imprisonment and at least two periodic least two periodic drug tests thereafter, as determined by the court.
   - ☐  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse.  *(check if applicable)*
4. ☐  You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution.  *(check if applicable)*
5. ☒  You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐  You must participate in an approved program for domestic violence.  *(check if applicable)*

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the conditions listed below.

## CONDITIONS OF SUPERVISION

1. You shall surrender as directed to the U.S. Immigration and Customs Enforcement.  If you are released from the custody of U.S. Immigration and Customs Enforcement for any reason, you shall report to the nearest U.S. Probation Office within 72 hours of your release.

2. If released from confinement, not deported or removed, or you re-enter the United States, you shall report to the nearest probation office within 72 hours.

3. You shall obtain the proper documentation from U.S. Immigration and Customs Enforcement authorizing you to work in the United States.

I understand that I and/or the probation officer may petition the Court to modify these conditions, and the final decision to modify these terms lies with the Court.  If I believe these conditions are being enforced unreasonably, I may petition the Court for relief or clarification; however, I must comply with the directions of my probation officer unless or until the Court directs otherwise.  Upon a finding of a violation of probation or supervised release, I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the condition of supervision.

These conditions have been read to me. I fully understand the conditions and have been provided a copy of them.

(Signed)

_____               _____
Defendant                                                                              Date

_____               _____
U.S. Probation Officer/Designated Witness                                Date

SA3

AO245B(Rev 02/16) Judgment in a Criminal Case                                      Judgment Page 4 of 5
_____
DEFENDANT: Alfonso Pineda-Hernandez, a/k/a "Flaco"
CASE NUMBER: 1:15CR00200-001

## CRIMINAL MONETARY PENALTIES

      The defendant must pay the total criminal monetary penalties in accordance with the schedule of payments set forth in this judgment.

|  | **Assessment** | **JVTA Assessment**[1] | **Fine** | **Restitution** |
|---|---|---|---|---|
| **TOTALS** | $200.00 | | | |

☐ The determination of restitution is deferred until.  An *Amended Judgment in a Criminal Case (AO245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

      If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**[2] | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| **Totals** | | | |

☐ Restitution amount ordered pursuant to plea agreement $

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☐ the interest requirement is waived for the ☐ fine ☐ restitution

    ☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

[1] Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.

[2] Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: Alfonso Pineda-Hernandez, a/k/a "Flaco"
CASE NUMBER: 1:15CR00200-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☐  Lump sum payment of $ _____ due immediately, balance due
    ☐      not later than _____, or
    ☐      in accordance with        ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☒  Payment to begin immediately (may be combined with ☐ C, ☐ D, ☐ F or ☐ G below); or

**C**  ☐  Payment in equal _____  *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  If this case involves other defendants, each may be held jointly and severally liable for payment of all or part of the restitution ordered herein and the Court may order such payment in the future. The victims' recovery is limited to the amount of loss, and the defendant's liability for restitution ceases if and when the victims receive full restitution.

**G**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐      Joint and Several

Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐      The defendant shall pay the cost of prosecution.

☐      The defendant shall pay the following court cost(s): _____

☐      The defendant shall forfeit the defendant's interest in the following property to the United States:

1          THE COURT:  Thank you.  That is fine.

2          MR. LASHER:  We will have several exhibits that are

3    drug-related exhibits and firearms.  We would like to display

4    those to the jury during the course of the case and then

5    substitute images for those exhibits when they go back to the

6    jury.

7          THE COURT:  That is a standard practice.  Any

8    objection, Ms. Rucker-Brooks?

9          MS. RUCKER-BROOKS:  No, Your Honor.

10          THE COURT:  Ms. Howells?

11          MS. HOWELLS:  No, Your Honor.

12          THE COURT:  Thank you.

13          MR. LASHER:  We will have one witness, cooperating

14    witness, Nicolas Cazares-Garcia, who will need a Spanish

15    interpreter.  We have contracted with a gentleman named Sam

16    Ramos to provide that service.  I understand that he has not

17    only worked with our witnesses in preparation for this case

18    but also with at least one of the defense witnesses.  I

19    believe that there is a stipulation to his acceptability as

20    providing that service.

21          THE COURT:  Is that correct, Ms. Rucker-Brooks?

22          MS. RUCKER-BROOKS:  That is correct, Your Honor.

23          THE COURT:  Thank you.  Ms. Howells?

24          MS. HOWELLS:  That is correct, Your Honor.

25          THE COURT:  Thank you.

1    morning, and welcome back, ladies and gentlemen.  I hope

2    nobody had to drive through snow.  It was a little snowy

3    earlier today, wasn't it?

4            Anybody talk to you about this case, or have you

5    talked to anyone about this case?  Please raise your hand, if

6    so.  Thank you.  We will show no one raised their hand.  We

7    are continuing with the Government's presentation of evidence.

8    Mr. Vaughn?

9            MR. VAUGHN:  Thank you.  The Government calls Miguel

10   Barragan-Lopez.

11           THE COURT:  And, sir, I need to swear you in.  Can

12   you raise your right hand?

13      (Witness sworn.)

14           THE COURT:  Would you tell the jury your first name

15   and last name and spell them both.

16           Just a minute, please.

17           INTERPRETER CONDE-BARWISE:  Excuse me, Your Honor.

18   If we are going to be doing consecutive, could the interpreter

19   have -- speak a little louder so the Defendant can hear the

20   Spanish as it is interpreted?

21           THE COURT:  He will.

22           INTERPRETER RAMOS:  It is on now.

23           THE COURT:  Go ahead, please.

24           THE WITNESS:  Miguel Barragan-Lopez.

25           THE COURT:  Can you spell the last name, please?

 1            THE WITNESS:  Barragan, B-A-R-R-A-G-A-N.

 2            THE COURT:  Thank you.  Go ahead, please.

 3            Question.  Do I need to swear in Mr. Ramos?

 4            MR. VAUGHN:  Yes.

 5            (SAMUEL RAMOS sworn to interpret Spanish into

 6    English.)

 7            THE COURT:  Thank you.  Go ahead, please.

 8            MR. VAUGHN:  Your Honor, if there are no issues with

 9    Mr. Ramos' qualifications, it will not be necessary for the

10    Government to proceed with any qualifications on his abilities

11    to translate for this Court.

12            THE COURT:  My understanding is there are no issues;

13    is that correct, Ms. Rucker-Brooks?

14            MS. RUCKER-BROOKS:  Absolutely.  We agree to have

15    Mr. Ramos.

16            THE COURT:  Okay, thank you.  Mr. Ramos will serve as

17    the Court's interpreter for this witness.

18            MS. RUCKER-BROOKS:  Thank you.

19            MR. VAUGHN:  Thank you.

20      **MIGUEL BARRAGAN-LOPEZ, GOVERNMENT'S WITNESS, SWORN**

21                    **DIRECT EXAMINATION**

22    BY MR. VAUGHN:

23    Q   Mr. Barragan-Lopez, how old are you?

24    A   Twenty — 37.

25    Q   In what country were you born?

1   with anybody else, and don't form or express an opinion until

2   you have heard all the evidence, the arguments of the

3   attorneys, and you have received the instructions from the

4   Court.  I will ask you to try to be back within 45 minutes.  I

5   don't know if you are aware.

6          The Court, in August and September, two of our judges

7   passed away, and this afternoon there is a memorial service

8   the Bar Association is conducting.  They, among others, are

9   being honored, and I need to attend as the Chief Judge.  So we

10  are going to be breaking a little after 3:00 today, so it will

11  be a short afternoon.  I would like to just cut lunch a little

12  bit so we can get some more evidence in, all right?  So we

13  will see you at — well, let's just say five until 1:00?

14  Thank you.

15         THE CLERK:  All rise.

16     (Jury out, 12:12 p.m.)

17         THE COURT:  Counsel, same.  Please be back like five

18  of, please.  Thank you.

19     (Lunch recess, 12:13 p.m.)

20                        AFTER RECESS

21                     **AFTERNOON SESSION**

22     (Jury out, 1:16 p.m., Defendant not present.)

23         THE COURT:  Please be seated.  We are on record and

24  outside the presence of the jury.  Mr. Pineda-Hernandez is not

25  here yet.  It is my understanding the parties wanted to

1  address something with the Court.

2          MR. VAUGHN:  Yes, Your Honor.

3          THE COURT:  Can we do this, Ms. Rucker-Brooks,

4  without him here?

5          MR. VAUGHN:  We should probably have him here.

6          THE COURT:  Yes.

7          MS. RUCKER-BROOKS:  We should probably wait, Your

8  Honor.  I believe they said he is on his way.

9          THE COURT:  He is on his way.

10          THE CLERK:  Here he is.

11          THE COURT:  He is coming.  Okay.  Hello.  How are

12  you?  You want to get his headset on, please.

