In the
# United States Court of Appeals
# for the Seventh Circuit

---

UNITED STATES OF AMERICA,
                                 Plaintiff-Appellee,

v.

JOSE TRINIDAD GARCIA, JR., and
ALFONSO PINEDA-HERNANDEZ, a/k/a Flaco,
                                 Defendants-Appellants.

---

On Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:15-cr-200 — Hon. Jane Magnus-Stinson, *Chief Judge*.

---

## BRIEF OF THE UNITED STATES

---

JOSH J. MINKLER
United States Attorney

Bob Wood
Chief, Appellate Division

Attorney for the
United States of America

United States Attorney's Office
10 W. Market Street, Suite 2100
Indianapolis, IN 46204
(317) 226-6333

# TABLE OF CONTENTS

**Page No**.

JURISDICTIONAL STATEMENT.............................................................1

STATEMENT OF THE ISSUES............................................................2

STATEMENT OF THE CASE...............................................................3

SUMMARY OF THE ARGUMENT......................................................18

ARGUMENT.......................................................................................19

I.    The District Court Did Not Plainly Err When It
Treated Trinidad Garcia's Prior Marijuana
Conviction As a Felony Drug Offense..............................................19

    A.    Standard of Review..................................................19

    B.    The Categorical and Modified Categorical Approaches..............20

    C.    Trinidad Garcia's Conviction Under Indiana Code
Section 35-48-10 Qualifies As a Felony Drug Offense
Under the Modified Categorical Approach.............................22

        1.    State Court Decisions Do Not Offer an Easy
Answer to the Divisibility Question................................22

        2.    A "Peek" Shows that the Statute Is Divisible....................26

    D.    Treating a Dealing in Marijuana Conviction as a Felony
Drug Offense Was Hardly a Plain Error................................29

II.    The Record Establishes Clear Waiver of Pineda-Hernandez's
Overarching Translation Claim, No Substantial Translation
Errors, and Commendable Handling of a Difficult Situation by
The District Court........................................................................31

    A.    Pineda-Hernandez Has Waived His Claims...........................31

i

B. Even if Not Waived, Pineda-Hernandez's Translation Claim Fails Because the Record Does Not Establish Any Substantial Translation Errors...................................33

C. The District Court Ably Handled a Difficult Situation ..........38

D. Any Error Was Harmless..................................................41

III. Because Pineda-Hernandez Was a Leader of the Conspiracy In This Case, the District Court's Decision to Apply a Leadership Enhancement Was Correct, Not Clearly Erroneous.............................................................................43

A. Standard of Review..........................................................43

B. Pineda-Hernandez's Role in the Offense Warranted a U.S.S.G. § 3B1.1 Enhancement.........................................44

CONCLUSION.................................................................................50

# TABLE OF AUTHORITIES

**Cases**

Page No.

*Arizona v. Fulminante*, 499 U.S. 279 (1991)…………………………...…….42

*Descamps v. United States*, 570 U.S. 254 (2013)………………………….......21

*Duncan v. State,* 412 N.E.2d 770 (Ind. 1980) …………………………… 24, 26

*Everroad v. State,* 570 N.E.2d 38 (Ind. Ct. App. 1991)…………….......23, 24, 26

*Gates v. State,* 97 N.E.3d 309 (Ind. Ct. App. 2018)………………….......25, 26

Gonzales v. Duenas-Alvarez, 549 U.S. 183 (2007)……………………….....28

*In re Lisse,* 905 F.3d 495 (7th Cir. 2018)……………………………………....27

*Martin v. Amoco Oil Co.*, 696 N.E.2d 383 (Ind. 1998)……………………….24

*Martin v. State*, 374 N.E.2d 543 (Ind. Ct. App. 1978)………………………..26

*Martinez v. Sessions*, 893 F.3d 1067 (8th Cir. 2018)…………………………22

*Mathis v. United States,* 579 U.S. ____, 136 S. Ct. 2243 (2016) ………...passim

*Mendoza v. United States*, 755 F.3d 821 (7th Cir. 2014)………………….41, 43

*Najera-Rodriguez v. Barr,* 926 F.3d 343 (7th Cir. 2019) ……………....… passim

*Neder v. United States,* 527 U.S. 1 (1999)…………………………………….42

*Quarles v. United States*, 587 U.S. ____, 139 S. Ct. 1872 (2019)………...….30

*Richardson v. State,* 717 N.E.2d 32 (Ind. 1999)……………………… 24, 25, 26

*Shepard v. United States*, 544 U.S. 13 (2005)………………………….28, 29

*Taylor v. State,* 929 N.E.2d 912 (Ind. Ct. App. 2010)…………………..….26

*United States v. Arojojoye*, 753 F.3d 729 (7th Cir. 2014)…………………….47

*United States v. Bennett*, 708 F.3d 879 (7th Cir. 2013)...........................46

*United States v. Bey,* 725 F.3d 643 (7th Cir. 2013)...........................31, 32

*United States v. Billops,* 43 F.3d 281 (7tʰ Cir. 1994).........................44, 48

*United States v. Cirrincione,* 780 F.2d 620 (7th Cir. 1985)......................34

*United States v. Collins*, 877 F.3d 362 (7th Cir. 2017)...........................44

*United States v. Colon*, 919 F.3d 510 (7th Cir. 2019)............................48

*United States v. Elder,* 900 F.3d 491 (7th Cir. 2018).............................. 20

United States ex rel. Negron v. New York, 434 F.2d 386 (2d Cir. 1970).....42

*United States v. Febus,* 218 F.3d 784 (7th Cir. 2000).........................33, 40

*United States v. Figueroa*, 682 F.3d 694 (7th Cir. 2012).........................46

*United States v. Garcia*, 497 F.3d 964 (9th Cir. 2007)...........................48

*United States v. Gonzalez,* 319 F.3d 291 (7th Cir. 2003)................34, 36, 38

*United States v. Hall*, 101 F.3d 1174 (7th Cir. 1996)............................44

*United States v. Hardamon,* 188 F.3d 843 (7th Cir. 1999)............37, 46, 48

*United States v. Harmelech*, 927 F.3d 990 (7th Cir. 2019)......................48

*United States v. Herrera,* 878 F.2d 997 (7th Cir. 1989)..........................44

*United States v. Hinkle*, 725 F. App'x 421 (7th Cir. 2018).....................30

*United States v. Howell,* 527 F.3d 646 (7th Cir. 2008)...........................44

*United States v. Johnson,* 248 F.3d 655 (7th Cir. 2001)....................38, 39

*United States v. Joshi*, 896 F.2d 1303 (11th Cir. 1990)..........................34

*United States v. Leiva,* 821 F.3d 808 (7th Cir. 2016)......................passim

*United States v. Lopez,* 704 F. App'x 588 (7th Cir. 2017).......................48

*United States v. Lynn,* 851 F.3d 786 (7th Cir. 2017)................. 20, 30, 33

*United States v. Mustread,* 42 F.3d 1097 (7th Cir. 1994).................45, 48

*United States v. Olano*, 507 U.S. 725 (1993).......................................20

*United States v. Orsini,* 907 F.3d 115 (1st Cir. 2018)..........................31

*United States v. Perkins,* 108 F.3d 512 (4th Cir. 1997)........................47

*United States v. Phillips,* 959 F.2d 1187 (3d Cir. 1992).......................46

*United States v. Ramirez*, 783 F.3d 687 (7th Cir. 2015).......................31

*United States v. Sanders,* 909 F.3d 895 (7th Cir. 2018).......................19

*United States v. Sandoval,* 347 F.3d 627  (7th Cir. 2003).................33, 41

*United States v. Skoczen,* 405 F.3d 537 (7th Cir. 2005)..........................44

*United States v. Shannon*, 836 F.3d 815 (7th Cir. 2016).......................46

*United States v. Sotelo*, 707 F. App'x 77 (3d Cir. 2017)........................46

*United States v. Wasz,* 450 F.3d 720 (7th Cir. 2006)...........................45

*United States v. Zambrana,* 841 F.2d 1320 (7th Cir. 1988)....................34

*United States v. Zaragoza,* 543 F.3d 943 (7th Cir. 2008).......................41

*Washington v. Recuenco,* 548 U.S. 212 (2006).....................................42

**Statutes**

18 U.S.C. §§ 1956(h) and (a)(1)(B)(i)............................................8
.

21 U.S.C. § 802(16).............................................................29

21 U.S.C. § 802(44)……………………………………………… 20, 22, 29

21 U.S.C. §§ 841(a)(1)………………………………………………8

21 U.S.C. § 841(b)(1)(A)(viii)(2018)…………………………17

21 U.S.C. § 846………………………………………………………8

21 U.S.C. § 851…………………………………………………....2, 20, 22

21 U.S.C. § 851(a)………………………………………………17

28 U.S.C. § 1827……………………………………………………33, 3

28 U.S.C. § 1827(a)………………………………………………40

28 U.S.C. § 1827(b)(1)……………………………………………40

28 U.S.C. § 1827(d)(1)(A)………………………………………39

28 U.S.C. § 1827(d)(2)…………………………………………40, 41

Ind. Code § 35-47-4-5(c)………………………………………26

Ind. Code § 35-48-4-6……………………………………………25

Ind. Code § 35-48-4-10……………………………………passim
.
Ind. Code § 35-47-4-10(a)(1)…………………………………17

Ind. Code § 35-48-4-10(a)(2)…………………………………27

Ind. Code § 35-48-4-10(c)-(d)………………………………… 26

**Rules**

Fed. R. App. P. 32(a)(7)(B)(i)……………………………………51

Fed. R. App. P. 32(a)(7)(C)………………………………………51

## Other Authorities

Brief in Support of Motion to Withdraw, *United States v. Hinkle*,
No. 17-2154, 2018 WL 454127 (7th Cir. filed Jan. 10, 2018)......................30

Black's Law Dictionary 634 (10th ed. 2014).............................................21

U.S.S.G. § 3B1.1...................................................................passim

U.S.S.G. § 3B1.1(a)...........................................................44, 46

U.S.S.G. § 3B1.1(c).................................................................49

# JURISDICTIONAL STATEMENT

The Appellants' jurisdictional statements are complete and correct.

# STATEMENT OF THE ISSUES

1. Whether the district court's treatment of Jose Trinidad Garcia's prior conviction for Dealing in Marijuana in Indiana as a "felony drug offense" for purposes of 21 U.S.C. § 851 was plainly erroneous.

2. Whether Alfonso Pineda-Hernandez waived any claim to prejudice from a witness's repeat testimony and alleged translation errors, where he urged the district court multiple times to permit the second round of testimony as a remedy for those purported errors.

3. Whether, if his claims are not waived, Pineda-Hernandez can establish that alleged mistranslations violated his due process rights, where no substantive errors have yet been identified, and where the district court went out of its way to protect the very rights he now says were violated; and, if he can make out such an error, whether it was plain and harmless.

4. Whether the district court clearly erred in applying a sentencing enhancement to Pineda-Hernandez for his leadership role, where he supplied much of the conspiracy's methamphetamine and directed others to perform various tasks in furtherance of the group's drug trafficking and his own profit.

## STATEMENT OF THE CASE

This appeal stems from the conviction at trial of Alfonso Pineda-Hernandez, the guilty plea of Jose Trinidad Garcia, Jr., and the sentencing of both defendants.[1]

For the most part, the facts of the case as they relate to the defendants' crimes and convictions are not contested. A brief overview of the defendants' drug trafficking activities and the related investigation is therefore sufficient for purposes of this appeal. Certain procedural facts require more detailed treatment.

### *The Code Red Conspiracy*

In the spring of 2015, Alfonso Pineda-Hernandez and Nicolas Cazares-Garcia met through a mutual acquaintance. (PSR 1 ¶ 4.) She introduced the two men specifically so that they could work together to deal drugs. (*Id*.)

They got to work quickly, organizing the drug conspiracy at issue in this case together. (T. 158-59.) Working with a handful of others, they sold methamphetamine in the Indianapolis area. (PSR 1 ¶ 4-7.)

---

[1] Throughout this brief, the government will make the following references: (T. = Trial Transcript); (PSR 1 = Pineda-Hernandez Presentence Investigation Report); (PSR 2 = Trinidad Garcia Presentence Investigation Report); (S. = Sentencing Hearing Transcript); (R. = District Court Docket Number); (A. Br. = Appellant's Brief); (A. = Appendix); (GSA = Government's Supplemental Appendix).

Although both functioned as leaders of the group, Cazares-Garcia sometimes did as Pineda-Hernandez instructed. For example, Pineda-Hernandez told him to get an apartment for them to use for the business, to deliver drugs on his behalf, and to retrieve and wire drug proceeds. (T. 208, 546, 613-16, 635, 638.) Indeed, Pineda-Hernandez coordinated much of the group's drug trafficking activity. (PSR 1 ¶ 4-8.)

The organization's signature product was red methamphetamine. That colorful twist on a common drug was Pineda-Hernandez's brainchild—he used red Gatorade to give the drug its trademark color. (T. 553; PSR 1 ¶ 5.) Pineda-Hernandez, Cazares-Garcia, and their compatriots also sold methamphetamine that was not red. (T. 403.)

In an arrangement typical of drug conspiracies, Pineda-Hernandez fronted methamphetamine to others on credit. Those subordinate distributors repaid him after selling the drug to customers further down the chain. (PSR 1 ¶ 5.)

One dealer Pineda-Hernandez and Cazares-Garcia fronted drugs to was Miguel Barragan-Lopez. (T. 160, 266.) He characterized Pineda-Hernandez as a leader in the group, emphasizing in particular that he was one of the group's sources of drugs that came from Mexico. (T. 541, 546, 559-60.) Cazares-Garcia delivered the meth to Barragan-Lopez on behalf of Pineda-Hernandez (and sometimes on his own behalf). (T. 574, 578, 588.) Cazares-

Garcia later confirmed that both he and Pineda-Hernandez supplied the entire group with drugs from Mexico.  (T. 658.)

Like most higher-ups in the drug trade, Pineda-Hernandez was keen on getting paid quickly and in full.  If subordinate distributors did not pay for or return fronted drugs quickly, he called them to apply pressure and even confronted them in person. (PSR 1 ¶ 8.)  Pineda-Hernandez and Cazares-Garcia once went to Barragan-Lopez's house to confront him about a drug debt.  (*Id.*; T. 267-68, 370.)

Barragan-Lopez did as Pineda-Hernandez and Cazares-Garcia told because he did not want to get into any "trouble."  (T. 572.)  After all, Cazares-Garcia was frequently his drug source, and Pineda-Hernandez was "in charge" and was also a source of some of the drugs Barragan-Lopez was dealing.  (T. 208, 369, 541, 546, 559-60.)