13          THE CLERK:  Yes.  Sorry.  It is charging.

14          THE COURT:  All right.  Go ahead, please, Mr. Vaughn.

15          MR. VAUGHN:  During the break, Your Honor, counsel

16  for Mr. Pineda-Hernandez and counsel for the Government were

17  approached by the two court interpreters who informed the

18  parties that the translations performed by Mr. Ramos

19  throughout the course of the morning episode, they were

20  replete with inaccuracies or not complete, were somewhat

21  misleading.  The parties had agreed to Mr. Ramos'

22  qualifications.

23          THE COURT:  Right.

24          MR. VAUGHN:  I don't know where this puts us.

25          THE COURT:  Okay.

1          MR. VAUGHN:  And I wanted to bring it to the Court's

2     attention and because Mr. Ramos -- it would be the

3     Government's intention, I believe the Defendant's intention,

4     that he would continue to interpret for the questioning of

5     Mr. Cazares-Garcia this afternoon.  And if we are going to

6     have two interpreters who are going to say that the

7     interpretation that is going to the jury is not accurate, that

8     the interpretation to the witness is not accurate, I don't

9     know where it leaves us.

10          THE COURT:  Well, twice during the course of the, of

11     the examination, the interpreter asked to approach.  I think

12     one was an error that he corrected, another one was an error

13     on my part that I think some of us heard -- misheard, and

14     Ms. Rucker-Brooks was correct that she had said

15     methamphetamine and heroin.

16          Anyway my assumption, therefore, was that when the

17     interpreters heard an error they would bring it to the Court's

18     attention, and they did in those two instances.

19     Ms. Rucker-Brooks, do you want to respond?

20          MS. RUCKER-BROOKS:  Based on my conversation with

21     them and when they spoke to Mr. Vaughn and Mr. Lasher and I,

22     they said it was throughout and it was so great that they

23     didn't want to continue but they wanted to bring it to our

24     attention as soon as it was --

25          THE COURT:  Why was that done after the testimony was

1   over?  I will ask them.

2           INTERPRETER SAMULOWITZ:  Your Honor —

3           THE COURT:  Can you please speak into the microphone?

4           INTERPRETER SAMULOWITZ:  Oh, sure.  Your Honor, most

5   of the time the omissions were at the end of different

6   sentences.  If you — the interpreters felt a lot of pressure.

7   When we started noticing there, there were so many different

8   — differences in meaning that were not crucial, but they were

9   different.  They started to accumulate.

10          We started noticing omissions.  Some of them, again,

11  not that important.  It didn't — we didn't feel that it

12  granted that we kept interrupting.  The syntax, Your Honor,

13  was so close to the English language that it — not all the

14  sentences made sense at one point or another in Spanish.

15          When we noticed great differences in meaning, we felt

16  the need to interfere, but as interpreters at any level, state

17  certified or federally certified, the first canon of our code

18  of ethics is accuracy, Your Honor.  And we are in a very

19  difficult situation if we hear that there is so much

20  happening.  We don't know what to do.  This was an interpreter

21  hired by, by the U.S. Attorney's Office.

22          THE COURT:  Yes.  He is used frequently by both sides

23  —

24          INTERPRETER SAMULOWITZ:  Exactly.

25          THE COURT:  — in criminal matters in our court.

1        INTERPRETER SAMULOWITZ:  Exactly.  So now, there is a

2  big difference, Your Honor, between a state certified and a

3  federally certified interpreter because the level of

4  difficulty is so, is so great that, that the command of both

5  language — of both languages varies when you are state

6  certified and federally certified.

7        The level at which you are tested when you are

8  getting a state certification is very different than the one

9  that you are tested when you get to obtain a —

10        THE COURT:  So what is your recommendation?

11        INTERPRETER SAMULOWITZ:  We would seriously recommend

12  having a federally certified interpreter to interpret

13  testimony.  The command of the language —

14        THE COURT:  Can one of you do that, then?

15        INTERPRETER SAMULOWITZ:  We would rather, if you

16  don't mind, Your Honor.

17        THE COURT:  Do you mind?

18        MR. VAUGHN:  No.  No.  No.  That would be fine.

19        THE COURT:  Do you have any objection,

20  Ms. Rucker-Brooks?

21        MS. RUCKER-BROOKS:  I have no objection, Your Honor.

22        THE COURT:  Since they were not actually interpreting

23  for your client during the testimony because we had — it took

24  us a minute, but we got everybody mic'd.  The other question

25  is, do you want us to recall Mr. Barragan-Lopez to reexamine

1  him?

2      MS. RUCKER-BROOKS:  If I can have a minute to speak

3  to them about the inaccuracies because they have been -- I

4  don't know they documented all of them.

5      THE COURT:  All right.

6      MS. RUCKER-BROOKS:  I asked them specifically, and

7  they kind of gave a couple of examples for Mr. Vaughn and I

8  but not a sit-down and let's go over it.  She said something

9  right before lunch.  They left and went to lunch and when they

10  came back, we spoke.  But I don't know the detail of it, and I

11  don't know how much they recorded.  So if I can have a moment

12  to do that.

13      THE COURT:  Yes.

14      MS. RUCKER-BROOKS:  Thank you.

15      THE COURT:  Well, actually, given that this is not a

16  communication.  She can't give you legal advice, and so if she

17  is going to give something, she needs to say it on the record

18  as she is the Court's neutral so the Government can hear it as

19  well.  So go ahead, please.

20      INTERPRETER SAMULOWITZ:  This interpreter, Claudia

21  Rubio Samulowitz, did not document every single instance.  I

22  took -- this interpreter took notes at different points in

23  time.  But I don't have an example of every single time that

24  this occurred.

25      THE COURT:  Can you give us the examples that you

1   have so that the parties can make a decision about whether

2   they should recall the witness.

3             INTERPRETER SAMULOWITZ:  Yes, Your Honor.

4             THE CLERK:  Should this witness be out of the room?

5             THE COURT:  It doesn't matter.

6             INTERPRETER SAMULOWITZ:  This interpreter made most,

7   most of the notes, sort of to notes to self for, for purposes

8   of -- for tactical purposes.  This interpreter teaches classes

9   and --

10            THE COURT:  Please just give us the errors.

11           INTERPRETER SAMULOWITZ:  So I can't give a lot of

12   information, but one of the -- the better examples that I have

13   is most of them are due to syntaxes, Your Honor.  The example

14   I gave to both counsel was, pertained to a question that was

15   asked, when did he -- when did the Defendant get out of the

16   car?  And it was --

17          MS. RUCKER-BROOKS:  Can you tell -- can you tell the

18   Court who asked the question?

19           INTERPRETER SAMULOWITZ:  I don't have it written.  I

20   didn't write it down.

21          MS. RUCKER-BROOKS:  Okay.  Thank you.

22          INTERPRETER SAMULOWITZ:  The question was, "When did

23   the Defendant get out of the car?"  The translation should

24   have, should have been "as soon as the car stopped," and it

25   was something like, "as much as he could stand up."  Which, if

1  you translate that into English it makes sense, but when you

2  say it in Spanish, it doesn't.

3         That is the best example this interpreter can give at

4  this point, but there were a lot of omissions, Your Honor,

5  towards the end of every, of every question, of every answer

6  back into English or questions into Spanish.  There was -- it

7  was obvious that the ability to retain the information for the

8  whole question was not there because every question kept being

9  interrupted to "chunk it," as we say.

10         THE COURT:  Right.

11         INTERPRETER SAMULOWITZ:  When you don't hear the

12  whole question, Your Honor, as an interpreter, you may not

13  give an accurate translation.  Because you are, you are

14  separating different segments.  You are interpreting different

15  segments, and by the end of the question, by the end -- now,

16  by the time you finish interpreting the question, even though

17  you interpret it correctly every segment, you may not have

18  asked the correct question.

19         I don't know if this makes sense.  Sometimes the

20  first question in English, the first word in English is the

21  last word in Spanish and vice versa.  So we need, as

22  interpreters, we need to hear the whole question before we

23  start, and that is the reason why, when there is testimony we

24  do consecutive because we need to hear the whole thing.

25         When we are doing simultaneous, Your Honor, we

1   have -- we lag behind to allow for that.  That is called a

2   "clash," and the longer we let the speaker go, the more

3   context we have, the more material we have to work with.  When

4   we have the, the question and answer --

5           THE COURT:  I understand what you are telling me.

6   Can you have give me some more examples?

7           INTERPRETER SAMULOWITZ:  Sadly, Your Honor, not

8   specific examples.

9           THE COURT:  Okay.

10          INTERPRETER SAMULOWITZ:  But maybe my colleague has

11  better documentation of what happened.

12          THE COURT:  Thank you.  Please make sure the

13  microphone is — so he can hear you.  Thank you.