Pineda-Hernandez spent considerable time collecting debts from subordinates.  (*Id.*)  Another member of the conspiracy drove him around Indianapolis to retrieve the money others owed him.  (*Id.*; T. 161.)

Pineda-Hernandez also had his own debts to pay, to suppliers of the drugs in Mexico.  After collecting from his own distributors, he wired the proceeds himself or gave the money to Cazares-Garcia to wire.  (*Id.*; T. 712-15.)

The coconspirators used shared apartments in Indianapolis to store, guard, and access drugs. (PSR 1 ¶ 6.) Pineda-Hernandez and Cazares-Garcia leased and paid the rent for at least one such apartment. (*Id.*; T. 281)

In May 2015, law enforcement stopped one member of the group, Jose Araujo-Orduno, for a traffic violation. (T. 211.) A search of his car turned up the signature red methamphetamine. (T. 214.) Araujo-Orduno cut his losses and decided to cooperate. (T. 215.)

His initial cooperation started immediately. Following the traffic stop, officers went to Araujo-Orduno's house, where he showed them more red methamphetamine he had planned to sell. (*Id.*)

Araujo-Orduno then agreed to (and did) conduct three controlled payments to Pineda-Hernandez—that is, repayments of debt on fronted meth (the same meth officers seized from his car and home) using money provided by law enforcement. (T. 216-35.) The two men arranged for repayment over the phone, and on two occasions Araujo-Orduno met with a middleman at Chili Verde, a restaurant on the eastside of Indianapolis. (T. 220.) Pineda-Hernandez later told Araujo-Orduna that he had arranged for the middleman to pick up the payments, and surveillance confirmed that Pineda-Hernandez was the recipient of those proceeds. (T. 244, 250-53, 497-500.) On another occasion, Pineda-Hernandez himself collected the money. (T. 253, 364-67, 479-80.) The two men also discussed Araujo-Orduno's total debt, and Pineda-

6

Hernandez put pressure on him to sell more drugs, saying "just get it out." (T. 250-53.)

For several months in 2015, Jose Trinidad Garcia, Jr. participated in the conspiracy in this case. (PSR 2 ¶ 6.) He worked with Cazares-Garcia, Barragan-Lopez, and at least one other member of the conspiracy to distribute not only methamphetamine but also heroin. (*Id.* ¶¶ 6-8.)

Sometimes, Cazares-Garcia fronted Trinidad Garcia methamphetamine and heroin. (PSR 2 ¶ 7.) Trinidad Garcia then sold the drugs around town and paid Cazares-Garcia his cut. (*Id.*)

At other times, their roles were flipped. Trinidad Garcia fronted heroin to Cazares-Garcia, who later paid him his share of the profits. (PSR 2 ¶ 8.)

Trinidad Garcia fronted drugs for further sale to multiple subordinates. (PSR 2 ¶ 9.) He also talked to those dealers about their customers and about methods of diluting drugs to increase profits. (*Id.*) And he collected the proceeds from them at his home. Trinidad Garcia and others also stored drugs and guns together at a house in Indianapolis. (PSR 2 ¶ 10.)

In November 2015, law enforcement executed a search warrant at a home near downtown Indianapolis that was connected to the conspiracy. (T. 25.) The officers found a gun, red meth, a drug scale, heroin, and drug ledgers. (T. 28-29.) The same day, officers also searched the home of the woman who initially introduced Pineda-Hernandez and Cazares-Garcia. (T.

37.)  She gave consent to search the home, where officers found packages containing red meth.  (T. 37, 40.)  Law enforcement also seized approximately a half pound of methamphetamine and a half pound of heroin from a home connected to Trinidad Garcia.  (PSR 2 ¶ 10.)

### *Indictment and Trial*

Shortly thereafter, a grand jury returned an indictment charging Pineda-Hernandez, Trinidad Garcia, and others with multiple counts of distributing controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  The indictment also charged Pineda-Hernandez with money laundering, in violation of 18 U.S.C. §§ 1956(h) and (a)(1)(B)(i).  (PSR 2 ¶ 1.)

Trial lasted five days.  The government called various law enforcement agents and cooperating witnesses.  (R. 631-636.)  Aside from testimony, the government presented physical evidence and played several recordings, including court-approved surveillance and consensual recordings of calls between defendants.

On the third day of trial, Miguel Barragan-Lopez testified.  (T. 377.) Pineda-Hernandez specifically agreed to the Court's use of the government's proposed English-to-Spanish interpreter prior to the testimony.  (*Id.*)[2]

---

[2] The government interpreter translated questions to Barragan-Lopez in Spanish and then relayed his answers to the court in English, as he had done in prior cases.  The other two interpreters were provided by the court to

Barragan-Lopez's testimony, including cross-examination, lasted approximately 3 hours. (T. 375, 448.)

After he was done testifying, the government brought an issue to the court's attention:

> During the break, Your Honor, counsel for Mr. Pineda-Hernandez and counsel for the Government were approached by the two court interpreters who informed the parties that the translations performed by [the interpreter] throughout the course of the morning episode, they were replete with inaccuracies or not complete, were somewhat misleading. The parties had agreed to [the interpreter's] qualifications.

(T. 449.)

Prompted by the court, the translators explained their concern as follows:

> INTERPRETER SAMULOWITZ: Your Honor, most of the time the omissions were at the end of different sentences. If you -- the interpreters felt a lot of pressure. When we started noticing there, there were so many different -- differences in meaning that were not crucial, but they were different. They started to accumulate. We started noticing omissions. Some of them, again, not that important. It didn't -- we didn't feel that it granted that we kept interrupting. The syntax, Your Honor, was so close to the English language that it -- not all the sentences made sense at one point or another in Spanish. When we noticed great differences in meaning, we felt the need to interfere, but as interpreters at any level, state certified or federally certified, the first canon of our code of ethics is accuracy, Your Honor. And we are in a very difficult situation if we hear that there is so much happening. We don't know what to do. This was an interpreter hired by, by the U.S. Attorney's Office.

---

assist Pineda-Hernandez at the defense table. They took turns interpreting for him.

9

> THE COURT: Yes. He is used frequently by both sides --
> INTERPRETER SAMULOWITZ: Exactly.
> THE COURT: -- in criminal matters in our court.
> INTERPRETER SAMULOWITZ: Exactly. So now, there is a big
> difference, Your Honor, between a state certified and a federally
> certified interpreter . . . .

(T. 451-52.)

The court then asked the interpreter for a recommendation.

Samulowitz responded, "We would seriously recommend having a federally

certified interpreter to interpret testimony." (T. 452.) The government

stated "that would be fine," and Pineda-Hernandez said he had "no objection."

(T. 452.)

Because Barragan-Lopez had already completed his testimony, that

notion obviously contemplated having him testify again. The court then

clarified that point: "[D]o you want us to recall Mr. Barragan-Lopez to

reexamine him?" (T. 452-53.)

While Pineda-Hernandez considered his options, the court explored

further the nature of the interpreters' allegations, asking for examples of

erroneous interpretations. The court's purpose was to determine whether the

purported errors merited "recall[ing] the witness." (T. 454.)

The interpreters provided one example and an explanation:

> INTERPRETER SAMULOWITZ: The question was, "When did
> the Defendant get out of the car?" The translation should have,
> should have been "as soon as the car stopped," and it was
> something like, "as much as he could stand up." Which, if you

translate that into English it makes sense, but when you say it in Spanish, it doesn't. That is the best example this interpreter can give at this point, but there were a lot of omissions, Your Honor, towards the end of every, of every question, of every answer back into English or questions into Spanish. There was – it was obvious that the ability to retain the information for the whole question was not there because every question kept being interrupted to "chunk it," as we say.

THE COURT: Right.

INTERPRETER SAMULOWITZ: When you don't hear the whole question, Your Honor, as an interpreter, you may not give an accurate translation. Because you are, you are separating different segments. You are interpreting different segments, and by the end of the question, by the end -- now, by the time you finish interpreting the question, even though you interpret it correctly every segment, you may not have asked the correct question. . . . [T]he longer we let the speaker go, the more context we have, the more material we have to work with. When we have the, the question and answer --

THE COURT: I understand what you are telling me. Can you give me some more examples?

INTERPRETER SAMULOWITZ: Sadly, Your Honor, not specific examples.

(T. 455-56.)  The interpreters later appeared to retract their critique of the

"chunking" method.  (T. 464.)

The other interpreter offered the following:

INTERPRETER CONDE-BARWISE: I have two examples of two mistranslations.

THE COURT: Okay.

INTERPRETER CONDE-BARWISE: It was something about a question, and I think this part of the question was being asked by the U.S. Government. Something, whatever drugs that you received from Flaco through Grenas, kind of showing through whom. It was interpreted into Spanish to the witness that you received from Flaco or Grenas. It is just one example of numerous things that happened like that.

THE COURT: Okay.

11

> INTERPRETER CONDE-BARWISE: Now second one is – and this is more generic. I just made a note. When the U.S. -- the AUSA, Mr. Vaughn, was asking him about how the distribution process went or how they had different levels into distribution, distribution channel, I noticed that he omitted parts and that he was not clear in the end how the distribution was made.

(T. 456-57.)

Conde-Barwise also later offered an incorrect opinion that the government's interpreter's first language was English, not Spanish; the court corrected her, saying, "That is not true, but okay." (T. 458-59.) She then added her belief that "at the end of every question [the government interpreter] omitted three or four words that sometimes were important, sometimes were not." (T. 459.)

After hearing the interpreters' examples, the judge stated, "I think it is important that we recall him. I am just making that decision. So we will recall him." (T. 457.) She later added, "[T]he only way I can correct this record is to have him come back in and be examined again . . . it is the only way to ensure that Mr. Pineda-Hernandez's due process rights are honored." (T. 460.)

The court offered Pineda-Hernandez a chance to pursue a different course. His counsel stated that re-calling Barragan-Lopez was a "good idea." (T. 458.)

12

The question also arose—from the government, not from Pineda-Hernandez—as to whether the court should strike the first iteration of Barragan-Lopez's testimony. The court responded, "I am not striking it. I am just going to tell the jury the funny thing called the truth, that there was an issue about the translation, and so the court-appointed interpreters are going to interpret his testimony." She added, "I guess I can strike it, but everybody just heard it. So it doesn't really make any sense to strike it, to me." (T. 461.)

When the judge asked the interpreters again to propose a procedure, they suggested an approach no other case participant had seen before involving the addition of more interpreters. As one attorney for the government explained, "I started out in Miami, Florida, where everyone spoke Spanish. It was interpreter city. I have never seen a situation like this where they are basically saying they need four interpreters in a trial." (T. 467; *see* T. 469.)

> After the Court sorted out procedures, the government stated:
>
> MR. VAUGHN: . . . Now, at the same time Mr. Pineda-Hernandez can go on the record and waive any objections that he may have to any purported translation errors, realizing that the jury is going to hear the testimony twice now --
> THE COURT: Correct.
> MR. VAUGHN: -- from Mr. Barragan-Lopez now. So if he wants to factor that in, then he can make an informed waiver on the record freely and voluntarily that, that waives any objection to any translation errors that may have taken place.

(T. 470.)

Pineda-Hernandez's counsel responded, "He does not waive any translation error.  He would like for the witness to come back tomorrow."  (T. 471.)

The parties returned to the subject the following morning, prior to presenting evidence.  The government began by noting that, after reviewing the allegations of mistranslation from the prior day, the government believed the translators had not identified any significant errors.  (T. 511.)

The government also explained that one of the two purported errors was not a mistranslation at all.  (T. 512.)  Indeed, the government later asked the court to clarify that it had not made a finding that any translations were erroneous.  (T. 513.)  The Court agreed that it was making "no finding that [the] . . . translation was inaccurate in this case."  (T. 514.)

The court then put the decision to Pineda-Hernandez:

> So if you agree that Mr. Barragan-Lopez can testify again today, and that is the course that you want the Court to pursue, then, as the Government noted, the jury will hear his testimony twice. They won't hear anybody else's testimony twice. . . . [B]y choosing to have him proceed to testify again, you are waiving any error in the fact that he will be testifying twice.  You can't complain on appeal if you are convicted in this case that it was wrong for me to allow him to testify twice.

(T. 515.)

Pineda-Hernandez responded, "I have made the decision that I would like to hear the testimony of this [witness] one, once more . . . . And I would not like to waive any right to any appeal. And so I would like for that witness to testify today." (T. 517.)

The Court clarified that Pineda-Hernandez could not have it both ways: "All right. That is your choice, then. But let me clarify that by making that choice, you are waiving a right to complain on appeal that he testified two times . . . ." (T. 517.) Pineda-Hernandez persisted, "Let me say this again, I do not want to waive my right. But let me say again, . . . I would like for him to testify again." (T. 517.)

The court explained the issue to the jury as follows:

> [Y]esterday the parties agreed that . . . the interpreter who translated during Mr. Barragan-Lopez's testimony, is qualified to perform the translation. Following the conclusion of Mr. Barragan-Lopez's testimony, an issue was raised as to the accuracy of the translation. Because I am not fluent in Spanish, I cannot determine the issue myself. Accordingly, the parties have agreed that Mr. Barragan-Lopez will testify again today using a different interpreter. I will instruct you further on this matter in the final jury instructions.

(T. 521-22.)

Near the end of trial, the court revisited the question of whether such an instruction was necessary. (T. 680.) The judge observed, "Do we want to do anything special in the instructions? Personally, I did not discern any difference, maybe some nuanced differences but nothing substantive." (T.

680.)  She added, "So I would prefer maybe not even draw any attention to it . . .  I can obviously be persuaded otherwise . . . ."  (*Id.*)

Pineda-Hernandez agreed: "I think it is kind of common sense for the jury that they heard it twice, but it doesn't get more credit.  I don't know if that needs to be said expressly."  (*Id.*) The government also agreed.  (*Id.*)

The following morning, the court addressed the question one more time.  The government offered a relevant instruction, to which Pineda-Hernandez agreed.  (T. 688, 727-28.)  The court instructed the jury in line with what the parties had agreed to:

> Miguel Barragan-Lopez testified twice because an issue was raised as to the accuracy of the translation of his first testimony. You should not give any extra weight to Mr. Barragan's testimony because he testified twice. Mr. Barragan's testimony should be evaluated in accordance with these instructions.

(T. 777.)

One more relevant mention of Barragan-Lopez's repeat testimony arose later in the trial.  During closing arguments, Pineda-Hernandez's counsel—not the government—sought to exploit the repeat testimony.  Citing perceived inconsistencies between day one and day two of his testimony, she stated, "Miguel Barragan-Lopez. We all remember him. You guys got to hear from him twice. He showed himself to be a liar."  (T. 755-57.)

The jury found Pineda-Hernandez guilty of counts one and two of the indictment.  (R. 182.)