14          INTERPRETER CONDE-BARWISE:  Yes, ma'am.

15          THE COURT:  Thank you.

16          INTERPRETER CONDE-BARWISE:  Yes, Your Honor.  This

17  interpreter noticed some of the same things that Ms. Claudia

18  did, which is first of all the syntax.  When interpreting from

19  English into Spanish —

20          THE COURT:  I understand what you are telling me that

21  there is a syntax error.  What I need to know is specific.

22  Can you give me specific errors?

23          INTERPRETER CONDE-BARWISE:  I have two examples of

24  two mistranslations.

25          THE COURT:  Okay.

1      INTERPRETER CONDE-BARWISE:  It was something about a

2 question, and I think this part of the question was being

3 asked by the U.S. Government.  Something, whatever drugs that

4 you received from Flaco through Grenas, kind of showing

5 through whom.  It was interpreted into Spanish to the witness

6 that you received from Flaco or Grenas.  It is just one

7 example of numerous things that happened like that.

8      THE COURT:  Okay.

9      INTERPRETER CONDE-BARWISE:  Now second one is — and

10 this is more generic.  I just made a note.  When the

11 U.S. — the AUSA, Mr. Vaughn, was asking him about how the

12 distribution process went or how they had different levels

13 into distribution, distribution channel, I noticed that he

14 omitted parts and that he was not clear in the end how the

15 distribution was made.

16      THE COURT:  Okay.  Well, then I think it is important

17 that we recall him.  I am just making that decision.  So we

18 will recall him.  Is he still in the building?

19      MR. VAUGHN:  No.  He is on his way back to Grayson.

20      THE COURT:  Well, he will have to be brought back

21 tomorrow.

22      MR. VAUGHN:  Okay.

23      THE COURT:  Okay.

24      MR. VAUGHN:  Now, at that time —

25      THE COURT REPORTER:  I'm sorry.  Microphone, please.

1    MR. VAUGHN:  I'm sorry.  Now, at that time will the

2    questioning be limited to those two questions?

3    THE COURT:  No.  We —— I am going to get —— we are

4    going to redo the testimony unless the Defendant objects.

5    MS. RUCKER-BROOKS:  I think it is a good idea to ——

6    THE COURT:  I can't send this up with a piecemeal

7    record.

8    MS. RUCKER-BROOKS:  Yeah.

9    THE COURT:  I mean, you can persuade me otherwise,

10   but I don't see how, with the lack of specificity and the

11   error and the generalized complaints about syntax, I think the

12   only way to ensure the record is to redo his testimony in

13   total.

14   MR. VAUGHN:  So my understanding is we have syntax

15   errors, and I don't know what syntax is.  But if that is

16   something that —— my guess is, that is not going to be

17   material.

18   THE COURT:  I don't know.

19   MR. VAUGHN:  I mean, I don't know what syntax is.  I

20   really don't.

21   THE COURT:  It may be a complete repetition of what

22   happened today.  What do you mean by syntax?

23   INTERPRETER CONDE-BARWISE:  This interpreter noticed

24   that obviously the first language of this interpreter is

25   English, second language is Spanish, in this interpreter's

1  opinion.

2          THE COURT:  That is not true, but okay.

3          INTERPRETER CONDE-BARWISE:  Better command.

4          THE COURT:  Okay.

5          INTERPRETER CONDE-BARWISE:  Better command.

6  Syntax -- with syntax we mean English has a way of structuring

7  a sentence that is different than in Spanish.  When

8  interpreters are not too comfortable with the other language,

9  in this case is Spanish.  When their Spanish is not as good as

10  English, and that is in this interpreter's opinion, what a

11  person does is they stick very close to the syntax of English

12  or a language.

13          There are two languages, A and B.  For this

14  interpreter, Spanish is my A language, and B is my -- in

15  repeating, correcting that.  Spanish is my A language, and

16  English is my B language.  It will always be.  In this

17  interpreter's opinion, these other colleagues, A language is

18  English --

19          THE COURT:  It is not true, but okay.  All right.

20          INTERPRETER CONDE-BARWISE:  Okay.  He stuck very

21  close to the syntax in English in the way of the structuring

22  the sentences in Spanish, that along with the many omissions,

23  in -- at the end of every question he omitted three or four

24  words that sometimes were important, sometimes were not.

25  Showed us that or lead us to believe that to a native speaker

1   of Spanish, it would not have made any sense what he was

2   saying because he talks very close to the original language,

3   which is English.

4           In Spanish, if a native speaker in Spanish who spoke

5   no English would have not understood it at all.  Maybe the

6   reason the Defendant is understanding something is because he

7   speaks English.  But interpreter continuously -- this I want

8   to say again.  For every single question, at the end, he

9   omitted two to three words.

10          THE COURT:  Okay.  Thank you.

11          INTERPRETER CONDE-BARWISE:  You're welcome.

12          MR. VAUGHN:  Judge, I wonder --

13          THE COURT:  Go ahead.

14          MR. VAUGHN:  I'm sorry.  I wonder how much of this is

15  simply a disagreement between two people who hear the same

16  conversation and hear it differently.

17          THE COURT:  I understand that, Mr. Vaughn, and we

18  will never know.  So the only way I can correct this record is

19  to have him come back in and be examined again.  It -- with

20  what is before me now, it is the only solution I can think of

21  that, without going line by line through the transcript -- it

22  is the only way to ensure that Mr. Pineda-Hernandez's due

23  process rights are honored.

24          MR. VAUGHN:  Okay.

25          THE COURT:  So we will let the marshal know that he

1  needs to be brought back.  I don't know if they can turn the
2  bus around, but if they can't, I don't know if there are other
3  people on it.  He will need to be on a bus for tomorrow.
4          MR. VAUGHN:  No problem, Your Honor.
5          THE MARSHAL:  I was in the process of checking to see
6  if we could get him turned around.  They are seeing how far
7  out they are.
8          THE COURT:  All right.  We may just need to recall
9  him.
10         MR. VAUGHN:  I am sorry.
11         THE COURT:  I mean, we will recall him.
12         MR. VAUGHN:  Will the procedure be that his entire
13  testimony for two and a half hours this morning is now
14  stricken?
15         THE COURT:  I, I am not striking it.  I am just going
16  to tell the jury the funny thing called the truth, that there
17  was an issue about the translation, and so the court-appointed
18  interpreters are going to interpret his testimony.  And they
19  can judge one way or the other.  I don't know of any — I
20  can't put this — the time that everyone has invested in this
21  case, that is the only way that I can ensure that — striking
22  it, I guess I can strike it, but everybody just heard it.  So
23  it doesn't really make any sense to strike it, to me.  So that
24  is what we will do.
25         MR. VAUGHN:  All right.

1     THE COURT:  Okay?  So this afternoon —— we have got

2 90 minutes.  I guess we will just get started with

3 Mr. Cazares-Garcia?

4     MR. VAUGHN:  No, we have ——

5     THE CLERK:  Agent Steele.

6     THE COURT:  Is he 90 minutes?

7     MR. VAUGHN:  I am sorry.  No.  I switched.  We have

8 two, two law enforcement witnesses and then ——

9     MR. LASHER:  Your Honor, if we began with

10 Mr. Cazares-Garcia, we would probably get approximately an

11 hour into testimony that I expect would be at least two.  I am

12 not sure ——

13     THE COURT:  That is okay.  We will start with him.

14     MR. LASHER:  He would need to be transported again

15 tomorrow.  DEA will make those arrangements.

16     THE COURT:  Okay.  That is what we will do.

17     THE CLERK:  They can bring him back tomorrow.  They

18 are over an hour out right now.

19     THE COURT:  That is fine.  Thank you, Ray.

20     THE MARSHAL:  No problem.

21     THE COURT:  Is that acceptable, Ms. Rucker-Brooks?

22     MS. RUCKER-BROOKS:  It is, but I am left with the

23 problem if he needs to —— my client needs to communicate with

24 someone up there.

25     THE COURT:  There won't be two of them up there.

1          MS. RUCKER-BROOKS:  Okay.

2          THE COURT:  It will just be one person.

3          MS. RUCKER-BROOKS:  They said they work as a team.

4          INTERPRETER CONDE-BARWISE:  If the interpreter may,

5    everything will be said both in English and Spanish.  We will

6    not be able to be here if that was the case, that he needed to

7    communicate -- I could come over here.  We would prefer to

8    work as a team.  That is usually the practice between

9    interpreters.

10         THE COURT:  I have never had that before, but tell me

11   what happens, what you are proposing.

12         INTERPRETER CONDE-BARWISE:  If I understand

13   correctly, you were saying you thought we were going to be --

14   the two of us up there?

15         THE COURT:  No.  I want to know what you are

16   proposing, the team approach you are proposing tomorrow.

17         INTERPRETER CONDE-BARWISE:  Based on what I

18   understood as she is concerned about who is interpreting for

19   him, I was proposing the two us sit next to the witness so

20   that we help each other in case one of them needs a word, to

21   know a word, and we help each other or correct each other so

22   that we don't have to interrupt Your Honor or any of the

23   attorneys.  We, we worked in the past before even for

24   consecutive as a team.  Two interpreters are sitting next to

25   the witness to assist one another.