*Sentencing*

The district court sentenced Pineda-Hernandez to 300 months in prison on count one and 240 months in prison on count two. (SA 58.) Among other things, the court applied a four-point leadership enhancement to his offense level. (S. 8.) The court also applied a two-point leadership enhancement to his offense level on the money laundering count; that resulted in the same overall offense level on both counts. (*Id.*)

Trinidad Garcia did not go to trial. He pleaded guilty to participating in the drug conspiracy but did not enter into a plea agreement. (R. 487.)

Trinidad Garcia admitted that the conspiracy involved more than 500 grams of a mixture or substance involving methamphetamine. Prior to sentencing, the government filed an information pursuant to 21 U.S.C. § 851(a). The information indicated specifically that Trinidad Garcia had been convicted of "Dealing in Marijuana" under Indiana law, Ind. Code § 35-48-4-10(a)(1), for an offense that took place in March 2014. That offense was elevated from a misdemeanor to a felony because he sold marijuana to a minor. (A. 15, 18.)

With the § 851 enhancement, the statutory sentencing range for Trinidad Garcia's offense was 20 years to life in prison, followed by 10 years of supervised release. 21 U.S.C. § 841(b)(1)(A)(viii) (2018); (R. 208). The

district court imposed the statutory minimum sentence, 240 months in prison, followed by a 10-year term of supervised release. (R. 573 at 2-3.)

This timely set of appeals followed.

## SUMMARY OF THE ARGUMENT

Trinidad Garcia's prior conviction for Dealing in Marijuana qualifies as a "felony drug offense" for purposes of his § 851 enhancement. If the Court sees the question as a close one, his claim still fails because he cannot establish that the district court's sentencing decision was plainly erroneous.

Although Indiana's marijuana statute contains a non-generic substance—salvia—the statute is divisible. Indiana courts have not definitively answered the divisibility question, but state practice reflected in various *Shepard* documents shows that courts and prosecutors treat drug type as an element of the relevant statute. The modified categorical approach therefore applies, and Trinidad Garcia's Dealing in Marijuana conviction qualifies.

Pineda-Hernandez has waived his translation claims. The district court explained that the consequence of his agreement to have Barragan-Lopez testify twice was that he could not complain on appeal about that repeat testimony. Likewise, by endorsing the court's remedy for alleged translation errors, he waived any attack on those purported errors.

In all events, his claim fails because the record does not establish that any meaningful translation errors occurred. Neither Pineda-Hernandez nor the translators have identified concrete problems with the testimony or its translation. And the limited variations between Barragan-Lopez's day-one and day-two testimony (to which no one objects) confirm that no real error occurred. Plus, the district court handled the difficult situation laudably, which is not a recipe for reversal.

Finally, the district court's decision to apply a leadership role enhancement to Pineda-Hernandez at sentencing was correct, not clearly erroneous. He was one of the two leaders of the conspiracy. He was the conduit of some of the drug supply that originated out of the country, he organized aspects of the group's drug trafficking activities, and he directed various group members to carry out tasks for the benefit of the conspiracy. The enhancement was warranted.

The Court should affirm in all respects.

## ARGUMENT

### I. The District Court Did Not Plainly Err When It Treated Trinidad Garcia's Prior Marijuana Conviction As a Felony Drug Offense

#### A. Standard of Review

This Court typically reviews questions of statutory interpretation such as Trinidad Garcia's challenge *de novo*. *United States v. Sanders*, 909 F.3d

895, 899 (7th Cir. 2018). As Trinidad Garcia acknowledges, he did not object below, limiting review to a determination of whether the district court plainly erred. *United States v. Lynn*, 851 F.3d 786, 794 (7th Cir. 2017). He therefore bears the burden to show "that (1) there was error; (2) it was plain rather than subject to reasonable dispute; (3) it affected his substantial rights; and (4) the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 792 (citing *United States v. Olano*, 507 U.S. 725, 732–36 (1993)).

## B.    The Categorical and Modified Categorical Approaches

When determining whether a prior conviction qualifies as a felony drug offense, this Court applies the "categorical approach." *United States v. Elder*, 900 F.3d 491, 497 (7th Cir. 2018). In the present context, the Court's focus is on whether the statutory elements of the predicate offense criminalize a broader category of drugs than 21 U.S.C. § 802(44). *Id.*; *Mathis v. United States*, 579 U.S. __, 136 S. Ct. 2243, 2248 (2016). If so, then the state conviction does not qualify under § 851. *Elder*, 900 F.3d at 497.

When a criminal law can be violated in many ways, applying the categorical method also requires consideration of whether the statute is "divisible," meaning that it defines distinct crimes with different elements, not just different means of committing the same crime. *Mathis*, 136 S. Ct. at

2248-49. If the statute is divisible, a court can turn to the "modified

categorical approach," which permits consultation of "a limited class of

documents, such as indictments and jury instructions, to determine which

alternative formed the basis of the defendant's conviction." *Descamps v.*

*United States*, 570 U.S. 254, 257 (2013).

The modified categorical approach still does not authorize a court "to

dig through the facts of the underlying case." *Najera-Rodriguez v. Barr*, 926

F.3d 343, 348 (7th Cir. 2019). Once the elements of conviction have been

identified, the court "compares the elements of the specific crime of conviction

to the elements of the federal statute" to see if the predicate qualifies. *Id.*

'Elements' are the 'constituent parts' of a crime's legal definition—the things

the 'prosecution must prove to sustain a conviction.'" *Mathis*, 136 S. Ct. at

2248 (quoting Black's Law Dictionary 634 (10th ed. 2014)).

Two "easy" paths are sometimes available to answer the elements-

means quandary: A "definitive state-court decision" may specify elements of

the subject statute. *Id.* Or "the statute's text may resolve the issue." *Id.*

"If state law fails to provide clear answers, federal judges have another

place to look: the record of a prior conviction itself." *Mathis*, 136 S. Ct. at

2256. As this Court has explained,

> This "peek" at the record is permitted "for the sole and limited
> purpose" of determining whether the listed items are elements of
> the offense." *Id.* at 2256–57. So, for example, if an indictment,

21

> jury instructions, and sentencing document (or perhaps another charging document, plea agreement, and sentencing document) all "referenc[e] one alternative term to the exclusion of all others," then one could say "that the statute contains a list of elements, each one of which goes toward a separate crime." *Id.* at 2257. On the other hand, a statute may be indivisible if the records of conviction are not so specific and simply "use a single umbrella term" to signal what the prosecutor must prove and need not prove. *Id.*

*Najera-Rodriguez*, 926 F.3d at 350. Such a "peek" does not mean looking at the facts of the defendant's offense. "The focus must remain on the elements of the crime in question." *Id.*

### C. Trinidad Garcia's Conviction Under Indiana Code Section 35-48-4-10 Qualifies As a Felony Drug Offense Under the Modified Categorical Approach

Trinidad Garcia correctly notes that the statute at issue contains a substance not listed in the federal generic definition of § 802(44), *i.e.*, salvia. Under a stiff reading of the categorical approach, that appears to render Ind. Code § 35-48-4-10 overbroad. *Martinez v. Sessions*, 893 F.3d 1067, 1070 (8th Cir. 2018).

But that is not the final word in this case. The statute is divisible, meaning the modified categorical approach applies. Under that approach, Trinidad Garcia's marijuana conviction qualifies as an § 851 predicate.

### 1. *State Court Decisions Do Not Offer an Easy Answer to the Divisibility Question*

Trinidad Garcia tries to avoid the modified categorical approach by arguing that Indiana state court cases "definitively" establish that Ind. Code § 35-48-4-10 is not divisible. (A. Br. 11.) That is incorrect.

He relies principally on *Everroad v. State*, 570 N.E.2d 38, 43 (Ind. Ct. App. 1991), *vacated in part*, 590 N.E.2d 567 (Ind. 1992), to argue that dealing two different drugs listed in Ind. Code § 35-48-4-10 gives rise to a single statutory violation. (A. Br. 14-15.) That argument faces more than one obstacle Trinidad Garcia cannot clear.

First, *Everroad* is a decision of an intermediate state court and contains little reasoning to back up the rule Trinidad Garcia draws from it. That is hardly "definitive" for categorical purposes. *Mathis*, 136 S. Ct. at 2256; *see Najera-Rodriguez*, 926 F.3d at 354 (declining to rely on intermediate court decisions to ascertain divisibility).

Second, the fact that the Indiana Supreme Court summarily affirmed *Everroad* without addressing the issue does not help Trinidad Garcia. Summary affirmance does not a holding make.

The Indiana Supreme Court has explained "the difference between the terms 'summarily affirm' and 'expressly adopt'" as follows:

> Often, as in this instance, this Court grants transfer to address only one of several issues addressed by a Court of Appeals' opinion. When this occurs, we use the term "summarily affirm" to indicate that we decline to review the remainder of the opinion. In essence, we partially deny transfer on these issues.

In contrast, the term "expressly adopt" indicates that we accept the reasoning of a Court of Appeals' opinion as our own.

*Martin v. Amoco Oil Co.*, 696 N.E.2d 383, 386 n.4 (Ind. 1998).

In other words, the analysis in *Everroad* that Trinidad Garcia relies on remains an intermediate court decision. This Court should not treat that meager analysis as definitive for purposes of the divisibility question.

Finally, *Duncan v. State*, 412 N.E.2d 770 (Ind. 1980), cannot bear the weight *Everroad* and Trinidad Garcia place upon it. (A. Br. 7, 14.) *Duncan* reasoned that an old statute outlawing unlawful dealing of a controlled schedule I, II, or III substance was intended to proscribe "dealing in drugs" and therefore held that "a single sales transaction between the same principals at the same time and place" does not justify multiple convictions even if more than one controlled substance is involved in the transaction. *Id.* at 775-76.

It would be a mistake for this Court to treat *Duncan* (via *Everroad*) as definitive on the divisibility question here. For one thing, *Duncan* may no longer be good law. Since *Duncan*, the Indiana Supreme Court clarified how Indiana determines a statute's essential elements in *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999). *Richardson* announced the following "statutory elements" test for addressing double jeopardy claims:

> The objective of this test is to determine whether the essential elements of separate statutory crimes charged could be

established hypothetically. In this test, the charged offenses are identified by comparing the essential statutory elements of one charged offense with the essential statutory elements of the other charged offense. Inspecting the relevant statutes and the charging instrument to identify those elements which must be established to convict under the statute, this review considers the essential statutory elements to determine the identity of the offense charged, but does not evaluate the manner or means by which the offenses are alleged to have been committed, unless the manner or means comprise an essential element.

*Id.* at 50.

Applying that test, the Indiana Court of Appeals recently rejected a double jeopardy challenge to multiple convictions under a single drug possession statute similar to Ind. Code § 35-48-4-10. *Gates v. State*, 97 N.E.3d 309, at *6 (Ind. Ct. App. 2018) (unpublished). Following the rule of *Richardson*, the prosecution in *Gates* treated the possession of six different controlled substances falling under a single statute, Ind. Code § 35-48-4-6, as six separate charges. Likewise, "the State presented detailed evidence as to each of the controlled substances that supported each of the charges of possession of a controlled substance," and "[t]he jury was instructed which controlled substance supported which charge." *Id.* at *7.

*Gates* approved of that approach, reasoning that "the essential elements of each offense" at issue in the case "could not . . . be established by evidence that also establishes the essential elements of the other charged

offenses." *Id.* In so holding, *Gates* suggested that *Duncan* may not survive *Richardson.* *Id.* at *7.

Beyond that, features of Ind. Code § 35-48-4-10 make it distinct from the *Duncan* statute. The *Duncan* statute criminalized the possession of "any" drug listed. *See Martin v. State*, 374 N.E.2d 543, 544 (Ind. Ct. App. 1978) (discussing same statute), *cited in Duncan*, 412 N.E.2d at 775. By contrast, Ind. Code § 35-48-4-10 refers in the singular form to drugs by name. Furthermore, the provision at issue here elevates the crime to various levels of felony based on the weight of "the drug." Ind. Code § 35-48-4-10(c)-(d). Given that singular description, the statute cannot be said to proscribe "dealing in drugs" in the plural manner central to *Duncan*. 412 N.E.2d at 775. When multiple drugs are involved, even in a single transaction, the statute allows for a conviction for each different narcotic drug. *Cf. Taylor v. State,* 929 N.E.2d 912, 920-21 (Ind. Ct. App. 2010) (defendant's contemporaneous possession of multiple firearms could result in multiple convictions under Ind. Code § 35-47-4-5(c) because the legislature used the phrase "possesses a firearm" as opposed to "possesses firearms").

For all of those reasons, *Everroad* and *Duncan* hardly offer the "clear" and easy answer, (A. Br. 14), upon which Trinidad Garcia's argument depends.

2. *A "Peek" Shows that the Statute Is Divisible*

26

A "peek" at state records offers a far clearer view of what Indiana sees as the elements of Ind. Code § 35-48-4-10. The sentencing order for Trinidad Garcia's predicate conviction states that he was convicted of "Dealing in Marijuana," with no mention of other drugs. (A15.)

Sentencing documents and judgments in other cases also point to divisibility. For example, relevant sentencing judgments state that the defendant was guilty of "35-48-4-10(a)(2)/F6: Dealing in Marijuana," (GSA 1), or more simply, "Dealing Marijuana." (GSA 2. Those documents do not reference the other drugs listed in the statute.

Likewise, relevant charging instruments identify the crime as "Dealing in Marijuana," and spell out the elements with exclusive reference to "marijuana" and with no mention of the other drugs in the statute. (*See, e.g.*, GSA 3; GSA 4; GSA 5; GSA6.)[3] There is no reason to believe a prosecutor could prove the elements of such a charge with evidence of hashish or salvia dealing. Indiana does not expect prosecutors to tie proof of dealing to an "umbrella term," or to the entire list of drugs in Ind. Code § 35-48-4-10. *Mathis*, 136 S. Ct. at 2257.

---

[3] As Trinidad Garcia notes, (A. Br. 4 n.3), such documents are properly subject to judicial notice. The government had no reason to put them into the record below because he did not raise this claim. Given that, the government requests that the Court take judicial notice of them. *In re Lisse,* 905 F.3d 495, 497 (7th Cir. 2018) (Easterbrook, J., in chambers).

The same approach holds when Indiana prosecutes a crime involving one of the other drugs listed in Ind. Code § 35-48-4-10. Because salvia is central to this case, examining salvia convictions makes good sense.

Since 2011, Indiana has prosecuted Dealing in Salvia just four times (close to the threshold of *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007), but beyond the realm of the merely theoretical).[4] For each such case where *Shepard* documents[5] are available online, the charging instrument specifies that the crime charged was "Dealing in Salvia" and does not mention marijuana or any other drug. (*See* GSA 7; GSA 8.) In one such case, the State issued two separate charging instruments for "Dealing in Salvia" and "Dealing in Marijuana," even though the offenses occurred on the same day and at the same location. (GSA 8.)