1    THE COURT:  Well, I think we will just have —

2    INTERPRETER CONDE-BARWISE:  Can you repeat your

3  question?  I am sorry.

4    THE COURT:  That just seems a little cumbersome.  I

5  don't understand why we need two people.

6    Let me also say, so you are — the other thing that

7  is important to you is that the Government complete its entire

8  question before any translation occurs.

9    INTERPRETER CONDE-BARWISE:  I am not sure I

10  understand your question, Your Honor.

11    THE COURT:  I am just trying to get the procedure

12  down.  Mr. Vaughn was, I thought courteously pausing at times

13  in his questions, same with Ms. Rucker-Brooks, pausing in

14  order to give the interpreter an opportunity to translate.

15  And you are, I am understanding, disapproving of that process?

16  Your chunking was not a good idea?

17    INTERPRETER CONDE-BARWISE:  In the end — you want to

18  talk about that?

19    INTERPRETER SAMULOWITZ:  Your Honor, if the pauses

20  are made by the attorney, that that is okay.  What we noticed

21  was that sometimes when Mr. Vaughn was speaking, Mr. Ramos

22  would start speaking and cut him off to interpret that little

23  bit.  That may be a practice of Mr. Ramos.  That, that, that

24  makes sense, and sometimes it works but sometimes it doesn't

25  when you interpret into, into Spanish.

1        The reason why we work as a team, Your Honor, either
2   for consecutive or simultaneous is because sometimes — it is
3   really to stay accurate.  Sometimes every time that there is a
4   number, for instance, both interpreters write the number just
5   to make sure that we are on the same page.
6        If there is a problem with, with a word, sometimes
7   because both interpreters are hearing the question in English,
8   if there is a term that is difficult, sometimes just a look to
9   your, to your partner is enough for the partner to write down
10  the number that he or she thinks you need in context.
11       THE COURT:  All right.  Let's go back to
12  Ms. Rucker-Brooks' question.  So you will have an opportunity
13  to confer with your client when the testimony is over.
14       MS. RUCKER-BROOKS:  So they will leave the stand and
15  then come over here?
16       THE COURT:  Yes.  Somebody will have to.
17       INTERPRETER SAMULOWITZ:  Yes, Your Honor, the person
18  who is not at the mic, if needed, would come back and help, of
19  course.
20       MS. RUCKER-BROOKS:  Okay.  I am just trying to
21  understand their process.
22       THE COURT:  Me too.
23       MS. RUCKER-BROOKS:  It sounds like they both are
24  focusing on —
25       THE COURT:  I don't really know that I have room for

1  you, a marshal, the witness, for two of you to be up here

2  because the marshal has to be right here.  These people are in

3  custody.

4         INTERPRETER SAMULOWITZ:  I understand, Your Honor.

5  Well, that is the way we work.  I apologize --

6         THE COURT:  If you want to sit behind the court

7  reporter so you can make eye contact with each other, that is

8  fine.  That is helpful.

9         INTERPRETER SAMULOWITZ:  Whatever works for the

10 Court.

11        THE COURT:  I think we will do it that way.

12        INTERPRETER SAMULOWITZ:  However we can accommodate.

13        THE COURT:  Okay.  Somebody should be at the table

14 there also.

15        MS. RUCKER-BROOKS:  But it sounds like if they are at

16 the table, it is for the benefit of each other and not, like,

17 if he is trying to communicate something to me.

18        THE COURT:  Well, they weren't helping him during the

19 examination in the first place today.

20        MS. RUCKER-BROOKS:  Yes, they have been.

21        THE COURT:  Someone will be there.

22        MS. RUCKER-BROOKS:  They have been writing notes and

23 handing them off while testimony has been going on.

24        THE COURT:  Writing notes to who?

25        MS. RUCKER-BROOKS:  Like, if he writes a note, and

1  they write in English and they hand it back to me.

2          THE COURT:  Okay.

3          INTERPRETER CONDE-BARWISE:  If this interpreter may.

4  It is not for benefit -- my apologies.  We also want to help

5  you, but our ultimate goal is to be impartial.  We don't try

6  specifically --

7          THE COURT:  You are here --

8          INTERPRETER CONDE-BARWISE:  Right.  We are here to

9  preserve the record, and the ultimate goal is accuracy.

10          THE COURT:  Yes.

11          INTERPRETER CONDE-BARWISE:  That is our only

12  obligation, to make sure -- our main obligation and probably

13  the most important, the accuracy.

14          MR. VAUGHN:  Your Honor?  I am sorry, but I

15  don't -- I, I should know this by now, but I don't.  I don't

16  know how these interpreters were selected, how we are here.  I

17  have never seen a situation this bizarre in -- and I have been

18  practicing law for over 30 years as a prosecutor.

19          I started out in Miami, Florida, where everyone spoke

20  Spanish.  It was interpreter city.  I have never seen a

21  situation like this where they are basically saying they need

22  four interpreters in a trial.

23          THE COURT:  Right.  It is not happening.

24          MR. VAUGHN:  This is bizarre.

25          THE COURT:  Okay.  So there will be one interpreter

1    here for the witness doing what Mr. Ramos did today, and then

2    one will remain at counsel table.  They are federally

3    certified interpreters so and if that is too taxing, let us

4    know and we will try to get another interpreter.

5            INTERPRETER CONDE-BARWISE:  Thank you.

6            INTERPRETER SAMULOWITZ:  Thank you, Your Honor.

7            THE COURT:  Can that work, then?  You can say no.  If

8    the answer is no, tell me.

9            INTERPRETER SAMULOWITZ:  I don't know until it stops

10   working, Your Honor.  We will do our best.  If it doesn't

11   work, we will let you know.

12           MR. VAUGHN:  I am sorry, and then we are right back

13   in a situation where we are going to be calling Barragan-Lopez

14   back for time number three?

15           THE COURT:  No.  We are not doing that.  We are

16   arranging for another interpreter to be here.

17           MS. RUCKER-BROOKS:  Thank you, Your Honor.

18           THE COURT:  Thank you.

19           MR. LASHER:  I apologize, Your Honor, but if I may,

20   does that mean that we won't be able to put Mr. Cazares-Garcia

21   on the stand this afternoon?

22           THE COURT:  Probably so.

23           MR. LASHER:  Okay.

24           THE COURT:  Can she be here in the afternoon?

25           THE CLERK:  That is what I am trying to find out.

1          THE COURT:  So let's get Agent Steele on and off,

2    Mike Cline on and off.  Can we do that?

3          MS. RUCKER-BROOKS:  I apologize, Your Honor, but I

4    don't think they have been interpreting everything that has

5    been happening with my client.  So can I just explain to him

6    what all just took place?

7          THE COURT:  I thought somebody was interpreting the

8    whole time.

9          MS. RUCKER-BROOKS:  You were interpreting all of

10   this?

11         INTERPRETER SAMULOWITZ:  When this interpreter

12   started speaking, of course, we stopped interpreting

13   simultaneously, Your Honor.  I don't know what happened

14   behind.

15         THE COURT:  Yes.  You may have a moment.

16         MS. RUCKER-BROOKS:  Thank you.

17         INTERPRETER SAMULOWITZ:  And if this interpreter may,

18   Your Honor?  We, we -- we can try to interpret this --

19         THE COURT:  I -- you have made a record now that

20   makes it difficult for me to accept a proposal that you said

21   is unacceptable even though it is a proposal that I have never

22   seen before, so we are going to -- you have made a record that

23   makes it difficult for me to accept that.  So I am going to

24   try to arrange for somebody else to be here tomorrow.

25         INTERPRETER SAMULOWITZ:  Okay.  Thank you, Your

1  Honor.

2          THE COURT:  Thank you.

3          THE CLERK:  Should I bring in the jury?

4          THE COURT:  No.  She is talking to her client.

5          THE CLERK:  Oh, sorry.

6          MS. RUCKER-BROOKS:  We are ready.  Thank you, Your

7  Honor.

8          MR. VAUGHN:  I am sorry, Your Honor, if I can put one

9  more thing on the record.  Now, at the same time

10  Mr. Pineda-Hernandez can go on the record and waive any

11  objections that he may have to any purported translation

12  errors, realizing that the jury is going to hear the testimony

13  twice now --

14          THE COURT:  Correct.

15          MR. VAUGHN:  -- from Mr. Barragan-Lopez now.  So if

16  he wants to factor that in, then he can make an informed

17  waiver on the record freely and voluntarily that, that waives

18  any objection to any translation errors that may have taken

19  place.

20          THE COURT:  Ms. Rucker-Brooks, do you want to confer

21  with your client about that?