Where the offense is Dealing in Salvia, the available plea agreement and sentencing order also specify "salvia" to the exclusion of any other drug. (GSA 9, GSA 10.) The fourth relevant salvia prosecution did not turn up any

---

[4] After Trinidad Garcia raised this issue for the first time on appeal, the government obtained this information from the Indiana Prosecuting Attorneys Council. The government asked for information on all salvia prosecutions in Indiana since 2011.

[5] *Shepard v. United States*, 544 U.S. 13, 16 (2005).

*Shepard* documents, but the state website indicates that the defendant was charged specifically with dealing salvia.[6]

All of this fits the view of divisibility this Court and the Supreme Court have articulated: every one of these documents "referenc[es] one alternative term to the exclusion of all others." *Mathis*, 136 S. Ct. at 2257, *quoted in Najera-Rodriguez*, 926 F.3d at 350. Accordingly, "the statute contains a list of elements, each one of which goes toward a separate crime." *Id.*

The modified categorical approach therefore applies. All that remains is to determine whether the alternative set of elements comprising Trinidad Garcia's Dealing in Marijuana conviction matches the federal generic definition. The match is clear: the "felony drug offense" definition specifically includes "marihuana." 21 U.S.C. §§ 802(44), 802(16).

The Court need go no further. Because Trinidad Garcia's conviction qualifies as a felony drug offense, the Court should reject his challenge.

**D.     Treating a Dealing in Marijuana Conviction as a Felony Drug Offense Was Hardly a Plain Error**

If the Court deems this a close case, the standard of review matters. Trinidad Garcia could have raised the issue below, but he gave the district

---

[6] The government retrieved this information from Indiana's public court website: https://public.courts.in.gov/mycase/#/vw/Search.

court no opportunity to address his argument. He must therefore surmount the plain error standard, which he cannot do.

Trinidad Garcia cannot show an effect on his substantial rights because his prior Dealing in Marijuana conviction qualifies as an § 851 predicate. At most, the question is "subject to reasonable dispute," not plain. *Lynn*, 851 F.3d at 792. It was hardly odd for the government to file, and for the district court to accept for sentencing purposes, an information indicating that felony Dealing in Marijuana was a felony drug offense. Dealing in Marijuana has been treated in precisely that way in prior cases. *E.g.*, *United States v. Hinkle*, 725 F. App'x 421, 422 (7th Cir. 2018) (unpublished); Brief in Support of Motion to Withdraw, *United States v. Hinkle*, No. 17-2154, 2018 WL 454127, at *6 (7th Cir. filed Jan. 10, 2018).

Although the Dealing in Marijuana predicate increased Trinidad Garcia's sentencing exposure, it did so in the same manner in which such predicates have for many years. Accordingly, even if the sentencing decision in this case was wrong, the alleged error did not seriously "affect[] the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 792.

The Supreme Court recently observed that courts should not "seiz[e] on modest state-law deviations" to deem statutes incompatible under the categorical approach. *Quarles v. United States*, 587 U.S. ___, 139 S. Ct.

1872, 1880 (2019). That sentiment has particular relevance in the plain error context, and four salvia prosecutions in a decade is modest by any measure.

Even if Trinidad Garcia could convince the Court that an error occurred, he cannot meet the plain error standard. The Court should therefore affirm.

## II. The Record Establishes Clear Waiver of Pineda-Hernandez's Overarching Translation Claim, No Substantial Translation Errors, and Commendable Handling of a Difficult Situation by the District Court

### A. Pineda-Hernandez Has Waived His Claims

This Court typically reviews due process challenges to trial or hearing translations *de novo*. *United States v. Leiva*, 821 F.3d 808, 819 (7th Cir. 2016). That typical standard does not apply here.

The district court explained to Pineda-Hernandez multiple times that, if he chose to embrace a second day of Barragan-Lopez testimony, the consequence of that choice would be waiver of any challenge to the procedure on appeal. (T. 517.) He urged the court to let Barragan-Lopez testify again. That choice waived most or all of his translation claims on appeal. *United States v. Ramirez*, 783 F.3d 687, 693 (7th Cir. 2015); *United States v. Bey*, 725 F.3d 643, 646 (7th Cir. 2013); *see United States v. Orsini*, 907 F.3d 115, 119 (1st Cir. 2018) (explaining strategic waiver rule in challenge to career offender status).

Pineda-Hernandez says the Court should ignore his waiver because he was confused. (A. Br. 36-37.) That is a self-serving and incorrect reading of the record. He was not confused—he wanted to eat his cake and have it too.

Nor was his decision a "purported acquiescence." (A. Br. 37.) He was unequivocal that he wanted Barragan-Lopez to testify again. And he had reasonable strategic reasons for doing so—a second round of cross examination, as well as the opportunity (which he took) to exploit perceived inconsistencies in Barragan-Lopez's testimony during closing argument. That strategic choice waived the procedural plaints he raises before this Court. *Bey*, 725 F.3d at 646.

He also complains that the district court "shifted the risk" of any translation problems onto him by presenting him with a "Morton's fork." (A. Br. 2, 36.) Rather than ask Pineda-Hernandez his position on the issue, he now says, the court should have *sua sponte* "declared a mistrial." (A. Br. 12.) Of course, he never asked the court for a mistrial. Instead, he urged the court to proceed exactly as it did. That is waiver. Punishing a district court for thoughtfully following through with a procedure a defendant agrees to would set an absurd precedent.

Because Pineda-Hernandez specifically endorsed the district court's remedy for the purported translation errors—repeating the testimony—this Court should also deem waived any challenge to the translation itself. If the

Court believes the two aspects of his claim—procedures and translation—are nonetheless distinct, his translation claim would be subject to plain error review because he never objected below. *United States v. Sandoval*, 347 F.3d 627, 632 (7th Cir. 2003). If the Court addresses his translation claim, he must show "that (1) there was error; (2) it was plain rather than subject to reasonable dispute; (3) it affected his substantial rights; and (4) the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Lynn*, 851 F.3d at 792.

Finally, Pineda-Hernandez packages a portion of his claim not in the constitution but in the Court Interpreter's Act, 28 U.S.C. § 1827. This Court typically reviews claims under that Act for abuse of discretion. *Leiva*, 821 F.3d at 819-20; *United States v. Febus*, 218 F.3d 784, 791-93 (7th Cir. 2000); *Sandoval*, 347 F.3d at , 632 . Again, Pineda-Hernandez has waived any such claim by acceding to the procedures the court adopted below. At most, this portion of his claim is subject to plain error review.

## B. Even if Not Waived, Pineda-Hernandez's Translation Claims Fail Because the Record Does Not Establish Any Substantial Translation Errors

Pineda-Hernandez says that "errors in the mistranslation" in this case were "pervasive, affecting nearly every question and answer given." (A. Br. 21.) On the contrary, the record does not establish any actual errors, only

vague allegations of error. Moreover, the district court remedied any purported problem by granting Pineda-Hernandez's request that the testimony be given again, as well as by telling the jury twice that a translation issue had affected day one of the testimony.

"A district court denies a criminal defendant due process where 'the accuracy and scope of a translation at a hearing or trial is subject to grave doubt.'" *Leiva*, 821 F.3d at 820 (quoting *United States v. Cirrincione*, 780 F.2d 620, 634 (7th Cir. 1985)). Put another way, "the 'basic constitutional inquiry' when determining competency of translation is 'whether any inadequacy in the interpretation made the trial fundamentally unfair.'" *Id.* (quoting *United States v. Joshi*, 896 F.2d 1303, 1309 (11th Cir. 1990)).

The trial in this case was fair. Even treating the allegations of mistranslation in this case generously, they raise no "grave doubts." *Leiva*, 821 F.3d at 820; *accord Cirrincione*, 780 F.2d at 634 . Entirely absent from Pineda-Hernandez's argument is any persuasive explanation as to how the day-one translation failed to "reasonably convey[] the intent or the idea" in any part of Barragan-Lopez's testimony. *United States v. Gonzalez*, 319 F.3d 291, 296 (7th Cir. 2003) (quoting *United States v. Zambrana*, 841 F.2d 1320, 1337 (7th Cir. 1988)).

Pineda-Hernandez calls the allegations of mistranslation in this case "credible," "substantive," "pervasive," and "specific." (A. Br. 24-27.) Far from

it: despite the district court's every effort to give the interpreters a chance to spell out their accusations, the complaints were none of those things.

The "credibility" of the interpreters' complaints is highly questionable. Besides leveling only vague accusations, they confidently—but incorrectly—asserted that the government interpreter's first language was English. (T. 459.) They backtracked on their criticism of "chunking," or translating in short bursts, which was in all events more of a difference of opinion about method than an allegation of inaccuracy. (T. 455, 464.) They proposed a remedial translation procedure out of step with anything the other seasoned case participants had seen before. (T. 467.) At times, their motivation seemed to be more about promoting federal certification than about getting the translation correct. (T. 451-52.) And, critically, they were wrong about one of the two errors they alleged. (T. 511-12.) Their credibility is doubtful at best.

The interpreters offered nothing "specific" to remedy, phrasing their concerns only in general terms. (T. 455-59.) Those general criticisms also failed to show "pervasive" errors. True, one interpreter stated, "there were a lot of omissions . . . towards the end of every question, of every answer." (A. Br. 24.) But she did not develop that allegation meaningfully. If Pineda-Hernandez could substantiate that allegation and show material alterations

in the meaning of many questions, he might have a claim. But no one has ever identified a real alteration in meaning, let alone numerous alterations.

Pineda-Hernandez also complains that the purported "errors were not corrected in real time" and that "defense counsel couldn't return to a topic or line of questioning." (A. Br. 26.) But the reason for both of those dynamics was that the translators failed to identify any specific errors. One cannot correct an error that has not been identified. Likewise, there is nothing for this Court to correct.

Pineda-Hernandez's claim of error is particularly weak given his inability to show substantial differences between Barragan-Lopez's first and second rounds of testimony. He does not allege any errors in the day-two testimony, so that is a fair standard against which to measure the correctness of the day-one testimony.

The district judge observed that she could "discern" no "substantive" difference between the two days of testimony. (T. 680.) Pineda-Hernandez appeared to agree with that sentiment. (*Id.*)

Now he disagrees. He points to two possible "inconsistencies." (A. Br. 30, 34). Neither resulted in a failure to convey the story from the witness. *Gonzalez*, 319 F.3d at 296. And, in the scheme of things, those "inconsistencies" were insignificant.

First, he says that Barragan-Lopez's description of his role in the offense changed from day one to day two. On day one, Barragan-Lopez described Pineda-Hernandez as a "source" who supplied drugs from "out of the country" and stated that he "colored the drugs with Gatorade." (T. 436-37; *accord* T. 393.) He also testified about getting in "trouble" with Pineda-Hernandez and Cazares-Garcia. (T. 572.) On day two, he offered similar testimony and added the phrase "in charge" to describe Pineda-Hernandez's role in the conspiracy. (T. 541-42.) That is not a major difference—the person who serves as the source of drugs in a conspiracy is often in charge. *United States v. Hardamon*, 188 F.3d 843, 851 (7th Cir. 1999).

More important, that purported "inconsistency" does not go to guilt or innocence. Pineda-Hernandez says the "inaccuracies" the interpreters identified "concerned fundamental facts underpinning the government's case." (A. Br. 24.) That dramatically overstates the role that evidence played in proving that he was a member of the conspiracy charged in the indictment. It does nothing to undermine the volumes of evidence showing his drug trafficking activities.

Second, Pineda-Hernandez says that Barragan-Lopez's testimony about the color of the methamphetamine differed from day one to day two. (A. Br. 30, 34.) On both days, Barragan-Lopez testified that some of the meth was clear or white and some of it was red or pink. (T. 403-04, 551-53.) His

testimony did not materially change.  Beyond that, it is hard to tell what gulf in meaning Pineda-Hernandez sees between the phrases "pinky transparent/pinkish or red" and "pinkish, between pinkish and red."  (A. Br. 16, 30.)  Even less clear is why he thinks that difference was material to the jury's verdict.  Regardless of his precise point, other evidence tied Pineda-Hernandez to the red methamphetamine.  For example, Araujo-Orduno received his red meth from Pineda-Hernandez.  (T. 214-35.)

In short, if as Pineda-Hernandez concedes, day two was error-free, then day one was error-free as well.  Coupled with the other flaws in his argument, that cinches matters.

All Pineda-Hernandez can point to are unspecified allegations of immaterial translation hiccups.  That is not the sort of "incomprehensible" translation or "grave" error this Court has deemed necessary to establish a due process violation.  *United States v. Johnson*, 248 F.3d 655, 663 (7th Cir. 2001); *Gonzalez*, 319 F.3d at 296.  Even if his claim is not waived, it cannot succeed.

## C.     The District Court Ably Handled a Difficult Situation

Even if Pineda-Hernandez's claims were not waived, reversal would still be the wrong result.  The district court did not plainly err in the way it handled a difficult situation.

On the contrary, the court worked to help Pineda-Hernandez and the interpreters make a record of any errors they could identify, worked thoroughly with the parties to fashion a solution, and resolved the problem in a sensible way with the parties' agreement. The court should be commended, not reversed.

That is how this Court has previously treated district courts who effectively navigated translation speedbumps. *Leiva*, 821 F.3d at 821 ("The district court responded practically to each issue that arose, and collaborated with counsel to make the best of a less than ideal situation.") In other words, where, as here, "[e]xamples abound of the district court's attentiveness to the concerns that the situation presented," reversal would turn common sense on its head. *Id.*; *accord Johnson*, 248 F.3d at 664.

Pineda-Hernandez nonetheless says the district court "exacerbated" translation errors by not availing itself of additional procedures under the Court Interpreters Act, 28 U.S.C. 1827. (A. Br. 31-33.) Of course, given that the record shows no material errors, there is nothing to "exacerbate." Plus, he cannot show that the extra statutory procedures he now says he wanted were necessary or would have changed matters at all.

To that end, the Act requires a court to provide an interpreter for a defendant who primarily speaks a language other than English. 28 U.S.C. § 1827(d)(1)(A). The Act's "purpose is to ensure that the defendant can

comprehend the proceedings and communicate effectively with counsel." *Febus*, 218 F.3d at  791.

The district court used qualified interpreters and ensured Pineda-Hernandez could comprehend the proceedings.  Rather than argue that the district court failed to fulfill the purpose of the Act, he picks nits and second-guesses the procedures the court employed, which he blessed at the time.