22          MS. RUCKER-BROOKS:  Sure, Your Honor.  Thank you.

23          THE COURT:  Thank you.

24          MR. LASHER:  Your Honor, while they are conferring,

25  can I work on the equipment, get ready for the jury?

1    THE COURT:  You bet.  Thank you very much for

2  thinking of that.

3    MS. RUCKER-BROOKS:  Your Honor, if I may.

4    THE COURT:  Yes.

5    MS. RUCKER-BROOKS:  He does not waive any translation

6  errors.  He would like for the witness to come back tomorrow.

7    THE COURT:  Okay.  The witness will come back.

8    Let me just say one more thing to the interpreters.

9  I was of the impression that any errors that you had perceived

10  were being brought to the Court's attention as happened a few

11  times.  Now that we find out that is not the case and these

12  other concerns were addressed with counsel before they were

13  addressed with the Court and after the witness has been

14  allowed to leave the building so it really creates an

15  inconvenience.  So I would ask that you please, in the future,

16  let the Court know as soon as you discern a problem.

17    INTERPRETER SAMULOWITZ:  Yes, Your Honor.  We

18  mentioned it much earlier, and it was not brought up.  Before

19  we even approached the Court, Your Honor, I think that we

20  mentioned that earlier.  I, I really --

21    THE COURT:  To whom?

22    INTERPRETER SAMULOWITZ:  To Ms. Brooks.

23    THE COURT:  You told me twice that you want to be

24  considered neutral, which means your obligation is to me.

25    INTERPRETER SAMULOWITZ:  Yes, Your Honor.

1      THE COURT:  So I have to be notified.  That is what I
2  am asking.
3      INTERPRETER SAMULOWITZ:  Yes, Your Honor.  We just
4  thought it would be more appropriate going by that channel.
5  That is all.
6      THE COURT:  Thank you.
7      MS. RUCKER-BROOKS:  I just wanted to make a record
8  that one of the U.S. Attorneys had already left because things
9  were kind of dispersing, and I said, we should wait until
10  everybody can be here and the judge.  It is not like there was
11  any conversation that I had with them.
12      THE COURT:  Okay.
13      MS. RUCKER-BROOKS:  She brought it up —
14      THE CLERK:  All rise.
15      THE COURT:  Thank you.
16  (Jury in, 1:50 p.m.)
17  (Witness sworn.)
18      THE COURT:  Please tell the jury, if you would, your
19  first and last names and spell them both.
20      THE WITNESS:  Kevin, K-E-V-I-N.  S-T-E-E-L-E, Kevin
21  Steele.
22      THE COURT:  Go ahead, please.
23      MR. LASHER:  Thank you, Your Honor.
24
25

1      (Jury out, 2:38 p.m.)

2           THE COURT:  Thank you.  Anything else we want to

3      address before tomorrow?

4           MR. VAUGHN:  Besides the fact that I am absolutely

5      stunned.  Anyway, there we go.

6           THE COURT:  All right, thank you.  Anything,

7      Ms. Rucker-Brooks?

8           MS. RUCKER-BROOKS:  No, Your Honor.

9           THE COURT:  I just want to confirm for the record

10     that you have no objection to the process the Court has

11     outlined where we will recall the witness and have one of the

12     Court interpreters serve as the interpreter?

13          MS. RUCKER-BROOKS:  No objection, Your Honor.

14          THE COURT:  By "the witness," I mean Miguel

15     Barragan-Lopez.

16          MS. RUCKER-BROOKS:  That's correct, Your Honor.  No

17     objection.

18          THE COURT:  All right.  Thank you.

19          MS. RUCKER-BROOKS:  Thank you.

20          THE COURT:  Ladies, can you tell me in what judge's

21     court in our building that you have team interpreted before

22     in the sense of providing interpretation for witness's

23     testimony with two interpreters being there?  What other

24     judges have authorized that?  I am trying to negotiate with

25     the clerk's office for that type of reimbursement.  So what

1    other judges have you done that for?

2           INTERPRETER CONDE-BARWISE:  Your Honor, this is

3    Interpreter Maria Conde-Barwise, has only participated in one

4    trial with Judge Walton Pratt.  At that time I worked with

5    Miss Christina Courtright, and there were no witnesses at that

6    time that needed any Spanish interpreting.  So we just sat in

7    the back and kept quiet the whole time interpreting, quietly

8    team interpreting.  We helped each other but only that

9    interpreting in the simultaneous mode.  Other than that, this

10   interpreter has only interpreted during pleas and sentencings

11   --

12          THE COURT:  Yes.

13          INTERPRETER CONDE-BARWISE:  -- with you and other

14   judges, Your Honor.

15          THE COURT:  Yes.

16          INTERPRETER CONDE-BARWISE:  That is all.

17          THE COURT:  Thank you.  And the other interpreter?

18   Make sure you are on the mic.

19          INTERPRETER SAMULOWITZ:  Your Honor, this interpreter

20   cannot honestly remember when was the last time she worked on

21   a jury trial in this particular building.  So I could not

22   honestly tell you, Your Honor.

23          THE COURT:  Okay.  Can you tell me a judge in another

24   district where this has happened where two people have served

25   to interpret a witness's testimony?

1          INTERPRETER SAMULOWITZ:  Certainly, Your Honor.  The

2     last I remember was in Omaha, Nebraska.  I can't remember,

3     Your Honor.  Usually this interpreter has worked for the court

4     in the simultaneous mode, in general, in different courts all

5     over the country.  So but I distinctly remember Omaha,

6     Nebraska as one of the times when this interpreter has worked

7     as a team in consecutive mode.

8          THE COURT:  So when the two of you before said you

9     worked as a team in consecutive mode, that wasn't —

10          INTERPRETER SAMULOWITZ:  With each other.

11          THE COURT:  — wasn't with each other?

12          INTERPRETER SAMULOWITZ:  No, Your Honor.

13          THE COURT:  All right, thank you.

14          INTERPRETER CONDE-BARWISE:  Your Honor, if this

15     interpreter may.  We were together in that capacity in state

16     court in Rensselaer, Indiana, Your Honor.

17          THE COURT REPORTER:  I'm sorry, where?

18          INTERPRETER CONDE-BARWISE:  In Rensselaer, Indiana.

19          THE COURT:  Okay.  Thank you.

20          INTERPRETER CONDE-BARWISE:  And also in Lexington,

21     Kentucky with Miss Marta Roller.  The two of us helped

22     interpret for several witnesses in Spanish, working as a team.

23          THE COURT:  Okay.  Thank you.

24          INTERPRETER CONDE-BARWISE:  You're welcome, Your

25     Honor.

1    THE COURT:  8:30 again, everybody.  Be here at 8:15.

2  Ms. Wetzel will e-mail you copies of the proposed jury

3  instructions just so you can be taking a look at those, all

4  right?  Thank you.

5    MR. VAUGHN:  Thank you, Your Honor.

6    (Adjourned, 2:43 p.m.)

7                    - - -

8            CERTIFICATE OF COURT REPORTER

9

10    I, Jean A. Knepley, hereby certify that the

11  foregoing is a true and correct transcript from reported

12  proceedings in the above-entitled matter.

13

14

15  /S/ Jean A. Knepley                July 18, 2018
    JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR  Date
16  Official Court Reporter
    Southern District of Indiana
17  Indianapolis Division

18

19

20

21

22

23

24

25

1          *(In open court.)*

2      (Jury out, 8:41 a.m.)

3          THE COURT:  We are on record outside the presence of

4      the jury in Cause No. 1:15-cr-200.  This is the case of the

5      United States of America versus Alfonso Pineda-Hernandez.

6          Mr. Pineda-Hernandez is present with counsel,

7      Ms. Rucker-Brooks.  The Government is present by Assistant

8      United States Attorneys Joe Vaughn and Matt Lasher.  They are

9      assisted by Special Agent Matt Holbrook with the DEA.

10          This matter is on before the Court for the fourth day

11     of trial by jury.  We are outside of presence of the jury at

12     this time.  Are there any matters to bring up before the jury

13     comes in?  Mr. Vaughn?

14          MR. VAUGHN:  Yes, Your Honor.  I have a number of

15     matters I would like to address on the record pertaining to

16     the events of yesterday afternoon.  First of all, I will

17     divide my comments into three basic sections:

18          First of all, the specific examples of purported

19     erroneous translations which were cited by the two court

20     translators yesterday, the Government would submit that in the

21     context of the case, the sparse examples they were able to

22     come up with are not material, in light of all the testimony

23     and the evidence in the case.

24          And number two, one of the examples that was cited

25     dealt with a question by Mr. Pineda-Hernandez's lawyer in

1    which there was a dispute whether the question concerned

2    marijuana or methamphetamine and heroin.  The Government's

3    recollection is that the Government and the Court and the

4    court translators heard the statement as -- I am sorry, and

5    Mr. Barragan.  It would be the witness, the Court, and Mr.

6    Barragan's interpreter heard the question as being marijuana.

7    The court reporter and the court translator heard it as

8    methamphetamine and heroin.  That is not a mistranslation.