He first says the court should have opted for a federally certified interpreter.  28 U.S.C. § 1827(b)(1).  But the Act plainly permits "otherwise qualified interpreters" to provide translations.  *Id.* § 1827(a).  The parties agreed to the government interpreter's qualifications.  (T. 337, 449, 521-22.) The interpreter had substantial experience in federal court assisting both the government and the defense.  (T. 452.)  Nothing in the record suggests that any party had ever expressed this sort of concern before.  (T. 456.)  Plus, the court did ultimately opt for federally certified interpreters on day two of Barragan-Lopez's testimony.

Pineda-Hernandez next faults the district court for not implementing live audio recording of the trial.  But this was hardly a case contemplated by the Act's "sound recording" provision.  28 U.S.C. § 1827(d)(2).  That provision is triggered "[u]pon the motion of a party"; no party made such a motion here, so the provision does not apply.  Even if Pineda-Hernandez had made such a motion, the court would have been right to deny it.  The Act directs a court

40

considering sound recordings to assess, as relevant here: "the qualifications of the interpreter and prior experience in interpretation of court proceedings[,] . . . and the complexity or length of the proceeding." *Id.* Pineda-Hernandez agreed that the interpreter was qualified. And the proceedings were not complex or lengthy. Five days is a normal trial length, and the subject matter was a routine drug conspiracy.

The district court was attentive to Pineda-Hernandez's ability to comprehend the proceedings and to the allegations of mistranslation. This Court should thus reject Pineda-Hernandez's post-hoc criticisms tied to the Act. *United States v. Zaragoza*, 543 F.3d 943, 949 (7th Cir. 2008). Not only did the district court act within its wide discretion, but Pineda-Hernandez cannot come within a mile of establishing plain error.

## D. Any Error Was Harmless

Even if Pineda-Hernandez's various quibbles could overcome waiver and plain error review, his challenge would still fail. That is because reversal is not appropriate in this context if any "error was harmless beyond a reasonable doubt." *Mendoza v. United States*, 755 F.3d 821, 830 (7th Cir. 2014). To earn a new trial, Pineda-Hernandez must "demonstrate that he would not have been convicted but for" purported problems created by an interpreter. *Sandoval*, 347 F.3d at 632.

41

Pineda-Hernandez cannot realistically say that the alleged translation hiccups affected the verdict. Instead, he argues that harmless error analysis should not apply at all because the purported error was structural. (A. Br. 27-28.)

Structural errors comprise "a limited class of fundamental constitutional errors that defy analysis by 'harmless error' standards." *Neder v. United States,* 527 U.S. 1, 7 (1999) (internal quotation marks and citation omitted). Examples include a biased trial judge, denial of self-representation, complete denial of counsel, and a defective reasonable doubt instruction. *Washington v. Recuenco,* 548 U.S. 212, 218 n. 2 (2006). These types of errors "affect[] the framework within which the trial proceeds," *Arizona v. Fulminante,* 499 U.S. 279, 310 (1991), and "are so intrinsically harmful as to require automatic reversal *(i.e.* 'affect substantial rights') without regard to their effect on the outcome," *Neder,* 527 U.S. at 7.

To advance his structural error theory, Pineda-Hernandez tries to compare this case to *United States ex rel. Negron v. New York*, 434 F.2d 386 (2d Cir. 1970), where there was no translation at all. (A. Br. 29.) Here, however, at most two vague translation issues were identified, and no one ever established that any error actually occurred. That is a far cry from a complete denial of due process that might be considered a structural error.

In fact, as this Court showed in *Mendoza*, translation claims do not "defy" harmless error review. 755 F.3d at 829.

Demonstrating that the alleged error here was harmless is simple enough. All that is necessary to assess prejudice is to excise the alleged errors. Pineda-Hernandez's suggestion that every question was tainted is a nonstarter; while the interpreters made that allegation, it was hardly credible and never substantiated. Without Barragan-Lopez's testimony about the red methamphetamine and his description of Pineda-Hernandez as "in charge," the jury undoubtedly would still have found him guilty of the conspiracy charges in this case.

The evidence showing that Pineda-Hernandez was a primary player in the conspiracy was mountainous—sound recordings of his drug trafficking activities, the products of search warrants, agent testimony about the investigation, and the products of physical surveillance. Because that evidence more than established his guilt beyond a reasonable doubt, any error was harmless.

## III. Because Pineda-Hernandez Was a Leader of the Conspiracy in This Case, the District Court's Decision to Apply a Leadership Enhancement Was Correct, Not Clearly Erroneous

### A. Standard of Review

This court reviews a district court's interpretation of the guidelines *de novo*; factual findings tied to a guidelines enhancement are reviewed for clear

error.  *United States v. Collins*, 877 F.3d 362, 363 (7th Cir. 2017); *United States v. Hall*, 101 F.3d 1174, 1176 (7th Cir. 1996).  "Whether a defendant exercised a managerial role in the charged offense is a factual determination that [this Court] review[s] under the clearly erroneous standard."  *Id.* (citing *United States v. Billops*, 43 F.3d 281, 287 (7th Cir. 1994)).  Reversal of a district court's determination is appropriate only where this Court is left with "the definite and firm conviction that a mistake has been committed."  *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir. 1989).

## B.     Pineda-Hernandez's Role in the Offense Warranted a U.S.S.G. § 3B1.1 Enhancement

Pineda-Hernandez was a leader in the Code Red conspiracy, and he was a leader in the money laundering scheme in this case.  He deserved the leadership bumps the district court applied at sentencing.  (S. 7-8.)

U.S.S.G. § 3B1.1(a) provides for a four-point upward adjustment if a defendant "was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  An organizer or leader must "influence the criminal activity by coordinating its members." *United States v. Skoczen,* 405 F.3d 537, 550 (7th Cir. 2005) (quotation omitted).  Pineda-Hernandez's role in the drug conspiracy merited a four-level increase.

"Relative responsibility and control" are touchstones in this analysis. *United States v. Howell,* 527 F.3d 646, 649 (7th Cir. 2008).  An organizer or

leader is someone who "exercised some degree of control over others involved in the commission of the offense *or* he must have been responsible for organizing others for the purpose of carrying out the crime." *United States v. Wasz*, 450 F.3d 720, 730 (7th Cir. 2006) (citation and internal quotation omitted). "That does not mean that others must have played marionette to the defendant's puppeteer." *United States v. Mustread*, 42 F.3d 1097, 1104 (7th Cir. 1994).

> Relevant guidelines commentary reads in pertinent part:

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as 'kingpin' or 'boss' are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. . . . This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1 cmt. n.4.

That same commentary puts to bed one of Pineda Hernandez's central arguments. He says only Cazares-Garcia was the leader of the conspiracy. (A. Br. 41.) But the commentary states, "There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id.* Even if Cazares-Garcia was a leader, Pineda-Hernandez was too. Indeed, Trinidad Garcia received a two-point increase under §

3B1.1(a), and his leadership activities were less extensive than Pineda-Hernandez's.  (PSR 2 ¶ 19.)

Framing the issue as a factual one, Pineda-Hernandez says he was "at most" a "middleman" who controlled no one.  (A. Br. 40.)  That is not borne out by the facts.

Pineda-Hernandez gave orders that others followed.  For example, he spent much of his time demanding repayment from subordinates he had fronted drugs to.  (T. 161, 208, 267-68, 546, 613-16, 635; PSR 1 ¶ 5-8.)  He also directed other members of the conspiracy to collect drug proceeds for him, to serve as drug couriers, and to drive him around to collect on debts.  (PSR 1 ¶ 6-7.)  That is typical leader behavior.  *United States v. Sotelo*, 707 F. App'x 77, 90 (3d Cir. 2017) (unpublished) (directing couriers and collecting proceeds warrants § 3B1.1(a) enhancement); *see United States v. Figueroa*, 682 F.3d 694, 697 (7th Cir. 2012) (directing others and following up on it is the conduct of a supervisor); *United States v. Bennett*, 708 F.3d 879, 891-92 (7th Cir. 2013) (similar); *United States v. Shannon*, 836 F.3d 815, 818 (7th Cir. 2016) (similar); *Hardamon*, 188 F.3d at 851; *United States v. Phillips*, 959 F.2d 1187, 1191 (3d Cir. 1992).

Pineda-Hernandez also put pressure on subordinates to sell more drugs, saying to one "just get it out."  (T. 250-53.)  He also indicated that he would protect Araujo-Orduno while he was selling drugs as part of the

conspiracy: "But you'll see me there if the homeboys decide to really screw you over, dude. . . Of course, one gets upset, dude." (T. 248-49.) And he specifically directed at least three others to deliver methamphetamine to customers. (PSR 1 ¶ 7.) That too is what a leader in a drug organization does. *Skoczen,* 405 F.3d at 550; *United States v. Arojojoye*, 753 F.3d 729, 737-38 (7th Cir. 2014).

Pineda-Hernandez counters that Barragan-Lopez had no problem bucking him, which he says made them "essentially equal partners in crime." (A. Br. 40-41.) Even if that were true, Pineda-Hernandez would still qualify for the enhancement because of his control over others. Further, Barragan-Lopez did as Pineda-Hernandez and Cazares-Garcia told at least once because he did not want to get into any "trouble." (T. 572.) That is because Pineda-Hernandez was "in charge." (T. 541, 559-60.)

Pineda-Hernandez organized and coordinated the group's activities, such as renting at least one apartment for the conspiracy to use to store drugs. (T. 680.) That counts as leadership for purposes of U.S.S.G. § 3B1.1. *United States v. Perkins*, 108 F.3d 512, 518 (4th Cir. 1997). He also created the group's signature red methamphetamine, and he directed Cazares-Garcia to do certain things for the benefit of the overall conspiracy, such as leasing the apartment, delivering drugs on his behalf, and wiring money to Mexico. (T. 208, 546, 613-16, 635.) That is the conduct of a leader and organizer.

The Code Red conspiracy had at least five members, and Pineda-Hernandez supplied much of the methamphetamine the group sold. (PSR 1 ¶ 5; T. 542, 588.) Supplying drugs to distributors "explif[ies] his leadership role." *United States v. Hardamon*, 188 F.3d 843, 851 (7th Cir. 1999); *Billops*, 43 F.3d at 287; *see United States v. Garcia*, 497 F.3d 964, 970 (9th Cir. 2007) (a defendant who procures drugs for an organization is a leader); *see also United States v. Lopez*, 704 F. App'x 588, 589 (7th Cir. 2017) (unpublished) (applying enhancement to defendant who fronted drugs to others and demanded repayment).

As all of this shows, Pineda-Hernandez was "much more than a middleman who brought together willing sellers and buyers." *Skoczen*, 405 F.3d at 550. That is why his reliance on *Mustread* and *United States v. Colon*, 919 F.3d 510, 518-19 (7th Cir. 2019)—cases discussing mere middlemen—misses the mark. (A. Br. 41-42.)

Pineda-Hernandez does not dispute that the conspiracy was extensive. He exercised control over at least three members of the organization, including his driver, Araujo-Orduno, and the middleman who collected payments from Araujo-Orduno. The control and organization Pineda-Hernandez exercised merits a four-level enhancement. *United States v. Harmelech*, 927 F.3d 990, 998 (7th Cir. 2019). The district court did not err, clearly or otherwise, in applying the enhancement.

48

The court also applied the two-point enhancement of U.S.S.G. § 3B1.1(c), with respect to Pineda-Hernandez's money laundering offense. He does not appear to contest that enhancement. The money laundering conspiracy involved Pineda-Hernandez and three others. Pineda-Hernandez coordinated wire transfers and on at least one occasion told Cazares-Garcia where to conduct a wire transfer to avoid detection. (T. 638.) Even if he was at times just a middleman in this conspiracy, his conduct merited a two-point increase. *Howell,* 527 F.3d at 649. As a result, on both counts, his offense level was 42.

Pineda-Hernandez makes much of the "prejudice" he suffered from the enhancement. But his offense level was 42 even without the four-level enhancement tied to the drug conspiracy, given the money laundering count. Regardless, any increase in Pineda-Hernandez's guidelines range was in order, in light of his conduct and role in the offense. He complains that his sentence was higher than Cazares-Garcia's. But to make that point, he ignores a major difference between the two of them: Cazares-Garcia cooperated with the government, even testifying at trial. That merits a lower sentence, as it has in countless cases before this one.

In short, the district court's decision to enhance Pineda-Hernandez's sentence pursuant to U.S.S.G. § 3B1.1 was correct.

## CONCLUSION

For the reasons stated above, this Court should affirm.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:  s/ Bob Wood
Bob Wood
Chief, Appellate Division

**CERTIFICATE OF COMPLIANCE IN ACCORDANCE WITH**
**FED. R. APP. P. 32(a)(7)(C)**

The foregoing BRIEF FOR THE UNITED STATES complies with the

type volume limitations required under Fed. R. App. P. 32(a)(7)(B)(i) in that

there are not more than 13,000 words or 1,300 lines of text using monospaced

type in the brief, that there are 10,924 words typed in Microsoft Word word-

processing this 26th day of July, 2019.


  s/ Bob Wood
Bob Wood
Chief, Appellate Division

**CERTIFICATE OF SERVICE**

I certify that on July 26, 2019, I electronically filed the foregoing

BRIEF FOR THE UNITED STATES with the Clerk of the Court for the

United States Court of Appeals for the Seventh Circuit by using the CM/ECF

system.

I certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the CM/ECF system to the following:

Peter W. Henderson
OFFICE OF THE FEDERAL PUBLIC DEFENDER
Peter_Henderson@fd.org
Attorney for Jose Trinidad Garcia, Jr.

Kyle Hosmer
Brian James Paul
FAEGRE BAKER DANIELS LLP
Kyle.Hosmer@faegrebd.com
Brian.Paul@faegrebd.com

s/ Bob Wood
Bob Wood
Chief, Appellate Division
Office of the United States Attorney
10 West Market Street, Suite 2100
Indianapolis, Indiana 46204-3048
Telephone: (317) 226-6333
Bob.Wood@usdoj.gov

In the
# United States Court of Appeals
## for the Seventh Circuit

UNITED STATES OF AMERICA,
                    Plaintiff-Appellee,

v.

JOSE TRINIDAD GARCIA, JR., and
ALFONSO PINEDA-HERNANDEZ, a/k/a Flaco,,
                    Defendants-Appellants.

On Appeal from the United States District Court
for the Southern District of Indiana, Terre Haute Division.
No. 1:16-cr-200 — Hon. Jane Magnus-Stinson, *Chief Judge*.