9    That is simply an example of people hearing different things

10   at the same time from one conversation.

11            Number two, the unspecified allegations of widespread

12   translation errors which have been alleged by the court

13   translators have compromised the record in this case and have

14   boxed this Court into a corner.  Basically, this Court has two

15   options:

16            Number one is to recall Mr. Barragan-Lopez and go

17   back through his testimony again with a new interpreter.

18            Number two would be for Mr. Barragan-Lopez to waive

19   any translation errors that may have occurred yesterday, and

20   we proceed with the next witness and we stand on

21   Mr. Barragan-Lopez's testimony as it was elicited yesterday.

22            Because this is such an unusual situation, the

23   Government requests that this Court conduct a colloquy with

24   the Defendant and discuss those options with him and confirm

25   that his decision has been made freely and voluntarily and to

1  understand that should he not waive the translation errors,

2  the jury will have heard Mr. Barragan-Lopez's testimony twice

3  within a timespan of 24 hours.  And I would submit that that

4  testimony was less than favorable to the Defendant.

5           Number three.  It is the Government's understanding

6  that this Court is not making a finding that there were, in

7  fact, translation errors committed by Mr. Ramos.  The

8  allegation has been made by the court translators that there

9  were errors.  Mr. Ramos has never been -- has not weighed in

10  on the matter.

11          In fact, he was unable to hear the translations being

12  made by the court translators to the Defendant.  For all we

13  know, Mr. Ramos would say that he got it exactly right, his

14  translations were spot on, and the court translators are the

15  ones who got it wrong.

16          Because of the state of the record based upon the

17  court translator's allegations, it is my understanding that

18  this Court is not going to make a finding over whether there,

19  in fact, were any translation errors.  It is not going

20  to -- it is not going to make any finding on the validity of

21  the translator's accusations, that this Court has two

22  interests.

23          One is to protect Mr. Pineda-Hernandez's due process

24  rights, and the second is to protect the record in this case.

25  And in order to do so, this Court is proceeding with the

1    options of either a waiver by Mr. Pineda-Hernandez or a redo

2    of Mr. Barragan-Lopez's testimony and is not making any

3    factual findings regarding the accuracy of the translations.

4    Thank you.

5           THE COURT:  Thank you.

6           Do you wish to respond, Ms. Rucker-Brooks?

7           MS. RUCKER-BROOKS:  No, Your Honor.  If you want to

8    question my client, I mean, it is certainly up to the Court.

9    I did speak to my client yesterday regarding his options.  I

10   believe he fully understood it when I spoke to him, and as

11   Your Honor is well aware, he has been pretty firm in not

12   agreeing to anything.

13          THE COURT:  Understood, not waiving any rights.

14          MS. RUCKER-BROOKS:  That's correct, Your Honor.

15          THE COURT:  So let's make sure.  Mr.

16   Pineda-Hernandez, a waiver in federal court -- let me just say

17   two things.  First of all, I agree with the Government's

18   characterization of the position the Court is in at this time,

19   and I also agree with -- or will affirm that the Court is

20   making no finding that Mr. Ramos' testimony was -- or

21   translation was inaccurate in this case.

22          As the parties noted yesterday and the Defense

23   counsel agreed to his qualifications, the Court is familiar

24   with him, and he has served both the defense in cases in the

25   Court's experience and the Government.  And so the Court is

1  not making any finding concerning Mr. Ramos.

2          The Court's decision that the calling — recalling

3  Mr. Barragan-Lopez is the best way to handle the situation is

4  born of this thought process, and I would ask Mr.

5  Pineda-Hernandez to listen carefully, which I am sure he is.

6          If Mr. Barragan-Lopez's testimony, as translated

7  today is the same as his testimony was yesterday, we will have

8  the best record possible as to the accuracy of yesterday's

9  translation, and so the Court has proposed a, an instruction

10  that I will give the jury this morning.  I have reviewed it

11  with counsel.  We just hashed it out.

12          Mr. Barragan-Lopez — or Mr. Pineda-Hernandez, one

13  thing I wanted to emphasize is that when you waive or give up

14  a right, you have to know what right you are giving up.  So if

15  you agree that Mr. Barragan-Lopez can testify again today, and

16  that is the course that you want the Court to pursue, then, as

17  the Government noted, the jury will hear his testimony twice.

18  They won't hear anybody else's testimony twice.  They will

19  hear his testimony twice in a period of 24 hours.

20          By choosing to have that be how we proceed, which is

21  fine, and we are ready to have that happen, by choosing to

22  have him proceed to testify again, you are waiving any error

23  in the fact that he will be testifying twice.  You can't

24  complain on appeal if you are convicted in this case that it

25  was wrong for me to allow him to testify twice.

1    So if you want that to be the process, and your

2    attorney has indicated that that is your choice, and that is

3    fine if it is, understand that in doing so you are giving up

4    any right to complain about him being called for a second

5    time, should you be convicted and should you try to raise this

6    issue on appeal.

7    So the choice that I am putting to you is, do you

8    wish to simply proceed on the record with his testimony as it

9    came in yesterday, or do you wish for him to be recalled and

10   have his testimony interpreted with a different translator?

11   And if you wish to speak with your attorney privately before

12   answering, that is just fine.

13   MS. RUCKER-BROOKS:  Tell the Court.  You can --

14   (Defendant speaking in Spanish.)

15   THE COURT:  Thank you.

16   INTERPRETER CONDE-BARWISE:  May the interpreter

17   inquire real quick, Your Honor?

18   THE COURT:  Yes.

19   MR. VAUGHN:  Wait a minute.  Your Honor, this is not

20   a translation process.  He just spoke for -- that was -- now

21   they don't know what he said?

22   THE COURT:  You know what he said?

23   INTERPRETER CONDE-BARWISE:  I do, Your Honor, but the

24   interpreter needs to clarify something.

25   THE COURT:  Okay.

1    INTERPRETER CONDE-BARWISE:  Thank you.  Your Honor,
2  as we had mentioned yesterday, I have made the decision that I
3  would like to hear the testimony of this Defendant one, once
4  more -- of this witness, correction from the interpreter.  And
5  I would not like to waive any right to any appeal.  And so I
6  would like for that witness to testify today.

7    THE COURT:  All right.  That is your choice, then.
8  But let me clarify that by making that choice, you are waiving
9  a right to complain on appeal that he testified two times if
10 you should be convicted in the case; do you understand?

11   INTERPRETER CONDE-BARWISE:  Yes.  That is -- I
12 understand that, but can I say something else?

13   THE COURT:  Yes.

14   (Defendant speaking in Spanish.)

15   INTERPRETER CONDE-BARWISE:  Your Honor, let me say it
16 again.  What I am saying, it was not my problem.  It was not
17 an issue for my attorney.  I think this was an issue that came
18 up that no one was planning for it to happen, and let me say
19 this again, I do not want to waive my right.  But let me say
20 again — let me say it again, you have the last word.  Do as
21 you deem fit.  I would like for him to testify again.

22   THE COURT:  All right.  He will testify again.  Thank
23 you.

24   MR. VAUGHN:  Thank you.

25   THE COURT:  I am just going to state on the record

1  what I will state to the jury since everyone is here.

2  Ladies and gentlemen, yesterday the parties agreed

3  that Sam Ramos, the interpreter who translated during

4  Mr. Barragan-Lopez's testimony was qualified to perform the

5  translation.  Following the conclusion of Mr. Barragan-Lopez's

6  testimony, an issue was raised as to the accuracy of the

7  translation.  Because I am not fluent in Spanish, I cannot

8  determine the issue myself.

9  Accordingly, the parties have agreed that

10  Mr. Barragan-Lopez will testify again today using a different

11  interpreter.  I will instruct you further on this matter in

12  the final jury instructions.

13  Is that instruction acceptable to the Government?

14  MR. VAUGHN:  Yes, it is, Your Honor.

15  THE COURT:  And to the Defendant?

16  MS. RUCKER-BROOKS:  Yes, it is, Your Honor.

17  THE COURT:  Thank you.

18  MS. RUCKER-BROOKS:  Your Honor?

19  THE COURT:  Yes.

20  MS. RUCKER-BROOKS:  Before the jury comes in, I have

21  an emergency.  May I step out for one minute?

22  THE COURT:  Yes.

23  MS. RUCKER-BROOKS:  Thank you.

24  THE COURT:  Whoever will get the translation needs to

25  get mic'd.  We will do it how we did yesterday with the

interpreter.  Ms. Sanchez, I think these interpreters have

indicated that they need to work as a team in providing the

translation.  So I would like you to remain at counsel table

with the Defendant so that he can communicate with his client,

all right —— his lawyer, I mean to say.  You can bring them

in.

          I have one other housekeeping matter to take care of.