# SUPPLEMENTAL APPENDIX
# OF THE UNITED STATES

JOSH J. MINKLER
United States Attorney

Bob Wood
Chief, Appellate Division

Attorneys for the
United States of America

United States Attorney's Office
10 W. Market Street, Suite 2100
Indianapolis, IN 46204
(317) 226-6333

# TABLE OF CONTENTS

**Page No**.

CUMMINGS JUDGMENT.........................................................................GSA1

BREEDLOVE JUDGMENT……………………………………………..GSA2

RAGLAND INFORMATION……………………………………………..GSA3

BREEDLOVE INFORMATION…………………………………………..GSA4

CUMMINGS INFORMATION…………………………………………...GSA5

COMBS INFORMATION………………………………………………...GSA6

KINLEY INFORMATION………………………………………………..GSA7

LOCKARD INFORMATION……………………………………………..GSA8

JOHNSON PLEA AGREEMENT………………………………………..GSA9

JOHNSON JUDGMENT…………………………………………………GSA10

**STATE OF INDIANA**                    )    **IN THE MORGAN COUNTY SUPERIOR COURT 3**
                                        )
**COUNTY OF MORGAN**                    )    **CASE NO:  55D03-1802-F6-000228**

**STATE OF INDIANA**

**VS.**

**MORGAN R. CUMMINGS**

**DOB:  12/13/1984    SSN:  xxx-xx-9503**

## JUDGMENT AND ORDER RE: SENTENCING

On June 11, 2018, The Court having conducted a change of plea and sentencing hearing this date and having considered evidence presented by the State and Defendant, **the Court enters Judgment that the Defendant is guilty of the offense of:**

**35-48-4-10(a)(2)/F6: Dealing in Marijuana weighing b/t 30 grams & 10 pounds.**

**The Court now orders:**

**FINE & COSTS:** The Defendant is fined in the sum of $1.00 plus $185.00 Court Costs.  The fine and costs shall be:

- [ ]  waived because the Court finds the Defendant to be indigent.
- [X]  paid with cash bail posted.
- [ ]  paid pursuant to the Order of Probation filed in this case.
- [ ]  Civil Judgment entered against Defendant in the amount of:

**SENTENCE:**  The Defendant is sentenced to **imprisonment** in the Community Corrections/Home Detention for a period of <u>545 Day(s)</u>, with jail time credit 68 days (Plus Class A Credit 68 days) actually served prior to sentencing.

**The Court further orders:**

- [ ]  That the Defendant's driving privileges be suspended for 35-48-4-10(a)(2)/F6: Dealing in Marijuana weighing b/t 30 grams & 10 pounds..
  - [ ]  beginning on
  - [ ]  but that the license suspension be stayed and the Defendant granted probationary driving privileges for 180 days after the 30 day mandatory administrative suspension.
- [X]  That Counts 1 and 3 of the Information be dismissed at the request of the State of Indiana.
- [X]  CASH BAIL: $600.00 released to pay fine and costs remainder released to pay fine and costs in case 55D03-1804-F6-00056.
- [ ]  The Defendant shall report to the Morgan County Jail on 06/11/2018 to begin serving the executed portion of this sentence.

**DATE:  06/11/2018**

_____
**Judge Sara Dungan, Morgan County Superior Court 3**

DISTRIBUTION:

X Prosecuting Attorney        Court Services      [ ] Defendant    X Counsel, Joshua Paul Stein

[ ] Probation Dept.      X Home Detention Officer                    X Sheriff        X Ind. Department of Correction

X Other: <u>  Reporter                                          </u>        X Bail Bond Agent, Lewis Ed Parker

**GSA 1**

STATE OF INDIANA
VS.

**MORGAN SUPERIOR COURT 1**
CASE NO. 55D01- 1801- F5-34
COUNT 2

Cody Breedlove
DOB 10-13-94 SSN 6230

## JUDGMENT AND ORDER RE: SENTENCING

On _____ 7-9 _____, 20 18 the Court conducted the following proceedings in this case:

The Court having found on _____ 7-9 _____, 2018, that the defendant is guilty of the criminal offense of
Dealing Marijuana more than 30 grams , a class 6 ☒ felony ☐ misdemeanor,
and having conducted a sentencing hearing
   ☐ at which time the Court considered a preplea/presentence investigation report previously filed.     ☐ felony ☐ misdemeanor.
The Court now renders judgment that the defendant is guilty of the above stated criminal offense as a class _____.

**The Court then ordered:**
☒ the defendant be fined in the sum of $ 1 00 ; assessed Court costs in the sum of $ 135 00 ;
countermeasure fees in the sum of $ 200 00 ; public defender's fees in the sum of $ _____;
    ☐ that the fine and costs be waived because the Court finds the defendant is an indigent person.
    ☐ that the fine and costs be paid ☐ today ☐ within _____ days to the Clerk of Morgan County, or
    ☐ laid out at the rate of $20.00 per day consecutive and additional to any other time being served, and
    ☐ if not satisfied, may be filed as a civil judgment.
    ☐ that the fine and costs be paid _____ within _____ days by any cash Bail posted in this case.
    ☒ that the fine and costs be paid ☒ today ☐ within _____ days.
    ☐ that the fine and costs be paid pursuant to an order of probation filed.

☒ the defendant be sentenced to imprisonment in the _____ MCJ _____ days, and _____ days Class credit time.
for a period of _____ 730 days with a jail time credit for _____ 1 days, and _____ 1 days _____ security.
The Court recommends: ☐ that the defendant be confined under _____

    ☒ however, serving of said sentence was withheld and suspended so long as the defendant complies with an order of probation
    for a probation period of _____ 730 days .
    ☒ except for a term of _____ 62 days to be served in the MCJ
    ☐ that the sentence be served:
        ☐ concurrently with _____
        ☒ consecutively to _____ 41+02 - 1612-CM - 1469 _____

**The court further ordered:**
☐ that the defendant's driving privilege be suspended for _____
    ☐ beginning _____, 20 _____ (the date of the administrative suspension).
    ☐ that the license suspension be stayed and the defendant is granted probationary driving privileges for 180 days after the
    30-day mandatory administrative suspension.

☒ that count(s) _____ 1, 3 _____ of the Information be dismissed at the request of the State of Indiana.

☐ that any Bail filed in this case be released.

☒ that cash Bail in the amount of fine and costs be paid to the Clerk of Morgan County and any additional Bail remaining released.

☐ that the No Contact Order be ☐ dismissed ☐ remain in effect.

☒ that the defendant is to report to the Morgan County Jail on today , 20 ___, at ___ ☐am ☐pm, and _____

- Restitution to Johnson Co. Sheriff's Dept Narcotics Division $460 00
to be paid during probation

Date: 7-10-18

PETER R. FOLEY, JUDGE

Copies on _____ by _____ to:

☐ RJO      ☐ Prosecutor      ☐ Court Services      ☐ Sheriff
☐ Defendant      ☐ File      ☐ Probation      ☐ Clerk, Civil Judgment Book
☐ Counsel _____      ☐ Bondsman      ☐ Home Detention      ☐ _____

Revised 4/05/07

**GSA 2**

STATE OF INDIANA                          IN THE MARION SUPERIOR COURT
MARION COUNTY, ss:                        CRIMINAL DIVISION

                                          Cause No:  49G14

STATE OF INDIANA              )
                             )            **INFORMATION**
       vs.                    )           **COUNT I**
                             )            **DEALING IN MARIJUANA**
                                          **I.C. 35-48-4-10(a)(2) and I.C. 35-48-4-10(c)**
JORDAN RAGLAND  B/Male                    **(2)(A)**
DOB 10/24/1996                            **A LEVEL 6 FELONY**
                                          **COUNT II**
                                          **POSSESSION OF MARIJUANA**
                                          **I.C. 35-48-4-11(a)(1) and I.C. 35-48-4-11(c)**
                                          **A LEVEL 6 FELONY**
                                          **COUNT III**
                                          **CARRYING A HANDGUN WITHOUT A**
                                          **LICENSE**
                                          **I.C. 35-47-2-1**
                                          **A CLASS A MISDEMEANOR**

On this date, the undersigned Deputy Prosecuting Attorney of the Nineteenth Judicial
Circuit, being duly sworn on his/her oath (or having affirmed), says that in Marion County, Indiana

COUNT I

On or about October 18, 2018, JORDAN RAGLAND did knowingly or intentionally possess
with the intent to deliver marijuana, pure or adulterated, with the said marijuana weighing more
than 30 grams, but less than 10 pounds, and he has a prior conviction for Possession of
Marijuana under cause number 49G10-1605-CM-016376;

COUNT II

On or about October 18, 2018, JORDAN RAGLAND did knowingly possess at least 30 grams
of marijuana, pure or adulterated, and he has a prior conviction for Possession of Marijuana
under cause number 49G10-1605-CM-016376;

COUNT III

On or about October 18, 2018, JORDAN RAGLAND did knowingly carry a handgun in a
vehicle or on or about his person, without being licensed as required by law;

all of which is contrary to statute and against the peace and dignity of the State of Indiana.

GSA 3

October 23, 2018
Date

**TERRY R. CURRY**
Marion County Prosecutor
19th Judicial Circuit


  _/s/ Amy Blackett____  _____
Deputy Prosecuting Attorney

State's Witnesses:
K. Allen IMPD 32665
T. Watson IMPD 30715
J. Smith IMPD S1276
R. Stratman IMPD 21237
A. Barnum IMPD B4750
C. Chapman IMPD 31656
S. Nickels IMPD 31731
R. Jett IMCFSA
Possession With Intent to Deliver Witness
Marion County Clerk
IDENT IMPD Print Examiner

| IN THE MORGAN CIRCUIT/SUPERIOR COURT | CAUSE NUMBER: 55 |
|---|---|

| STATE OF INDIANA<br><br>VS<br><br>CODY L. BREEDLOVE<br>4952 2nd Street<br>Helmsburg, IN 47435<br>DOB: 10/13/1994<br>SSN: XXX-XX-6230<br>EMAIL: | INFORMATION FOR:<br><br>1.  CORRUPT BUSINESS INFLUENCE<br>I.C. 35-45-6-2(1)<br>a Level 5 Felony<br><br>2.  DEALING IN MARIJUANA<br>I.C. 35-48-4-10(a)(2) and I.C. 35-48-4-10(c)(2)(A)<br>a Level 6 Felony<br><br>3.  MAINTAINING A COMMON NUISANCE -<br>CONTROLLED SUBSTANCES<br>I.C. 35-45-1-5(c)<br>a Level 6 Felony |
|---|---|

1.  Brian K. Chambers says that between December 6, 2017 and December 14, 2017 in Morgan County, State of Indiana, Cody L. Breedlove did knowingly receive proceeds from a pattern of racketeering activity, to-wit: dealing marijuana; and did use or invest said proceeds to operate an enterprise.

2.  Brian K. Chambers says that between December 6, 2017 and December 14, 2017 in Morgan County, State of Indiana, Cody L. Breedlove did knowingly or intentionally possess with the intent to deliver marijuana, pure or adulterated, with the said marijuana weighing more than 30 grams, but less than 10 pounds.

3.  Brian K. Chambers says that between December 6, 2017 and December 14, 2017 in Morgan County, State of Indiana, Cody L. Breedlove did knowingly maintain a building, structure, vehicle or other place that was used one or more times to unlawfully use or keep a controlled substance or items of drug paraphernalia.

I affirm under the penalties for perjury that the foregoing representations are true to the best of my knowledge and belief on:  January 8, 2018

*Brian Chambers*

This information approved by me on:  January 8, 2018

*Amanda K*

Deputy Prosecuting Attorney

| IN THE MORGAN CIRCUIT/SUPERIOR COURT | CAUSE NUMBER: 55 |
|---|---|

| STATE OF INDIANA<br><br>VS<br><br>MORGAN R. CUMMINGS<br>126 MERRIMAN RD<br>MOORESVILLE, IN  46158<br>DOB: 12/13/1984<br>SSN: XXX-XX-9503<br>EMAIL: | INFORMATION FOR:<br><br>1.  MAINTAINING A COMMON NUISANCE - CONTROLLED SUBSTANCES<br>I.C. 35-45-1-5(c)<br>a Level 6 Felony<br><br>2.  DEALING IN MARIJUANA<br>I.C. 35-48-4-10(a)(2) and I.C. 35-48-4-10(c)(2)(A)<br>a Level 6 Felony<br><br>3.  POSSESSION OF MARIJUANA<br>I.C. 35-48-4-11(a)(1)<br>a Class B Misdemeanor |
|---|---|

1.  Brian K. Chambers says that on or about February 12, 2018 in Morgan County, State of Indiana, Morgan R. Cummings did knowingly maintain a building, structure, vehicle or other place that was used one or more times to unlawfully use or keep a controlled substance or items of drug paraphernalia.

2.  Brian K. Chambers says that on or about February 12, 2018 in Morgan County, State of Indiana, Morgan R. Cummings did knowingly possess, with intent to deliver marijuana, pure or adulterated, with the said marijuana weighing more than 30 grams, but less than 10 pounds.

3.  Brian K. Chambers says that on or about February 12, 2018 in Morgan County, State of Indiana, Morgan R. Cummings did knowingly possess marijuana.

I affirm under the penalties for perjury that the foregoing representations are true to the best of my knowledge and belief on:  February 13, 2018

*Brian Chambers*

This information approved by me on:  February 13, 2018

Chief Deputy Prosecuting Attorney

| IN THE MORGAN CIRCUIT/SUPERIOR COURT | CAUSE NUMBER: 55 |
|---|---|

| STATE OF INDIANA<br><br>VS<br><br>JONAS A. COMBS<br>61 Endsley Drive<br>Mooresville, IN  46158<br>DOB: 1/5/1998<br>SSN: XXX-XX-9484<br>EMAIL: | INFORMATION FOR:<br><br>1.  DEALING IN MARIJUANA<br>I.C. 35-48-4-10(a)(2) and I.C. 35-48-4-10(c)(2)(A)<br>a Level 6 Felony<br><br>2.  POSSESSION OF MARIJUANA<br>I.C. 35-48-4-11(a)(1)<br>a Class B Misdemeanor<br><br>3.  POSSESSION OF PARAPHERNALIA<br>I.C. 35-48-4-8.3(b)(1)<br>a Class C Misdemeanor |
|---|---|

1.  Jim Thomas says that on or about March 18, 2017 in Morgan County, State of Indiana, Jonas A. Combs did knowingly possess with the intent to deliver marijuana and the amount of marijuana was at least 30 grams but less than 10 pounds.

2.  Jim Thomas says that on or about March 18, 2017 in Morgan County, State of Indiana, Jonas A. Combs did knowingly possess marijuana.

3.  Jim Thomas says that on or about March 18, 2017 in Morgan County, State of Indiana, Jonas A. Combs did knowingly possess an instrument, device, or object that the defendant intended to use for introducing into his/her body a controlled substance.