Because of the issues yesterday we got a little bit off

schedule.  So if the Government —— the Government had done a

great job predicting the timing for each of the days.  How do

you now see the case unfolding?

          MR. LASHER:  Your Honor, before I respond ——

          THE COURT:  You know what?  You are right.  We will

wait.

          MR. LASHER:  We need Ms. Rucker-Brooks.

          THE COURT:  We will wait.

          I had asked Ms. Rucker-Brooks —— I forgot that you

had left, and they didn't answer my question anyway.  I asked

the Government to outline the order of events to see when they

predicted that the case would end.  So I thought we would all

want to know that.  Go ahead, please, Mr. Lasher.

          MR. LASHER:  Your Honor, we expect to have four

witnesses today, starting with Mr. Barragan-Lopez, followed by

Mr. Nicolas Cazares-Garcia.  Then that will probably take us

to approximately lunch.  After that, we would have Agent

1  Holbrook come up and testify again to interpret more

2  intercepted communications, and then we would close with Eric

3  Sills regarding Count II of the indictment.

4         THE COURT:  Okay.

5         MR. LASHER:  I predict that is going to be mid to

6  late afternoon by the time we are done.  That will finish the

7  Government's case in chief, and then depending on what the

8  defense chooses to do will determine where we go.

9         THE COURT:  I realize you don't have to make a call

10  right now.  Do you anticipate putting on any evidence?

11         MS. RUCKER-BROOKS:  There is a possibility, Your

12  Honor.

13         THE COURT:  Okay.  All right.  So that would be

14  tomorrow morning anyway, but I would still anticipate that we

15  would submit the case to the jury tomorrow, argue and instruct

16  tomorrow.  Everybody is ready for that, correct?

17         MR. LASHER:  Yes, Your Honor.

18         MS. RUCKER-BROOKS:  That is correct, Your Honor.

19         THE COURT:  Thank you.

20         MS. RUCKER-BROOKS:  Any evidence that the Defense

21  puts on wouldn't take an hour ——

22         THE COURT:  Okay.

23         MS. RUCKER-BROOKS:  —— at best, from our side.

24         THE COURT:  Okay.  Thank you.

25         As the Government has done, I would ask that you

1  confer with them so that they can be aware, as they have been

2  aware.

3       MS. RUCKER-BROOKS:  Absolutely.  They have been an

4  amazing communicator.

5       THE COURT:  Thank you.  All right.  Are we ready for

6  the jury, Mr. Vaughn?

7       MR. VAUGHN:  Yes, we are.

8       THE COURT:  Ms. Rucker-Brooks?

9       Ms. Sanchez, I need to swear you in.

10    (Interpreter Elizabeth Sanchez sworn.)

11      THE COURT:  At this time the Court would note that

12  Interpreter Elizabeth Sanchez is here interpreting for the

13  Defendant, and the court-appointed interpreters will be

14  interpreting for the witness.  Thank you -- and counsel.

15      Mr. Barragan-Lopez, please make sure you speak into

16  the microphone, okay?

17      THE WITNESS:  Okay.

18    (Jury in, 9:03 a.m.)

19      THE COURT:  Thank you.  Please be seated.  Welcome

20  back, ladies and gentlemen.  Good morning.  Let me ask you as

21  I have in the past, has anyone talked to you about this case,

22  or have you talked to anyone about this case?  If so please

23  raise your hand.  Okay.

24      Ladies and gentlemen, yesterday the parties' agreed

25  that Sam Ramos, the interpreter who translated during

1    Mr. Barragan-Lopez's testimony, is qualified to perform the

2    translation.  Following the conclusion of Mr. Barragan-Lopez's

3    testimony, an issue was raised as to the accuracy of the

4    translation.  Because I am not fluent in Spanish, I cannot

5    determine the issue myself.

6           Accordingly, the parties have agreed that

7    Mr. Barragan-Lopez will testify again today using a different

8    interpreter.  I will instruct you further on this matter in

9    the final jury instructions.  So sir, could you state your

10   name for the record.

11          THE WITNESS:  Miguel Barragan-Lopez.

12          THE COURT:  And do you understand that you are still

13   under oath?

14          THE WITNESS:  Yes.

15          THE COURT:  Go ahead, Mr. Vaughn.

16   **MIGUEL BARRAGAN-LOPEZ, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

17                        **DIRECT EXAMINATION**

18   BY MR. VAUGHN:

19   Q    Welcome back, Mr. Barragan.

20   A    Thank you.

21   Q    Have you seen the movie *Ground Hog Day*?

22   A    No.

23   Q    What we are going to do today is go back through the same

24   testimony that we went through with you yesterday.

25   A    Okay.

1    it?

2              MS. RUCKER-BROOKS:  Yes, of a mixture —

3              MR. VAUGHN:  I am sorry?  Wait a minute.

4              THE COURT:  The last sentence said 50 grams or more.

5    It can't be less —

6              MR. VAUGHN:  I see.

7              THE COURT:  You are right.

8              MR. VAUGHN:  Thank you.

9              THE COURT:  We will take out "or more" in the third

10   sentence.  Any other proposed changes?

11             MS. RUCKER-BROOKS:  No, Your Honor.  No, Your Honor.

12             THE COURT:  Okay.  Thank you.  All right.  So we will

13   go ahead and make the changes that we discussed and resend the

14   instructions to you tonight.  Can we do that?  I bet she is

15   close to done, and we will send the proposed verdict form,

16   too, and we will see you tomorrow at 8:30; is that all right?

17   Anything else for the Government?

18             MR. VAUGHN:  No, Your Honor.

19             THE COURT:  For Mr. Pineda-Hernandez, anything else

20   for the Court?

21             MS. RUCKER-BROOKS:  No, Your Honor.

22             THE COURT:  All right.  Thank you.

23             THE CLERK:  All rise.

24             THE COURT:  My trusty law clerk reminded me that we

25   didn't do anything in the jury instructions -- please be

1    seated -- about Mr. Barragan-Lopez's testimony.  Do we want to

2    do anything special in the instructions?  Personally, I did

3    not discern any difference, maybe some nuanced differences but

4    nothing substantive.

5        So I would prefer to maybe not even draw any

6    attention to it, but that would be my preference.  I can be

7    obviously persuaded otherwise and open the floor to the

8    parties to so persuade me.  What is the Defendant's

9    preference?

10        MS. RUCKER-BROOKS:  I think it is kind of common

11    sense for the jury that they heard it twice, but it doesn't

12    get more credit.  I don't know if that needs to be said

13    expressly.

14        THE COURT:  Okay.

15        MR. VAUGHN:  I think the Government's position would

16    be it just gets left alone.  It is kind of covered by the

17    context of all the other instructions in the case.  He is just

18    another witness.

19        THE COURT:  All right.  Okay.  As it stands I won't

20    do anything, and if you want to tender an instruction,

21    Ms. Rucker-Brooks, do that by 10:00 o'clock.

22        MS. RUCKER-BROOKS:  I will do it by 8:00 o'clock.  My

23    client has informed me that he is confident he is not going to

24    testify tomorrow so I don't have to go to the jail tonight.  I

25    get to work.

1    THE COURT:  You want to make the record or wait until

2  tomorrow?

3    MS. RUCKER-BROOKS:  We will wait until tomorrow.

4    THE COURT:  Okay.  That is fine.

5    MS. RUCKER-BROOKS:  Just in case he sleeps on

6  something else.

7    THE COURT:  So by 8:00 o'clock is great for the

8  instructions.

9    MS. RUCKER-BROOKS:  Thank you, Your Honor.

10    THE COURT:  Thank you.  We will see you tomorrow.

11    MR. VAUGHN:  Thank you.

12    THE CLERK:  All rise.

13    (Adjourned, 5:13 p.m.)

14                          - - -

15              CERTIFICATE OF COURT REPORTER

16

17    I, Jean A. Knepley, hereby certify that the

18  foregoing is a true and correct transcript from reported

19  proceedings in the above-entitled matter.

20

21

22  /S/ Jean A. Knepley                  July 22, 2018
    JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR    Date
23  Official Court Reporter
    Southern District of Indiana
24  Indianapolis Division

25

1    this case, I have one additional proposed instruction that

2    would pertain to Mr. Barragan-Lopez and the fact that he

3    testified twice.  It is very short, and I can read the draft

4    into the record.

5         THE COURT:  Okay.

6         MR. VAUGHN:  I read that Miguel Barragan-Lopez

7    testified twice because an issue was raised as to the accuracy

8    of the translation of his first testimony.

9         THE COURT:  Okay.

10        MR. VAUGHN:  Second paragraph.  You should not give

11   any extra weight to Mr. Barragan's testimony based on the fact

12   that he testified twice.

13        THE COURT:  How about just because he testified

14   twice?

15        MR. VAUGHN:  Because he testified twice.

16        Third paragraph.  Mr. Barragan's testimony should be

17   evaluated in accordance with these instructions.