I affirm under the penalties for perjury that the foregoing representations are true to the best of my knowledge and belief on:  March 20, 2017

This information approved by me on:  March 20, 2017

**GSA 6**

Chief Deputy Prosecuting Attorney

IN THE CLARK CIRCUIT COURT NO. 2
STATE OF INDIANA

STATE OF INDIANA

VS.

DAVID KINLEY
DOB: 3/13/1984

**FILED**

SEP 12 2016

*Susan Popp*
CLERK CLARK CIRCUIT COURTS

CASE #: 10C02-1609-F5-241

# INFORMATION

### COUNT I - DEALING IN SALVIA (LEVEL 5 FELONY)
### I.C. 5-48-4-10(a)(1)and I.C. 35-48-4-10(d)(2)(A)(ii)

On or about July 20, 2016 in Clark County, State of Indiana, DAVID KINLEY did possess with intent to deliver salvia, pure or adulterated, with the said salvia weighing at least 300 grams.

### COUNT II - DEALING IN A SYNTHETIC DRUG OR SYNTHETIC DRUG LOOKALIKE
### SUBSTANCE (LEVEL 6 FELONY) I.C. 35-48-4-10.5(c)(1)and I.C. 35-48-4-10.5(e)(1)(B)

On or about July 20, 2016 in Clark County, State of Indiana, DAVID KINLEY did possess with intent to deliver a synthetic drug or a synthetic drug lookalike substance, in an amount greater than 5 grams.

### COUNT III - MAINTAINING A COMMON NUISANCE - CONTROLLED
### SUBSTANCES (LEVEL 6 FELONY) I.C. 35-45-1-5(c)

On or about July 20, 2016 in Clark County, State of Indiana, DAVID KINLEY did knowingly or intentionally maintain a building, structure, vehicle, to-wit: 1534 Plank Road #3, maintained for the unlawful use, manufacture, keeping, sale, delivery or financing the delivery of controlled substances or items of drug paraphernalia.

All of which is contrary to the form of the statute(s) in such cases made and against the peace and dignity of the State of Indiana.

*I AFFIRM, UNDER PENALTIES FOR PERJURY, THAT THE FOREGOING REPRESENTATIONS ARE TRUE.*

Michaelia Gilbert, Deputy
Prosecuting Attorney
State of Indiana
4th Judicial Circuit
Attorney #: 29924-10

GSA 7

STATE OF INDIANA )
) SS:
COUNTY OF SULLIVAN )

FILED
IN CIRCUIT COURT

STATE OF INDIANA

VS

DEC 12 2018

Peggy Hardman
LOCKARD Circuit Court

LUCAS ALAN RANDALL LOCKARD
506 North Alexander Street
Carlisle, IN 47838
DOB: 1/25/2000

IN THE SULLIVAN Circuit COURT

CAUSE NUMBER. 77 C01-1812-F4-000888

INFORMATION FOR COUNT I:
POSSESSION OF SALVIA
I.C. 35-48-4-11(a)(1) and I.C.
35-48-4-11(c)
A LEVEL 6 FELONY

The undersigned, being duly sworn upon his oath, says that on or
about December 7, 2018, at U. S. Highway #41 in Sullivan County,
State of Indiana, Lucas Alan Randall Lockard did knowingly or
intentionally possess at least 2 grams of salvia (pure or
adulterated), contrary to the form of the statutes in such cases
made and provided by I.C. 35-48-4-11(a)(1) and against the peace and
dignity of the State of Indiana.

Ron Elliott

Subscribed and sworn to before me this ____ day of December, 2018.
My commission expires: 08/21/2023

Joanne Davis, Notary Public
A Resident of Sullivan County
APPROVED BY ME:

John M. Hiatt
Chief Deputy Prosecuting
Attorney

WITNESSES:
Matthew Price





GSA8

STATE OF INDIANA )
                     FILED
COUNTY OF SULLIVAN IN CIRCUIT COURT

                   DEC 12 2018

STATE OF INDIANA

               *Peggy Goodman*

     VS       Clerk, Sullivan Circuit Court

LUCAS ALAN RANDALL LOCKARD
506 North Alexander Street
Carlisle, IN 47838
DOB: 1/25/2000

IN THE SULLIVAN *Circuit* COURT

CAUSE NUMBER. 77 C01-1812-F4-000888

INFORMATION FOR COUNT II:
DEALING IN SALVIA
I.C. 35-48-4-10(a)(2)and I.C.
35-48-4-10(c)(2)(B)
A LEVEL 6 FELONY

The undersigned, being duly sworn upon his oath, says that on or
about December 7, 2018, at U. S. Highway #41 in Sullivan County,
State of Indiana, Lucas Alan Randall Lockard did knowingly or
intentionally possess with the intent to deliver salvia, pure or
adulterated, with the said salvia weighing more than 5 grams, but
less than 300 grams, contrary to the form of the statutes in such
cases made and provided by I.C. 35-48-4-10(a)(2)and I.C.
35-48-4-10(c)(2)(B) and against the peace and dignity of the State
of Indiana.

                                    Ron Elliott

Subscribed and sworn to before me this____day of December, 2018.
My commission expires: 08/21/2023

                                 Joanne Davis, Notary Public
                                 A Resident of Sullivan County
                                 APPROVED BY ME:

                                 John M. Hiatt, Chief Deputy
                                 Prosecuting Attorney

WITNESSES:
Matthew Price



**GSA8**

STATE OF INDIANA **FILED**
IN CIRCUIT COURT

COUNTY OF SULLIVAN  DEC 12 2018

STATE OF INDIANA  *Peggy Gordman*
Clerk. Sullivan Circuit Court

VS

LUCAS ALAN RANDALL LOCKARD
506 North Alexander Street
Carlisle, IN 47838
DOB: 1/25/2000

IN THE SULLIVAN Circuit COURT

CAUSE NUMBER. 77 C01 7812 F4-000 88

INFORMATION FOR COUNT III:
POSSESSION OF MARIJUANA
I.C. 35-48-4-11(a)(1)
A CLASS B MISDEMEANOR

The undersigned, being duly sworn upon his oath, says that on or about December 7, 2018, at U. S. Highway #41 in Sullivan County, State of Indiana, Lucas Alan Randall Lockard did knowingly or intentionally possess marijuana (pure or adulterated), contrary to the form of the statutes in such cases made and provided by I.C. 35-48-4-11(a)(1) and against the peace and dignity of the State of Indiana.

Ron Elliott

Subscribed and sworn to before me this____day of December, 2018.
My commission expires: 08/21/2023

Joanne Davis, Notary Public
A Resident of Sullivan County
APPROVED BY ME:

John M. Hiatt, Chief Deputy
Prosecuting Attorney

WITNESSES:
Matthew Price





**GSA8**

STATE OF INDIANA    )           IN THE SULLIVAN Circuit COURT
                  ) SS:
COUNTY OF SULLIVAN  ) **FILED**   CAUSE NUMBER. 77 C01-1812-F4-000 888
           IN CIRCUIT COURT

STATE OF INDIANA   **DEC 12 2018**   INFORMATION FOR COUNT IV:
                           DEALING IN MARIJUANA
   VS        Peggy Goodman   I.C. 35-48-4-10(a)(2)
        Clerk. Sullivan Circuit Court  A CLASS A MISDEMEANOR

LUCAS ALAN RANDALL LOCKARD
506 North Alexander Street
Carlisle, IN 47838
DOB: 1/25/2000

The undersigned, being duly sworn upon his oath, says that on or
about December 7, 2018, at U. S. Highway #41 in Sullivan County,
State of Indiana, Lucas Alan Randall Lockard did knowingly or
intentionally possess with the intent to deliver marijuana, pure or
adulterated, contrary to the form of the statutes in such cases made
and provided by I.C. 35-48-4-10(a)(2) and against the peace and
dignity of the State of Indiana.

                                    Ron Elliott

Subscribed and sworn to before me this____day of December, 2018.
My commission expires: 08/21/2023

                                    JoAnne Davis, Notary Public
                                    A Resident of Sullivan County
APPROVED BY ME:

                                    John M. Hiatt, Chief Deputy
                                    Prosecuting Attorney

WITNESSES:
Matthew Price




STATE OF INDIANA ) 
                 ) SS:
COUNTY OF SULLIVAN )

STATE OF INDIANA

    VS

LUCAS ALAN RANDALL LOCKARD

## FILED
IN CIRCUIT COURT

### DEC 12 2018

*Peggy Goodman*
Clerk, Sullivan Circuit Court

IN THE SULLIVAN Circuit COURT

CAUSE NUMBER. 77 C0H8D-F4-0W888

AFFIDAVIT FOR PROBABLE CAUSE

Count I:
Possession of Salvia
I.C. 35-48-4-11(a)(1) and I.C.
35-48-4-11(c)
a Level 6 Felony
Count II:
Dealing in Salvia
I.C. 35-48-4-10(a)(2) and I.C.
35-48-4-10(c)(2)(B)
a Level 6 Felony
Count III:
Possession of Marijuana
I.C. 35-48-4-11(a)(1)
a Class B Misdemeanor
Count IV:
Dealing in Marijuana
I.C. 35-48-4-10(a)(2)
a Class A Misdemeanor
Count V:
Possession of Methamphetamine
I.C. 35-48-4-6.1(a)
a Level 6 Felony
Count VI:
Dealing in Methamphetamine
I.C. 35-48-4-1.1(a)(2) and I.C.
35-48-4-1.1(c)(1)
a Level 4 Felony
Count VII:
Carrying a Handgun Without a
License
I.C. 35-47-2-1
a Class A Misdemeanor
Count VIII:
Possession of a Controlled
Substance
I.C. 35-48-4-7(a)
a Class A Misdemeanor
Count IX:

Affiant swears or affirms that he believes, and has good cause to believe, that:

1. Affiant herein is an investigator for Sullivan County.

2. Affiant attaches a copy of Shelburn Deputy Marshal Price's case report as probable cause for the above stated offenses.

I swear or affirm, under perjury as specified by IC 35-44.1-2-1 that the foregoing representations are true.

Ron Elliott

Subscribed and sworn to before me this_____day of December, 2018.

My commission expires: 08/21/2023

Joanne Davis, Notary Public
A Resident of Sullivan County

**GSA8**

STATE OF INDIANA ) IN THE VANDERBURGH SUPERIOR
) SS: COURT
COUNTY OF VANDERBURGH ) 2016 TERM VANDERBURGH SUPERIOR COURT

**F I L E D**

STATE OF INDIANA )
) MAR 16 2016
VS )
) Debra Y. Stuck.
JERMAINE ANTHONY JOHNSON ) CLERK

CAUSE NUMBER. 82D02-1602-F6-001093

## PLEA AGREEMENT

Comes now the State of Indiana by its Deputy Prosecuting Attorney, and states as follows:

1. That the Defendant in the above-captioned cause is charged in a TWO (2) Count Information with **Count 1: Dealing in Salvia**, a Level 6 Felony; **Count 2: False Informing**, a Class B Misdemeanor (Specific Terms and Fines are on enclosed sheet.)

2. That on _____, 2016, the Defendant indicated in open Court his intent to plead guilty as charged in Counts 1 and 2

3. That after negotiations between the Prosecuting Attorney and the Defendant's attorney, the State of Indiana has agreed to accept the Defendant's plea. Pursuant to plea negotiations, the Defendant agrees to be sentenced in Count 1 to the Indiana Department of Corrections for a period of eighteen (18) months, suspended to Drug Abuse Probation Services (DAPS). In Count 2, the Defendant agrees to be sentenced to the Indiana Department Corrections for a period of one-hundred eighty (180) days, suspended to DAPS. Counts 1 and 2 shall be served concurrently.

A) The Court will assess the Defendant and the drug and alcohol interdiction fee, which amount shall be determined by the Court, and which shall be no less than Two Hundred Dollars ($200.00) or more than One Thousand Dollars ($1,000.00). The fee shall be paid within one hundred eighty (180) days from the date of sentencing.

B) The Defendant agrees to give a sworn cleanup statement to a member of the Evansville Police Department or the Vanderburgh County Sheriff's Department concerning his knowledge of the distribution of controlled substances in the tri-state area when called upon to do so. No information received from the Defendant concerning controlled substances will be used against him/her.

GSA 9

C) The Defendant agrees to testify truthfully when called upon to so by the State of Indiana at any trial or grand jury proceeding and to make himself/herself available for trial preparation when requested by the State of Indiana.

D) If the Defendant is arrested for or charged with any new offense between the time that he enters into the agreement, and the time set for sentencing, the State reserves the right to withdraw from this agreement.

4. The Defendant shall provide a DNA sample pursuant to I.C. 10-13-6-10(a)(3) if convicted of a felony.

5. If a no contact order is in effect as a condition of bond, it is to be dismissed upon plea and sentencing in this matter.

6. If the Court sentences the Defendant directly to Alcohol Abuse Probation Services (AAPS)/Drug Abuse Probation Services (DAPS) or to probation, then community service will be served in the amount of forty (40) hours for a felony conviction or twenty-four (24) hours for a misdemeanor conviction to be served within the time limit specified by the supervising agency.

7. If required, in addition to any special conditions of Probation, the Defendant acknowledges that he has read the attached conditions of Probation, Vanderburgh County Work Release, Vanderburgh County Electronic Home Detention Program or Drug and Alcohol Supervision Program Rules. The Defendant acknowledges that he fully understands these attached rules and realizes that any violation of these rules will result in execution of the suspended or Vanderburgh County Work Release portion of his sentence. The Defendant acknowledges notice of the additional charges for any drug or alcohol program services, agrees that those charges are reasonable and necessary for the additional services provided to the Defendant, and agrees to pay those charges.

8. If a victim exists, they will be notified by mail of the terms of this agreement and will be given an opportunity to present opinions concerning it. The victim will also be notified of the time and place of the sentencing and the right to attend.

9. The Defendant agrees, as a condition of this plea negotiation, to relinquish his/her bond money to the Vanderburgh County Public Defender's Fund (if he is represented by a Vanderburgh County Public Defender) and to the payment of court costs, fees, and restitution owed in this cause.

10. The Defendant agrees that if any evidence was collected in regards to this case it can be

disposed of or destroyed by the appropriate law enforcement agency anytime after 90 days of the Defendant's sentencing. Any requests for return of personal property shall be made in writing to the evidence custodian of the appropriate law enforcement agency within ninety (90) days of sentencing.

_V⅃S_ 11. The Defendant acknowledges that if he/she is not a natural born United States citizen, signing this plea agreement could affect his/her immigration status. The Defendant has discussed fully with his/her counsel the effect of signing this plea agreement on his/her immigration status.