18        THE COURT:  Anything else?

19        MR. VAUGHN:  That is it.

20        THE COURT:  Okay.  Do you have any objection to that,

21   Ms. Rucker-Brooks?

22        MS. RUCKER-BROOKS:  No, Your Honor.  I believe that I

23   thought that would be appropriate.  I said that yesterday.

24        THE COURT:  You did.  All right, thank you.

25        That will result in a renumbering.  Let's go ahead,

1  as evidence against the Defendant.

2      You may give these witnesses' testimony whatever

3  weight you believe is appropriate, keeping in mind that you

4  must consider that testimony with caution and great care.

5      Miguel Barragan-Lopez testified twice because an

6  issue was raised as to the accuracy of the translation of his

7  first testimony.  You should not give any extra weight to

8  Mr. Barragan's testimony because he testified twice.

9  Mr. Barragan's testimony should be evaluated in accordance

10  with these instructions.

11      It is within the lawful performance of the duty of

12  the United States Attorney to enter into plea bargaining with

13  any individual relating to his alleged involvement in criminal

14  activity, to seek an indictment, and to decide whether to

15  recommend a reduced sentence against a particular individual

16  in exchange for that person's cooperation in the Government's

17  investigation.

18      You have heard evidence that before the trial,

19  witnesses made statements that may be inconsistent with the

20  witnesses' testimony here in court.  You may consider an

21  inconsistent statement made before the trial to help you

22  decide how believable a witness' testimony was here in court.

23      You have heard recorded conversations and seen video

24  recordings.  This is proper evidence that you should consider

25  together with and in the same way you consider the other

1    unexplained source of income was explained by the jury's

2    verdicts.  We know how he was making that money, and instead

3    of trying to be a productive member of society, he was just

4    distributing the drugs both probably to support his own habit

5    but also to maintain his lifestyle and to provide for the son

6    that he cares so much for.

7        Looking at the circumstances of the offense and the

8    history and characteristics of the Defendant, I think that

9    this is a case where the guidelines accurately capture what

10   has happened, his refusal to accept any responsibility for his

11   actions would not justify, in my mind, any kind of variance

12   beneath these guidelines.  And the Government would ask that

13   the Court sentence him to 360 months of incarceration, Your

14   Honor.

15       THE COURT:  Thank you.  All right.

16       The Court is, of course, required to consider the 3553(a)

17   factors.  The first is the nature and circumstances of the

18   offense and the history and characteristics of the Defendant.

19   With respect to the nature and circumstances of the offense, I

20   understand that the Defendant is maintaining his innocence.

21   But the jury spoke, and the jury found him guilty of Counts I

22   and II.

23       I also understand that the Defendant has raised some

24   questions about evidence that the Government did not produce,

25   but I think that what the Defendant needs to realize is the

1  charge in this case was conspiracy.  So it was the fact that

2  there was an agreement to distribute -- to possess with the

3  intent to distribute and to distribute the methamphetamine.

4  And consequently, the Government doesn't have the same

5  responsibility as it might in an actual possession charge or

6  in an actual distribution charge to prove sort of the chain of

7  custody he is interested in.

8      So the case did largely rest on the testimony of

9  individuals who testified that they were engaged in the

10 conspiracy with Mr. Pineda-Hernandez, but it wasn't just their

11 testimony because the Government had the benefit of the

12 surveillance and the audiotapes and the other physical

13 evidence that was actually introduced to corroborate the

14 testimony of those individuals who cooperated with the

15 Government in the case.

16     So there was sufficient proof beyond a reasonable doubt

17 to support the two charges for which the Defendant was found

18 guilty.  So when we think about that quantity of drugs coming

19 into our community, as somebody who experiences, from his own

20 admission today, the problems that result in life from one who

21 is addicted, importing that level of drug into our community

22 just does two things:  It feeds addiction, which is a horrible

23 disease, and it destroys families' and citizens' ability to

24 live productive lives.

25     So that is a very serious circumstance about the offense

1   in question.  The amounts of drugs were delineated by the

2   Government not only in evidence at trial but recapitulated in

3   their sentencing memorandum, and the quantity the Court has

4   found to be appropriate to support the base offense level of

5   34.

6       The Defendant's history and characteristics, I do

7   acknowledge his difficult childhood and the hurt that he felt

8   when his father chose to start a new family.  And I respect

9   his love for his son, but as the Government noted, that I

10   would have hoped would have inspired him to live a law-abiding

11   life here in this country so that he could stay with his son

12   and teach his son the right way to live.

13       In this particular case I have found that the evidence

14   also supported the leadership role that he had in this

15   conspiracy.  He wasn't, as I said before, the only leader, but

16   he was a leader, and so as the Government notes, it did

17   involve the recruitment or at least the inclusion of other

18   young men in this offense in bringing them into this

19   lifestyle.

20       So it is a very serious offense for the reasons just

21   stated, and the Court has to be mindful of making sure that

22   the respect for the law is promoted by its sentence and that a

23   just punishment is also imposed.  I also need to make sure

24   that Mr. Pineda-Hernandez is deterred from committing crimes

25   in the future, and protection of the public is of some

 1   concern.  But he is going to have a lengthy sentence, whatever

 2   the circumstance.  The other point that I do want to emphasize

 3   here is the unwarranted sentence disparities.

 4        I recognize that there is some significant value to the

 5   Government in the cooperation provided by Mr. Cazares-Garcia,

 6   but he also was, I think, a more, a larger drug dealer maybe

 7   you would say or involved in more and different types of

 8   drugs.  So that is weighing in the Court's mind as well.

 9        It is that factor as much as any that is causing the

10   Court to consider a variance in this case because the sentence

11   is going to be significant in any event.  However, the minimum

12   sentence that is argued by the Defendant, the Court finds, is

13   not supported by the quantity of drugs and the extent of the

14   conspiracy and the money laundering charges in this case.

15        So the Court finds that an appropriate sentence in this

16   case is a sentence -- looking at all of the other

17   Defendants -- that a sentence of 25 years is an appropriate

18   sentence in this case.  And the Court will enter that sentence

19   formally at this time.

20        Pursuant to the Sentencing Reform Act of 1984, it is the

21   judgment of the Court that the Defendant, Alfonso

22   Pineda-Hernandez, is hereby committed to the custody of the

23   Bureau of Prisons to be imprisoned for a term of 300 months on

24   Count I and 240 months on Count II to be served concurrently

25   for the reasons just stated.  The Court is not ordering a

1  fine, based on the Defendant's financial resources and future

2  ability to pay.

3      The law requires supervised release, and the Court is

4  imposing a term of five years on Count I and three years on

5  Count II to be served concurrently.  It is required by law,

6  but the Court also notes that the Defendant is likely to be

7  deported and so there will be minimal special conditions.

8      While on supervised release, Mr. Pineda-Hernandez shall

9  not commit another federal, state, or local crime, shall

10  cooperate with the collection of a DNA sample, shall refrain

11  from any unlawful use of a controlled substance, and shall

12  submit to one drug test within 15 days of placement on

13  supervised release and two periodic tests thereafter as

14  directed by the probation officer.

15      Further, the Defendant shall comply with the following

16  additional conditions:  One, you shall surrender as directed

17  to U.S. Immigration and Customs Enforcement.  If you are

18  released from the custody of the United States Immigration and

19  Customs Enforcement for any reason, you shall report to the

20  nearest U.S. probation office within 72 hours of your release.

21      Two, if released from confinement, not deported or

22  removed or you reenter the United States, you shall report to

23  the nearest probation office within 72 hours.

24      Three, you shall obtain the proper documentation from

25  United States Immigration and Customs Enforcement authorizing

1   you to work in the United States.

2       Because the Defendant was convicted of two federal

3   felonies, the Court is ordering a special assessment of $200.

4   Payment of the special assessment is due immediately and is to

5   be made directly to the clerk of the United States District

6   Court.

7       Counsel, do you have any legal objection to the sentence

8   I have proposed or request any further elaboration of my

9   reasons under Section 3553(a) either as to the length of the

10  term of imprisonment or as to the length and conditions of

11  supervised release, Mr. Lasher?

12              MR. LASHER:  No, Your Honor.

13              THE COURT:  Ms. Rucker-Brooks?

14              MS. RUCKER-BROOKS:  No, Your Honor.

15              THE COURT:  Is there any argument for a sentencing

16  recommendation as to conditions or location of imprisonment?

17              MS. RUCKER-BROOKS:  Yes, Your Honor.  He would like

18  to go to Manchester, Kentucky, if possible.

19              THE COURT:  All right.  The Court will recommend

20  placement in Manchester, Kentucky.

21              MS. RUCKER-BROOKS:  If not Manchester, then Terre

22  Haute.  But Manchester is his first choice because of

23  programming.

24              THE COURT:  All right.  And are there any specific

25  programs he is interested in?  The Court will recommend