_V⅃S_ 12. The Defendant agrees that he/she was fully advised of and knowingly, intelligently, and voluntarily waived the right to challenge the 'reasonableness' of the Court's sentence under mitigating circumstances, and waived the right to challenge the weighing of the aggravating and mitigating circumstances. The Defendant hereby waives the right to appeal any sentence imposed by the Court, under any standard of review, **including but not limited to, an abuse of discretion standard and the appropriateness of the sentence under Indiana Appellate Rule 7(B)** so long as the Court sentences the Defendant within the terms of the plea agreement. It is further agreed that the sentence recommended and/or imposed is the appropriate sentence to be served pursuant to this agreement and that Defendant hereby waives any further request to modify the sentence under I.C. 35-38-1-17.

WHEREFORE, the State of Indiana requests that the Court order a Pre-Sentence Report pursuant to I.C. 35-38-1-8 and thereafter approve and accept the aforesaid agreement pursuant to I.C. 35-35-3-3.

Respectfully submitted,

_____
Deputy Prosecuting Attorney
Vanderburgh County Prosecutor's Office

I, **Jermaine Anthony Johnson**, Defendant in the above-entitled matter, do hereby swear and affirm under oath that I have received a copy of the above and foregoing Plea Agreement and after having fully discussed the same with my attorney, do hereby acknowledge that I understand the same and do hereby accept the conditions contained therein, and I further understand that the Court can either accept this agreement or can reject it. If rejected, I understand my original plea of not guilty will be entered on my behalf. I understand that the State and Federal Constitutions guarantee me certain rights, among those being the rights to a speedy and public trial before an impartial jury; to confront and cross-examine the witnesses against me; to use the power and process the Court to compel the production of any evidence, including the attendance of any witnesses in my favor; to have the assistance of counsel for my defense

at all stages of the proceedings, to be provided at public expense if I am indigent; and to require the State of Indiana to prove my guilt beyond a reasonable doubt at a trial in which I am presumed innocent and may not be compelled to testify, or in any way incriminate myself. I further understand that the entry of my guilty plea pursuant to this agreement works a waiver of those rights and constitutes an admission of the truth of all facts alleged in the Information and lesser included offenses therein to which I plead guilty, and that the guilty plea amounts to conviction on said count(s) of the Information, authorizing the Court to proceed with judgment and sentence. Dated this _____ day of _____ , 2016.

_____
Defendant

## CERTIFICATE

I, Nicholas G. Hermann, Prosecuting Attorney for the First Judicial Circuit of Indiana do hereby certify that a copy of the above pleading has been served on counsel for all Defendants in the above cause in person or by United States Mail on or before the date of filing.

NICHOLAS G. HERMANN
Prosecuting Attorney
First Judicial Circuit

By: _____

## Terms and Fines

### Felonies

☐   a **Level 1 Felony (General),** which carries a minimum term of imprisonment of twenty (20) years and a maximum term of imprisonment of forty (40) years, and a possible fine not to exceed Ten Thousand Dollars ($ 10,000.00).

☐   a **Level 1 Felony (Credit Restricted Felon),** which carries a minimum term of imprisonment of twenty (20) years and a maximum term of imprisonment of fifty (50) years, and a possible fine not to exceed Ten Thousand Dollars ($10,000.00).

☐   a **Level 2 Felony,** which carries a minimum term of imprisonment of ten (10) years and a maximum term of imprisonment of thirty (30) years, and a possible fine not to exceed Ten Thousand Dollars ($10,000.00).

☐   a **Level 3 Felony,** which carries a minimum term of imprisonment of three (3) years and a maximum term of imprisonment of sixteen (16) years, and a possible fine not to exceed Ten Thousand Dollars ($10,000.00).

☐   a **Level 4 Felony,** which carries a minimum term of imprisonment of two (2) years and a maximum term of imprisonment of twelve (12) years, and a possible fine not to exceed Ten Thousand Dollars ($10,000.00).

☐   a **Level 5 Felony,** which carries a minimum term of imprisonment of one (1) year and a maximum term of imprisonment of six (6) years, and a possible fine not to exceed Ten Thousand Dollars ($10,000.00).

☐   a **Level 6 Felony,** which carries a minimum term of imprisonment of six (6) months and a maximum term of imprisonment of two and a half ( 2 1/2) years, and a possible fine not to exceed Ten Thousand Dollars ($10,000.00).

### Misdemeanors

☐   a **Class A Misdemeanor,** which carries a term of imprisonment of up to one (1) year and a fine of up to Five Thousand Dollars ($5,000.00).

☐   a **Class B Misdemeanor,** which carries a term of imprisonment of up to one hundred eighty (180) days and a fine of up to One Thousand Dollars ($1,000.00).

☐   a **Class C Misdemeanor,** which carries a term of imprisonment of up to sixty (60) days and a fine of up to Five Hundred Dollars ($500.00).

_____ ORDER OF STANDARD PROBATION
_____ ALCOHOL ABUSE PROBATION SERVICE
_____ DRUG ABUSE PROBATION SERVICE

STATE OF INDIANA                                          IN THE CIRCUIT COURT
    VS          CAUSE NO.            OF VANDERBURGH COUNTY, INDIANA

It is appearing to the satisfaction of the court that you are not likely again to engage in a criminal course of conduct. Now therefore, it is hereby ordered and adjudged by the court that instead of institution treatment, you are placed on probation for a period of: _____ , expiring _____. Parties ordered in date for withheld judgment:@_____
_____. It is further ordered that you shall comply with the following conditions of probation:

1._____ Obey all laws of the state of Indiana or any other state under which you are governed and obey all orders and directions of your probation officer.

2._____ Remain within the jurisdiction of the court and report to a probation officer of the court as directed. If granted travel outside of the jurisdiction of the court, you will sign a waiver of extradition. You will report to the probation office and other designated program office(s), as you are scheduled or ordered, or upon notification by either mail or telephone. You shall follow all orders or instructions, written or verbal, of your probation officer and other designated program office(s) to include, evaluation, counseling and treatment. Failure to appear for probation/court related appointments and/or monitoring is a violation of your probation and may result in a revocation.

3._____ Not unlawfully use, possess, sell, or dispense any drug identified as a controlled substance, nor visit or frequent any place where said controlled substance or alcohol is unlawfully used, possessed, sold, or dispensed. You shall not consume any substances (K2, Spice, etc) that may cause a person to feel under the influence. You are subject to a urinalysis(drug test) or breathalyzer at any time. You must provide a valid sample of your urine for testing upon request. The provided sample must not be diluted nor adulterated which may be confirmed by the Probation Department. A drug or alcohol test result returned from the lab as diluted will be considered a positive. **You shall waive any objection to the admissibility of the results of the test as they are received by the court into evidence at any revocation hearing.**

4._____ Not drink alcohol. This means you are not to have anything in your mouth that contains alcohol (certain mouthwash, Nyquil, etc). It is your responsibility to know what you ingest or put in your mouth. A failed breathalyzer is such, regardless of what you have put in your mouth that contains alcohol.

5._____ Not consume any alcoholic beverages to a degree in which it could impair your ability to react or think in any way, which would be at a level of .04 % or more. You shall also not consume any alcoholic beverages on the day of your scheduled appointment with your probation officer or scheduled court date.

6._____ Make total restitution to the victim of your crime in the amount of $ ____ with payments to be made as prescribed by the probation department; at the rate of $ _____/month.

7._____ Pay court costs. Pay a probation administrative fee of $___, within (30) days of being placed on probation; pay an initial user's fee of $___, plus $___ per month probation user fee, inclusive of a service._ All money is paid to the Vanderburgh County Clerk, Room 216, Court Bldg., Evansville, IN by cash, certified check or money order.

8._____ Pay a $200 drug and alcohol/countermeasure fee to the clerk of Vanderburgh County, within ____ days.

9._____ Complete _____ hours community service by_____ with a local nonprofit agency approved by the probation officer. You shall also complete any additional community service hours issued as a sanction for violations of probation.

10.\_\_\_\_ Notify the court or probation officer of any change in address, phone or employment within 24 hours and permit a probation officer or the designee to visit you at your home or elsewhere. With reasonable suspicion of illegal activity, a probation officer or a law enforcement officer acting on behalf of a probation officer, has the right to search you and the premises under your control, at any time or place where you may be, including, but not limited to, the home in which you reside, your vehicle, or your person.

11.\_\_\_\_ Not possess a firearm or other deadly weapon.

12. \_\_\_ Support your dependents and meet other family responsibilities.

13. \_\_\_\_Work at suitable employment or pursue a course of study or vocational training that will equip you for suitable employment.

14. \_\_\_\_Attend and complete the court counseling workshops or "Thinking for a Change", based on the Indiana Risk Assessment results. This may be at your expense.

15.\_\_\_\_Enroll, attend and work toward completion of your high school diploma or GED as required by the Probation Department.

16.\_\_\_\_If convicted under IC 11-8-8, you are required to register with the local law enforcement agency having jurisdiction in the area where you reside or intend to reside, work or attend school. You shall register not later than three days after you arrive at that residence. If you move you must notify the local law enforcement agency of your new address, in writing, within 3 days of your change of address. Knowingly or intentionally failing to register is a Class A Misdemeanor or a Class 6 Felony if you have a prior unrelated offense under this section. You must continue to register for a minimum of 10 years after you are placed on probation. Further you shall not reside within one thousand feet of school property per IC 35-38-2-2.2.

17. \_\_\_You may be required to be evaluated by a physician to determine if you can consume Antabuse. If prescribed, you will continue taking Antabuse until the completion of your sentence, unless a physician advises you to discontinue Antabuse for medical reasons, and thereafter you will be placed on breathalyzer monitoring.

18. \_\_\_\_ Notify your probation officer within 24 hours of all medication, medical changes, medical appointments, ER visits, and hospital stays. You must provide all medications in the original container to the probation officer. A prescription will be considered valid only if the purchase date is within thirty days. All prescriptions are subject to being counted. If the pill count is not consistent with the prescription, this will be a violation of your probation. A release of information must be signed with all treating physicians. You must notify your physician of court obligations to consume Antabuse and or take daily breathalyzers. Participants are responsible for their medical care.

19. \_\_\_\_Obtain and retain an identification card from the probation office and carry this card with you into the office. If this card is lost or destroyed you will be assessed a $10.00 replacement fee. You must have your probation ID card when you are given a urinalysis or take a breathalyzer. Failure to produce this card may be counted as a **Failure to Appear.**

20.\_\_\_\_If you violate a condition of probation during the probationary period, a petition to revoke your probation may be filed before the earlier of the following: (A) one (1) year after the termination of probation; (B) forty-five (45) days after the state receives notice of the violation.

21. \_\_\_Not serve as a confidential informant for any agency, unless approved by your sentencing judge.

22. \_\_\_\_Not harrass or threaten any employee of the Vanderburgh County Adult Probation Department and agree to cooperate fully with any probation officer or person acting on behalf of the probation officer, during the course of your supervision. You shall not falsify any written or oral report to any employee of the Vanderburgh County Probation Department.

Special conditions of probation:

23. ___



You are placed on notice that the Court, may at anytime it finds you in violation of probation, revoke your probation and impose any sentence which it might have imposed before placing you on probation.


DONE AND ORDERED BY THE COURT, this _____* day of _*_____, 2015
ORIGINAL SENTENCING DATE: _*_____

_____
*, Judge

_____
*, Probation Officer

I hereby acknowledge receipt of a copy of this order from the above named probation officer and fully understand the contents of same.

_____
*, Probationer

Revised July 2014

GSA 9



## STATE OF INDIANA
## COUNTY OF VANDERBURGH

### SENTENCING ORDER

VANDERBURGH SUPERIOR COURT
FILED
509
MAR 16 2016
Debra L. Stuck
CLERK

| Case Name | Case Number | Court |
|---|---|---|
| State of Indiana v. Jermaine Anthony Johnson | 82D02-1602-F6-001093 | Vanderburgh Superior Court 2 |

| Judicial Officer | Prosecutor | Defense Attorney |
|---|---|---|
| Trockman, Wayne S | Martha Jane Posey | Jacklyn R. Buente |

| Date of Offense | Date of Sentencing | TCN Number |
|---|---|---|
| 02/20/2016 | 03/16/2016 | 8210127315 |

**The Defendant was charged with the following crimes, resulting in the following Dispositions under the above-referenced cause:**

| PART I | | CHARGES | | | |
|---|---|---|---|---|---|
| COUNT | | CRIME | GOC | STATUTORY CITATION | DISPOSITION |
| I | | 35-48-4-10(a)(2)/F6: Dealing in Salvia Dealing in salvia weighing b/t 5 & 300 grams. | | 35-48-4-10(a)(2) | Plea by Agreement |
| II | | 35-44.1-2-3(d)(1)/MB: False Informing def. gives a false report of commission of crime or gives fal | | 35-44.1-2-3(d)(1) | Plea by Agreement |

**As a result of the above convictions, the Court has sentenced the defendant as follows:**

| PART II | | SENTENCE | | | | |
|---|---|---|---|---|---|---|
| COUNT | SENTENCE | SUSPENDED | CONCURRENT | CONSECUTIVE | WITH (COUNT OR CASE NUMBERS) | |
| I | 1 Year(s) and 180 Day(s) | 1 Year(s) and 180 Day(s) | X | | Counts I and II run concurrent | |
| II | 0 Year(s) and 180 Day(s) | 0 Year(s) and 180 Day(s) | X | | | |

| COUNT | CONFINEMENT TYPE | CONFINEMENT COMMENTS |
|---|---|---|
| I | Indiana Department of Correction | Defendant is entitled to credit for time served from 2/20/16 - 3/15/16. |
| II | Indiana Department of Correction | |

**The Defendant is to serve this sentence at:**

| PART III | CREDIT TIME CALCULATION | | |
|---|---|---|---|
| | TYPE | START DATE | END DATE |
| Incarceration (All Credit Days apply to Case Number 82D02-1602-F6-001093) | | 2/20/16 | 3/15/16 |

| PART IV | | SENTENCING CONDITIONS | | | |
|---|---|---|---|---|---|
| | CONDITION | DURATION | LOCATION | AMOUNT/COMMENT | EFFECTIVE | END |
| Drug/Alcohol Monitoring | | | SUSPENDED to Drug Abuse Probation Services (DAPS). Defendant ordered to pay $200 drug and alcohol interdiction fee in 180 days. Costs of this action assessed against the Defendant, payable in 180 days. | 03/16/2016 | |

**GSA 10**

| PART V | MONETARY OBLIGATIONS |
|---|---|

**Restitution**

In the Amount of $.

| Awarded To: | Awarded Against: | Payable Through |
|---|---|---|
| | | ☐ Vanderburgh County Clerk |
| | | ☐ Vanderburgh County Probation |

Comments:

| PART VI | ADDITIONAL SENTENCING INFORMATION |
|---|---|

| Date to Report for Incarceration | Additional Comments and Orders |
|---|---|
| 03/16/2016 | |

_____
Judicial Officer

3/16/2016
Date

**GSA 10**